UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CV 10520**

**JUDGE MARRERO**

-----------------------------------------------------------------x

IGY OCEAN BAY PROPERTIES LIMITED and
ISLAND GLOBAL YACHTING LTD.

                              Plaintiffs

                -against-

OCEAN BAY PROPERTIES I LIMITED,
OCEAN BAY PROPERTIES II LIMITED,
BRITISH COLONIAL DEVELOPMENT COMPANY
LIMITED, PRK HOLDINGS LTD., ADURION
CAPITAL LIMITED and GEORGE ALLEN,

                       Defendants

-----------------------------------------------------------------x

:  Civil Action No.

:  NOTICE OF REMOVAL

NOV 2 1 2007

U.S.D.C. S.D.N.Y.
CASHIERS

PLEASE TAKE NOTICE THAT Defendants Ocean Bay Properties I Limited,

Ocean Bay Properties II Limited, British Colonial Development Company Limited, PRK

Holdings Ltd., Adurion Capital Limited and George Allen, by and through their

undersigned counsel, without waiving any arguments, claims or defenses (including those

available pursuant to Fed. R. Civ. P. 12(b)), respectfully submit this Notice of Removal

pursuant to 28 U.S.C. §§ 1441 and 1446 for the removal of the above-captioned action

from the Supreme Court of the State of New York, County of New York to this

Honorable Court, and in support state:

           1.      On October 9, 2007, plaintiffs IGY Ocean Bay Properties Limited

("IGY") and Island Global Yachting Ltd. ("IGYL" and, collectively with IGY,

"Plaintiffs"), filed a Complaint, captioned *IGY Ocean Bay Properties Limited and Island*

*Global Yachting Ltd. v. Ocean Bay Properties I Limited, Ocean Bay Properties II*

*Limited, British Colonial Development Company Limited, PRK Holdings Ltd., Adurion*

*Capital Limited and George Allen*, Index No. 603307-07, in New York State Supreme Court, County of New York. A copy of Plaintiffs' Summons and Complaint is annexed hereto as Exhibit A.

      2.    On or about October 26, 2007, the Summons and Complaint was served upon Davis & Co., as registered agent for Ocean Bay Properties I Limited ("OBI"), Ocean Bay Properties II Limited ("OBII"), British Colonial Development Company Limited ("BCDC"), and PRK Holdings Ltd. ("PRK") (collectively, with Adurion Capital Limited ("Adurion") and George Allen, "Defendants"). Each of the aforementioned parties received copies of the Summons and Complaint from Davis & Co. on or about October 26, 2007.

      3.    On or about October 31, 2007, Adurion Capital Limited was served by personal delivery.

      4.    On or about October 24, 2007, George Allen was served by personal delivery.

      5.    As this notice of removal is filed within thirty days of each defendant's respective receipt of the Summons and Complaint, it is timely pursuant to 28 U.S.C. § 1446.

      6.    In their Complaint, Plaintiffs assert seven claims for relief. First, Plaintiff IGY alleges that Defendants OBI, OBII and BCDC breached the terms of the Purchase Agreement between OBI, OBII, BCDC and Plaintiff IGY by "refusing to agree upon the Shareholders' Agreement" contemplated in the Purchase Agreement. Compl. ¶ 64. Second, Plaintiff IGY seeks specific performance, asking that OBI, OBII and BCDC be ordered to approve the Shareholders' Agreement and convey the property pursuant to

the terms of the Purchase Agreement.  See id. ¶¶ 68-74.  Third, Plaintiff IGY claims that

Adurion Capital Limited, which allegedly acquired "a majority economic interest and a

voting interest in British Colonial" tortiously interfered with the Purchase Agreement

between IGY, OBI, OBII and BCDC.  Id. ¶ 79.  Fourth, Plaintiffs IGY and IGYL claim

that Adurion tortiously interfered with the business relationship they had with OBI, OBII

and BCDC.  See id. ¶¶ 81-87.  Fifth, Plaintiff IGY alleges a fraudulent inducement claim

against all Defendants based on alleged misstatements made by George Allen, allegedly

the "Agent of the Sellers."  Id. ¶¶ 90-91.  Sixth, Plaintiff IGY asserts a common law

unfair competition claim against all defendants.  Id. ¶¶ 95-100.  Seventh, Plaintiffs allege

that all of the Defendants tortiously interfered with IGY and IGYL's business

relationship with the Bahamian Government, thereby preventing them from "participating

in the Project or any other similar Project in the Bahamas."  Id. ¶ 105.

### GROUNDS FOR REMOVAL

7.    This action is removable based on the Court's diversity jurisdiction

pursuant to 28 U.S.C. § 1332(a).  Diversity jurisdiction exists "where the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is

between ... citizens of different States and in which citizens or subjects of a foreign state

are additional parties."  28 U.S.C. § 1332(a)(3).

### The Amount In Controversy Exceeds $75,000

8.    The allegations in the Complaint demonstrate that the amount in

controversy more likely than not exceeds $75,000, exclusive of costs and interest.  In

their Complaint, Plaintiffs allege, among other things, that with regard to their first, third, fourth, fifth, sixth and seventh causes of action, they seek damages "in an amount yet to be determined but believed to be no less than $85,000,000." Accordingly, the amount in controversy unquestionably exceeds $75,000 exclusive of interest and costs.

### There is Complete Diversity Among the Parties

9.      Complete diversity of citizenship exists between Plaintiffs and Defendants. Plaintiff IGY is a corporation organized under the laws of the Commonwealth of the Bahamas with its principal place of business at 717 Fifth Avenue, New York, New York. *See* Compl. ¶ 14. Plaintiff IGYL is a corporation organized under the laws of the Cayman Islands with its principal place of business at 717 Fifth Avenue, New York, New York. *See id.* ¶ 15. Pursuant to 28 U.S.C. § 1332(c)(1), Plaintiffs are deemed to be citizens of New York State. See Phoenix Four, Inc. v. Strategic Resources Corp., 446 F.Supp.2d 205 (S.D.N.Y. 2006).

10.     Defendant George Allen, a United States citizen, is an individual residing in Vero Beach, Florida.

11.     Defendant OBI is a corporation organized under the laws of the Commonwealth of the Bahamas. OBI's principal place of business is in Nassau, Bahamas.

12.     Defendant OBII is a corporation organized under the laws of the Commonwealth of the Bahamas. OBII's principal place of business is in Nassau, Bahamas.

13.    Defendant BCDC is a corporation organized under the laws of the Commonwealth of the Bahamas.  BCDC's principal place of business is in Nassau, Bahamas.

14.    Defendant PRK is a corporation organized under the laws of the Commonwealth of the Bahamas.  PRK's principal place of business is in Nassau, Bahamas.

15.    Defendant Adurion is a corporation organized and existing under the laws of England and Wales.  Adurion's principal place of business is in London, England.

16.    Based on the foregoing, this Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  See Bank of New York v. Bank of America, 861 F. Supp. 225 (S.D.N.Y. 1994).

17.    Removal of this case on the basis of diversity is not precluded by the provisions of 28 U.S.C. § 1441(b) because none of the Defendants are citizens of New York, the state in which the action was brought.

## CONCLUSION

18.    By removing this action, Defendants do not waive any defenses or counterclaims they may have, including but not limited to lack of personal jurisdiction. In addition, nothing in this Notice shall be construed as an admission by defendant, implied or otherwise, of any fact or allegation set forth in the Complaint.

**WHEREFORE,** Defendants request that the New York State Supreme Court, New York County, proceed no further with Index No. 603307-07, and that said action be removed from that court to the United States District Court for the Southern District of New York.

Dated: New York, New York
       November 21, 2007

                                Respectfully submitted,

                                Bruce S. Meyer (BM-3506)
                                Ryan P. Poscablo (RP-8496)
                                Weil, Gotshal & Manges LLP
                                767 Fifth Avenue
                                New York, NY 10153
                                (212) 310-8000

                                John T. Morin (JM-0390)
                                Jennifer L. Marlborough (JM-4303)
                                Wormser, Kiely, Galef & Jacobs LLP
                                825 Third Avenue
                                New York, NY 10022
                                (212) 687-4900

                                *Attorneys for Defendants*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

IGY OCEAN BAY PROPERTIES
LIMITED and ISLAND GLOBAL
YACHTING LTD.

        Plaintiffs,

    v.

OCEAN BAY PROPERTIES I LIMITED,
OCEAN BAY PROPERTIES II LIMITED,
BRITISH COLONIAL DEVELOPMENT
COMPANY LIMITED, PRK HOLDINGS
LTD., ADURION CAPITAL LIMITED and
GEORGE ALLEN,

        Defendants.

---

Index No. _603307-07_

**SUMMONS**

    You are hereby summoned and required to serve upon Plaintiffs' attorneys an answer to the complaint, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

    The basis of the venue designated is Plaintiffs' residence.

Dated:  New York, New York
       October 5, 2007

               GREENBERG TRAURIG, LLP

               By:

               Simon Miller
               Sophia Tsokos
               200 Park Avenue
               New York, New York 10166
               (212) 801-9200

               *Attorneys for Plaintiffs*

NEW YORK
COUNTY CLERK'S OFFICE

[OCT 0 9 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IGY OCEAN BAY PROPERTIES
LIMITED and ISLAND GLOBAL
YACHTING LTD.

        Plaintiffs,

        v.

OCEAN BAY PROPERTIES I LIMITED,
OCEAN BAY PROPERTIES II LIMITED,
BRITISH COLONIAL DEVELOPMENT
COMPANY LIMITED, PRK HOLDINGS
LTD., ADURION CAPITAL LIMITED and
GEORGE ALLEN,

        Defendants.

Index No. 603307/07

**COMPLAINT**

    Plaintiffs IGY Ocean Bay Properties Limited ("IGY") and Island Global Yachting Ltd. ("IGYL"), as and for their complaint against Defendants Ocean Bay Properties I Limited, Ocean Bay Properties II Limited (the "Ocean Bay Entities"), British Colonial Development Company Limited ("British Colonial"), PRK Holdings, Ltd. ("PRK"), Adurion Capital Limited ("Adurion") and George Allen ("Allen") (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

    1.    This action arises from the breach by the Defendant Sellers[1] of a Purchase Agreement for the sale of a parcel of land in the Commonwealth of the Bahamas (the "Bahamas"), and also Defendants' tortious interference with Plaintiffs' existing and prospective contractual relationships, unfair competition, and the fraud in the inducement of Defendants Allen, the Ocean Bay Entities, British Colonial and PRK.

---

[1]    Any capitalized terms which are not defined in the Nature of the Action have the meanings ascribed to them in the Factual Background below.

2.      IGY (also referred to herein as "Purchaser") and Defendants the Ocean Bay Entities and British Colonial (together with PRK, collectively, the "Sellers" or the "Seller Defendants") entered into a Purchase Agreement for the purchase of waterfront property owned by the Sellers adjoining the British Colonial Hilton Hotel located in Nassau, Bahamas (the "Property"), to develop an offshore, mixed-use mega-yacht marina and resort development (the "Project"). Because the Sellers wanted to retain a portion of the equity interest in the Property, the Purchase Agreement provided that the purchase price would be comprised of $8 million in cash payable by IGY and a $10 million equity interest in IGY given to the Sellers at closing. Accordingly, in the Purchase Agreement, the parties agreed that after the closing IGY would be a Joint Venture entity that would own, develop and operate the Property, with the shareholders of IGY being the Sellers on the one hand, and on the other hand Island Global Yachting Facilities Ltd. ("IGY Facilities"), a wholly-owned subsidiary of IGY's parent company, IGYL, or a designated affiliate of IGY Facilities (the "Joint Venture"). In anticipation of the Joint Venture, the Purchase Agreement also contained a lengthy, detailed and comprehensive outline of the terms of a Shareholders' Agreement that would govern the relationship among the parties in IGY post-closing. The parties contemplated drafting a separate document constituting a form Shareholders' Agreement, to be executed at closing.[2] The Purchase Agreement required the parties to act in good faith with respect to the negotiation and approval of the Shareholders' Agreement.

3.      Specifically, Sellers had an obligation not to "unreasonably withhold, condition or delay [their] approval of" the Shareholders' Agreement. As a finalized Shareholders' Agreement was the *sine qua non* of the closing of the transaction. In order for IGY properly to obtain the

---

[2]      The parties refer to the "Operating Agreement" and its successor, the "Shareholders' Agreement" interchangeably; for clarity, the document will be referred to herein as the Shareholders' Agreement.

necessary approvals from the Government of the Commonwealth of the Bahamas (the "Bahamian Government") – through a document from the Bahamian Government called a "Heads of Agreement" – which would allow it to purchase the Property, lease the seabed, own, develop and operate the proposed Project, IGY had to provide the Bahamian Government with evidence that IGY would be the rightful owner of the Property. Thus, the Bahamian Government would not grant IGY the Heads of Agreement giving it the right to purchase and develop the Property, or to use the adjacent seabed, without knowing that IGY was or would become the rightful owner of parcels that would comprise or facilitate access to the development Project. Without a Heads of Agreement, the contemplated transaction could not close, nor could the Project be undertaken. IGY applied for an "Approval in Principle," the precursor to the Heads of Agreement in March 2006.

4.       According to the specific terms set forth in the Purchase Agreement, the parties drafted the required Shareholders' Agreement between September 2006 and December 2006. IGY gave a draft of the Shareholders' Agreement to the Sellers in September 2006. Because the Shareholders' Agreement had already been substantially negotiated, the Sellers had few comments, which they delivered to IGY. By December 2006, every comment given by the Sellers was either incorporated into the draft Shareholders' Agreement or satisfactorily addressed by IGY, and the parties had agreed upon the form of the Shareholders' Agreement that could be submitted to the Bahamian Government in connection with obtaining the Heads of Agreement. After all of their comments were addressed, the Sellers neither indicated that they had any additional comments, nor did they respond that the Agreement was unacceptable in any way. On or about December 7, 2006, the Bahamian Government granted its Approval in Principle to the Project.

5.      Throughout the course of the transaction, IGY committed nearly $1 million conducting due diligence and other activities in connection with closing, incurring legal fees in connection with the negotiation of the agreements, engaging third parties to assist in the planning, design and permitting process, and engaging third party consultants in respect to discussions with the Bahamian Government, among other things.

6.      As the work progressed (with IGY bearing both the laboring oar and the expense), in approximately early December 2006, the Defendant Sellers and their agent, Allen, advised that a majority economic interest and a voting interest in British Colonial had been acquired in some manner by Adurion, and British Colonial requested IGY's consent, under the Purchase Agreement, to assign some of the Sellers' rights under the Purchase Agreement to Adurion.

7.      At this critical stage of the transaction, which was close to closing after over an entire year's worth of work by IGY, to induce IGY to agree to the assignment, the Sellers and their agent, Allen, specifically represented to IGY that Adurion would stand by the transaction as already agreed upon and would not block the closing or try to renegotiate the deal. IGY justifiably relied on the representations made by Sellers and Allen, which repeatedly reaffirmed that Adurion's participation in the upper tier entities associated with Sellers would not have any impact on the desire or determination of Sellers to close the transaction. Allen and the Sellers led IGY to believe that the transaction would proceed to closing and that Adurion would not fail to honor the agreements previously agreed upon by the Sellers.

8.      However, as soon as Adurion acquired its interest, it immediately began to attempt to renegotiate the terms that had been agreed pursuant to the Purchase Agreement, including the sale price, various obligations, and management rights.

4

9.    Most significantly, evidently believing that the Sellers should get a better deal than that already agreed to in writing, Adurion caused the Sellers to refuse to approve the form of Shareholders' Agreement which had already been substantially agreed upon by the Sellers prior to Adurion's involvement, which was prepared in conformance with the detailed terms in the Purchase Agreement, and which was the *sine qua non* of obtaining the Heads of Agreement and closing the transaction.  Instead, Adurion raised, and caused the Sellers to raise, additional objections and comments to the Shareholders' Agreement that were inconsistent with both the fundamental terms of the Joint Venture outlined in the Purchase Agreement, and were also in breach of the Seller's obligations, under the Purchase Agreement, to act in good faith with respect to the negotiation and approval of the Shareholders' Agreement.  Specifically, Sellers breached their obligation not to "unreasonably withhold, condition or delay [their] approval of" the Shareholders' Agreement.

10.    On information and belief, Adurion controlled the Sellers and prevented them from approving the agreed upon documents, and Defendants' actions unilaterally prevented the closing from taking place.

11.    After having caused, through their unilateral and wrongful actions and contractual breaches, the transaction not to proceed to closing, Defendants then sent a letter in July 2007 purporting to terminate the Purchase Agreement, claiming that IGY breached by not meeting the closing deadline.  Pursuant to the clear terms of the Purchase Agreement, such "termination" was invalid.

12.    And now, after purporting to terminate the Purchase Agreement with IGY and in violation of the confidentiality provisions of that Purchase Agreement, Defendants have, on information and belief, misappropriated the work product generated by IGY over the course of

5

more than a year in good faith, and in reliance on the signed Purchase Agreement, including the results of IGY's extensive negotiations with the Bahamian Government with whom it worked closely. On information and belief, Defendants intend to use the work product in order to develop the Project with a different investor.

13.     Defendants' breaches of contract, tortious interference, fraud in the inducement and unfair competition have harmed Plaintiffs, who as a result lose the benefit of their bargain in this deal. In addition, Defendants' actions could cause irreparable harm to the fundamental business plan of IGYL and IGY which is to develop, own and operate luxury marina facilities, in this case on the island of Nassau and New Providence Island. This is because any new development would require IGYL to engage in the same process to obtain a Heads of Agreement, and the same officials within Government who worked on this transaction closely with IGYL might consider that IGYL does not have the ability or intention to complete an alternative marina development due to the failure to complete this transaction. Because the Property and Project are unique, and on information and belief is the sole site upon Nassau on which a Project of this type could be built, IGY is irreparably harmed. Accordingly, IGY is entitled to specific performance as well as damages for Defendants' actions.

## PARTIES

14.     Plaintiff IGY Ocean Bay Properties Limited is a corporation organized under the laws of the Commonwealth of the Bahamas with its principal place of business at 717 Fifth Avenue, New York, New York.

15.     Plaintiff Island Global Yachting Ltd. is a corporation organized under the laws of the Cayman Islands with its principal place of business at 717 Fifth Avenue, New York, New York.

16.    On information and belief, Defendant Ocean Bay Properties I Limited is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

17.    On information and belief, Defendant Ocean Bay Properties II Limited is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

18.    On information and belief, Defendant British Colonial is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

19.    On information and belief, Defendant PRK is a corporation organized and existing under the laws of Canada.

20.    On information and belief, Defendant Adurion is a corporation organized and existing under the laws of the United Kingdom.

21.    On information and belief, Defendant Allen is an individual residing in Florida.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the causes of action herein.   The Purchase Agreement among the parties provides for exclusive jurisdiction and venue in State or federal court in New York county, and the parties consented to jurisdiction and venue in such court.

23.    Venue is proper pursuant to CPLR § 503 because Plaintiffs have their principal place of business in the County of New York.

24.    Personal jurisdiction over Defendants is proper because Defendants consented to jurisdiction in the Purchase Agreement, the causes of action alleged herein arise out of the transaction of business within the State of New York, tortious acts committed within the State, and tortious acts causing injury within the State, and because on information and belief, Defendants transact business in the State of New York.

## FACTUAL BACKGROUND

25.    IGY is an indirect, wholly-owned subsidiary of IGYL which, together with its affiliates, is a premier owner, developer and operator of luxury yacht marinas, yachting-oriented destinations and related facilities throughout the world. IGYL and its affiliates currently own, operate and develop or seek to develop numerous marinas worldwide, primarily with the intention of offering high quality services to the yachting industry. Since its inception, IGYL has exerted great effort to promulgate and protect its brand-name and reputation. Indeed, the Island Global Yachting name and services have become widely known and have acquired a worldwide reputation for excellence and significant goodwill.

26.    On or about November 7, 2005, IGY and Defendants, the Ocean Bay Entities and British Colonial, entered into a Purchase Agreement (the "Purchase Agreement"), providing for the purchase by IGY of the Ocean Bay Property consisting of approximately five acres of prime undeveloped waterfront property in downtown Nassau, The Bahamas. On information and belief, the Property is owned by Defendants the Ocean Bay Entities which, in turn, are owned by British Colonial.

27.    The Property on which the marina and resort were to be developed is unique, and is on information and belief the only viable site for IGY for such a Project on the island of Nassau, the Bahamas.

28.    On this Property, and the adjoining seabed to be leased from the Bahamian Government, IGY planned to develop an offshore, mixed-use mega-yacht marina and resort development with up to 72 slips and an upland development comprising a condo-hotel with up to 200 units, 24 beachfront villas, office and related facilities, retail, residential and an area for parking.

29.    Under the Purchase Agreement, the Sellers were to receive at closing $18 million made up of $8 million in cash payable by IGY and a $10 million equity interest in IGY. Accordingly, in the Purchase Agreement, the parties agreed that after the closing IGY would be a Joint Venture entity that would own, develop and operate the Property, and the shareholders would be the Sellers on the one hand, and IGY Facilities, a wholly owned subsidiary of IGY's parent company, IGYL, or a designated affiliate of IGY Facilities. The Purchase Agreement set forth the terms governing the parties' relationship in the Joint Venture at the time of closing, and provided that the Sellers and IGY Facilities or its designated affiliate would enter into an Amended and Restated Operating Agreement for IGY (the "Shareholders' Agreement") that would govern their relationship in IGY post-closing. Further, the Purchase Agreement provided that the parties would use their good faith efforts to do so within 90 days of the Purchase Agreement. At the time of the Purchase Agreement, the parties had already extensively negotiated the fundamental terms of the Shareholders' Agreement, and a detailed, comprehensive, nine page outline of its terms was attached as Schedule A to the Purchase Agreement.

30.    Entering into the Shareholders' Agreement was a *sine qua non* of the Project moving to closing. A fully agreed upon form of Shareholders' Agreement was required by the Bahamian Government before it would grant to IGY what is referred to as a "Heads of Agreement" – that is, the Bahamian Government required evidence that IGY would be the proper and rightful owner of the Property before it could grant the Heads of Agreement. The Heads of Agreement would be, in effect, a license agreement between IGY and the Bahamian Government, permitting the sale of the Property to IGY, approving the Project, and permitting IGY to use the seabed adjacent to the Property, which was clearly critical to the Project to

9

develop an offshore, mixed-use marina. Indeed, the Purchase Agreement provided if such Heads of Agreement could not be obtained, either party had the option to terminate the Purchase Agreement. Without the Heads of Agreement, the transaction could never close because the Heads of Agreement would also give the necessary approval by the Bahamian Government for the sale of the Property.

31.    The Purchase Agreement contained several sections requiring the Sellers to act in good faith – particularly in connection with the Shareholders' Agreement which was a prerequisite to obtaining the necessary Government approvals and Heads of Agreement. Pursuant to Section 5.05 entitled "Additional Covenants," the Sellers covenanted, in relevant part:

> Seller shall use its good faith, commercially reasonable and diligent efforts to assist Purchaser in (i) securing the Necessary Approvals, whether by amendment, extension and assignment of the Existing Heads of Agreement in the name of Purchaser or otherwise, and (ii) negotiating and finalizing the terms and provisions of the Amended and Restated Operating Agreement.

32.    Accordingly, the Sellers represented that they would cooperate with IGY in obtaining all necessary approvals from the Bahamian Government, specifically, on paragraph D of page 1 of the Purchase Agreement:

> Seller has indicated that it now has or can assist Purchaser in its efforts to obtain all of the permits, licenses and approvals that may be necessary for Purchaser to (i) obtain the right from the Government of the Commonwealth of the Bahamas, by easement, lease, irrevocable license or otherwise, to use, develop and occupy the Submerged Land, and (ii) develop a mixed-use Project on the Ocean I Property, the Ocean II Property and the Submerged Land, including, but not limited to, a mega-yacht marina and attendant facilities as well as other uses (such as retail, commercial, parking and/or residential properties) that Purchaser determines may be appropriate for the Ocean Bay Property, all as more specifically described on <u>Schedule "B"</u> attached hereto (the "<u>Potential Development</u>")

Such obligations would also include the Sellers' obligations to approve and execute necessary documents such as the Shareholders' Agreement, in connection with such approvals, and the Sellers represented they had authority to do so.

33.     Pursuant to Section 7.03 of the Purchase Agreement, entitled "Good Faith Efforts; Critical Path Schedule," the parties agreed to "use their respective good faith and commercially reasonable efforts to cause the critical path milestones in the transaction" to be satisfied.  More specifically, the parties agreed that:

> Seller and Purchaser covenant and agree that they shall use their respective commercially reasonable, diligent and good faith efforts to agree upon the form of Amended and Restated Operating Agreement within ninety (90) days of the date hereof and neither shall unreasonably withhold, condition or delay its approval of the same; *provided, however,* that the parties agree that, without limitation, it shall be reasonable for either party to disapprove a proffered form of Amended and Restated Operating Agreement on the basis that the same is inconsistent with the terms of Schedule A in a manner that is materially adverse to its interest.

(Emphasis added).

34.     Further, Section 5.02 of the Purchase Agreement contained a confidentiality agreement, whereby the Sellers agreed to hold confidential (and to cause their agents to hold confidential) and not disclose "all information, whether written or oral, furnished to Seller about Purchaser, its Affiliates or their business and affairs, including, without limitation, the IGY Partnership Agreement and the IGY Unaudited Financials."  This definition prohibited Sellers from disclosing any type of "confidential information, including analyses, compilations, studies or other documents prepared," and further prohibited disclosure of the Purchase Agreement and transactions contemplated thereby.

35.    The Purchase Agreement specified an Outside Closing Date of September 30, 2006, subject to Purchaser's right to extend for two thirty-day periods.

36.    As required by the Purchase Agreement, promptly upon the signing of the Purchase Agreement in November 2005, on March 28, 2006 IGY filed a development proposal to apply for Approval in Principle from the Ministry of Financial Services and Investments of the Bahamian Government. IGY worked closely over the course of the next year with the Bahamian Government to obtain the approvals required for the Project, and also to reach a Heads of Agreement with the Government.

37.    Over the course of the next nine months, the parties obtained the certifications and necessary approvals needed to close the transaction. On or about December 7, 2006, IGY received approval of the Proposed Development by the National Economic Counsel of the Bahamian Government as well as an Approval in Principle from the Ministry of Financial Services and Investments of the Bahamian Government to construct a mixed-use mega-yacht marina and resort development (the "Approval in Principle"). IGY also received approval of the proposed sale transaction, which would result in a Heads of Agreement provided that a Shareholders' Agreement was entered into by the parties.

38.    In addition, during this time, on the basis of the detailed terms for the Shareholders' Agreement set forth in the Purchase Agreement, IGY gave a draft of the Shareholders' Agreement to the Sellers in September 2006. Because the Shareholders' Agreement had already been substantially negotiated, the Sellers had few comments to the Shareholders' Agreement which they delivered to IGY, and IGY incorporated or otherwise satisfactorily addressed all of the Sellers' comments. By early December 2006, the parties had agreed upon the form of the Shareholders' Agreement that could be submitted to the Bahamian

12

Government in connection with obtaining the Heads of Agreement – after all of the Sellers'

comments had been addressed, the Sellers did not indicate that they had any additional

comments, nor did they indicate that the Shareholders' Agreement was unacceptable in any way.

Moreover, Sellers had an obligation under the Purchase Agreement not to "unreasonably

withhold, condition, or delay [their] approval" of the Shareholders' Agreement.

39.    The form of Shareholders' Agreement which was agreed upon was consistent

with the requirements of the Purchase Agreement.

40.    IGY spent nearly $1 million throughout the course of the transaction, drawing up

plans required by the Bahamian Government, obtaining licenses and permits, conducting due

diligence investigations, legal fees and costs, and engaging third parties to prepare reports,

studies, analyses and design plans necessary for closing and in an effort to lay the groundwork

for Government approval.    IGY retained Bahamian local legal counsel and third party

consultants to provide lobbying and advisory services, perform environmental investigations

including a Phase 1 Site Assessment, complete residential market studies, perform a wind/wave

engineering study, develop a parking study, perform a geotechnical investigation, provide

conceptual design services relating to the marina, hotel, retail, office and parking, and provide

several artistic renderings of the Project. In addition, during the entire time IGY was negotiating

the Heads of Agreement with the Bahamian Government.

41.    Pursuant to the Purchase Agreement, IGY expected that the Sellers would, at the

closing, execute the Shareholders' Agreement that had been agreed to, which was a prerequisite

to a Heads of Agreement.    Without a Heads of Agreement the entire Project would be

terminated.

**Adurion's Involvement Beginning in December 2006**

42.     In approximately early December 2006, Defendant Sellers and their agent, Allen, advised IGY that a majority economic interest and voting interest in British Colonial had been acquired in some manner by Adurion. Pursuant to Section 10.07 of the Purchase Agreement, which required IGY's consent before the Sellers could assign the Purchase Agreement to another party, British Colonial requested that IGY consent to the assignment of some portion of British Colonial's interest to Adurion.

43.     In connection with the request, Allen, on behalf of the Sellers specifically assured IGY that Adurion intended to cooperate in closing the transaction in accordance with the Purchase Agreement. Allen, on behalf of the Sellers, specifically advised a representative of IGY and counsel for IGY that Adurion would not seek to alter the existing contractual arrangement between the parties or fail to honor the agreements previously agreed upon by the Sellers.

44.     In addition, the Sellers continued to represent that they would approve the Shareholders' Agreement which was a prerequisite to receiving the Heads of Agreement. Adurion also represented to IGY that it intended to proceed to closing of the transaction which was in place, and in respect to which IGY had been incurring extensive expense and effort over the course of more than a year to bring to closing.

45.     In fact, in order to induce IGY to give its consent to the assignment to Adurion, in early December 2006 the agent of the Sellers, Allen, specifically told a representative of IGY that Adurion intended to proceed to closing the transaction which had been negotiated, that Adurion's involvement would not block the closing, and that Adurion intended to honor the

Sellers' obligations under the Purchase Agreement, including approving the Shareholders' Agreement.

46.    Relying on these representations, IGY gave its consent to the assignment of a portion of the Purchase Agreement to Adurion. In addition, IGY requested an extension of the Outside Closing Date first to January 31, 2007, then to June 30, 2007, to allow the Bahamian Government sufficient time to issue the Heads of Agreement. Defendants agreed to the January 31, 2007 extension specifically, and did not refuse the June 30, 2007 extension.

47.    In contrast to the explicit representations of the Sellers and Allen to induce IGY to consent to the assignment to Adurion, almost immediately after the assignment Adurion began to demand to revisit the agreements among IGY, British Colonial and the Ocean Bay Entities, and the Shareholders' Agreements exchanged by the parties in order to renegotiate the terms of the deal, including the purchase price, that had been agreed upon.

48.    In particular, Adurion demanded the renegotiation of the Shareholders' Agreement which had already been agreed to by the parties prior to Adurion's involvement in early December 2006.

49.    On information and belief, all of a sudden Adurion refused to permit the Sellers to approve the Shareholders' Agreement, causing the Sellers to renege on the deal. Adurion raised, and caused the Sellers to raise, additional objections and comments to the Shareholders' Agreement that were inconsistent with both the fundamental terms of the Joint Venture outlined in the Purchase Agreement and Sellers' explicit obligations in the Purchase Agreement to act in good faith with respect to the negotiation and approval of the Shareholders' Agreement.

50.    Instead, Adurion demanded and caused the Sellers to demand that the boundaries of the Property that would be sold should be decreased so as not to include certain portions of the

land, and demanded that the purchase price should be increased, that IGY take on additional obligations, that the Seller group be granted additional management rights over the development Project (even though Defendants do not have the expertise in marina development that IGY, whose entire business is devoted to it, does), as well as renegotiating the limits of the marina, site configuration and emergency access to the British Colonial hotel site, *inter alia*.

51.    Adurion's actions and the actions it caused all of the other Defendants to take, thereby prevented IGY from ever obtaining the necessary Heads of Agreement. Defendants thereby unilaterally prevented the closing. Defendants' actions undercut all of the agreements that had already been negotiated among the parties in this transaction that was approaching closing, and undercut all of the extensive work undertaken by IGY for more than one year.

52.    Adurion's failure and refusal to permit the Sellers to approve the agreed upon Shareholders' Agreement, pursuant to the Purchase Agreement, was done in bad faith, even though it knew that the approved Shareholders' Agreement was the *sine qua non* of the transaction proceeding to closing, because without it the Bahamian Government would not give its Heads of Agreement. Sellers' obstruction of the closing by failure to approve the Shareholders' Agreement was in breach of Sellers' obligations under the Purchase Agreement, including but not limited to Section 7.03 which prohibited them from "unreasonably withhold[ing], condition[ing], or delay[ing] . . . approval" of the Shareholders' Agreement.

53.    Thus, even though IGY had received the Approval in Principle on December 7, 2006, Adurion's refusal to permit execution of the Shareholders' Agreement — causing the Sellers to be in violation of the Purchase Agreement — was the reason that the transaction could not proceed to closing, because Defendants prevented a Heads of Agreement from ever being capable of being issued by the Bahamian Government.

54.     Defendants' unilateral wrongful actions and contractual breaches were the cause of the closing not having occurred by the Outside Closing Date as defined by the Purchase Agreement and as extended by agreement of the parties.

55.     Despite Defendants' own obstructive conduct which prevented a closing from occurring, on or about July 5, 2007, it was Defendants who sent a letter to IGY purporting to give notice that they were terminating the Purchase Agreement pursuant to Section 9.01(d) thereof for Purchaser's failure to effectuate a closing prior to the Outside Closing Date defined in the Agreement.     However, Section 9.01(d) prevents precisely this circumstance – it does not permit the party whose actions caused the inability to close – here, Sellers – to also terminate the Purchase Agreement for failure to close.

56.     On or about July 18, 2007, IGY sent demand letters to all Defendants demanding that they comply with their obligations under the Purchase Agreement according to its terms, including without limitation their obligations under Section 7.03 of the Purchase Agreement to approve the Shareholders' Agreement in the form that had already been negotiated, and to take all necessary steps to proceed to a prompt closing of the purchase within a commercially reasonable timeframe.

57.     Defendants responded by letter dated July 27, 2007 stating, *inter alia*, that they considered the Purchase Agreement terminated.

58.     On information and belief, after wrongfully purporting to terminate the Purchase Agreement, Defendants are using the work product developed by IGY over the course of more than a year, including designs, plans, financial projections and relationships, and are in particular using the approvals and licenses obtained from the Bahamian Government through IGY's sole efforts and labor, in order to build the planned marina without IGY. Rather, on information and

belief, Defendants have partnered with another investor, and intend to move forward with the Project as planned without IGY.

59.    Accordingly, on information and belief, Adurion engaged in its wrongful conduct to prevent Sellers from approving the Shareholders' Agreement, and all Defendants prevented the business relationship between IGY and the Bahamian Government, for the sole purpose of harming IGY, and intentionally and with malice, in order to prevent IGY from reaping the fruits of its labor over the course of more than a year, to prevent it from participating in the Project and wrongfully to misappropriate its efforts, goodwill and Property, including misappropriation of IGY's work product over the course of more than one year, plans, specifications, and other materials. This all was in violation of the Purchase Agreement, and also in violation of the confidentiality agreement contained within the Purchase Agreement.

60.    Defendants' actions not only misappropriate the value of IGY's labor, but also minimizes IGY or IGYL's ability to develop a marina on a different parcel of land. As set forth above, the Bahamian Government was not initially inclined to approve one marina, let alone two. In any event, Nassau is a small island and the market and Nassau cannot support an infinite number of such Projects. In fact, the site of the Project was unique because, on information and belief, it was the sole viable site for the contemplated Project. And, Defendants' interference in IGY's established business relationship with the Bahamian Government has caused IGY harm on this basis as well.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Against the Ocean Bay Entities and British Colonial)

61.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-60 with the same force and effect as if set forth in their entirety in this paragraph.

62.    The Purchase Agreement is a valid and enforceable contract entered into by IGY and Defendants the Ocean Bay Entities and British Colonial.

63.    IGY has at all times duly performed all of its obligations pursuant to the Purchase Agreement.

64.    Despite demand being made by Plaintiffs, Defendants the Ocean Bay Entities and British Colonial have failed and refused and still fail and refuse, to perform the terms of the Purchase Agreement to be performed on Defendants' part.  In particular, *inter alia*, Defendants have breached the Agreement by refusing to agree upon the final Shareholders' Agreement which was agreed upon by IGY and Sellers prior to Adurion's involvement in early December 2006, which was required by the terms of the Purchase Agreement, and which was in substantially the same form as required under Schedule A to the Purchase Agreement.  By so refusing, Defendants Ocean Bay Entities and British Colonial unilaterally prevented the transaction contemplated by the Purchase Agreement from Closing, because an agreed-upon Shareholders' Agreement was a prerequisite to the Bahamian Government entering into a Heads of Agreement approving the Project, and the right to use the seabed and also approving the sale of the Property, which, in turn, was a prerequisite and critical requirement of closing.

65.    Defendants' breaches of the Purchase Agreement were material.

66.    By acting in bad faith and by failing and refusing to approve the Shareholders' Agreement, Defendants the Ocean Bay Entities and British Colonial also breached the implied covenant of good faith and fair dealing in the Purchase Agreement, and specifically breached their express obligations to act in good faith pursuant to Sections 5.05 and 7.03 of the Purchase Agreement.

67.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## SECOND CAUSE OF ACTION

**(Specific Performance – Against the Ocean Bay Entities and British Colonial)**

68.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-67 with the same force and effect as if set forth in their entirety in this paragraph.

69.    The Purchase Agreement is a valid and enforceable contract entered into by IGY and Defendants the Ocean Bay Entities and British Colonial.

70.    IGY has at all times duly performed all of its obligations pursuant to the Purchase Agreement and has at all times been willing and able to perform any remaining obligations, including proceeding to closing of the transaction contemplated by the Purchase Agreement.

71.    Despite demand being made by Plaintiffs, Defendants the Ocean Bay Entities and British Colonial failed and refused and still fail and refuse, to perform the terms of the Purchase Agreement to be performed on Defendants' part.   In particular, *inter alia*, Defendants have breached the Agreement by refusing to approve the Shareholders' Agreement which was agreed upon by IGY and Defendants, which was required by the terms of the Purchase Agreement, and which was in substantially the same form as required under Schedule A to the Purchase Agreement.  By so refusing, Defendants unilaterally prevented the transaction contemplated by the Purchase Agreement from Closing, because a finalized and approved Shareholders' Agreement was a prerequisite to the Bahamian Government entering into a Heads of Agreement approving the Project, which, in turn, was a prerequisite and critical requirement of closing.

72.    Defendants the Ocean Bay Entities and British Colonial have at all times been able and still are able to perform the terms of the Purchase Agreement to be performed on

Defendants' part. In particular, *inter alia,* Defendants the Ocean Bay Entities and British Colonial have been and are able to approve the Shareholders' Agreement which was agreed upon by IGY and Defendants and are able to convey the Property as contemplated by the Purchase Agreement.

73.    IGY has no adequate remedy at law, because the Property is unique.

74.    By reason of the foregoing, IGY is entitled to a Judgment ordering Defendants the Ocean Bay Entities and British Colonial to approve the Shareholders' Agreement and convey the Property pursuant to the terms of the Purchase Agreement.

## THIRD CAUSE OF ACTION

### (Tortious Interference with Contractual Relations – Against Adurion)

75.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-74 with the same force and effect as if set forth in their entirety in this paragraph.

76.    The Purchase Agreement is a valid and enforceable contract entered into by IGY and Defendants the Ocean Bay Entities and British Colonial.

77.    Adurion had actual knowledge of the Purchase Agreement among IGY and the Sellers and had specific knowledge of all of its terms.

78.    Adurion, acting in bad faith, either with the sole purpose to harm IGY or with wrongful, dishonest, unfair and improper means and intentionally, maliciously, and without justification caused the Ocean Bay Entities and British Colonial to breach the Purchase Agreement by, *inter alia,* causing them to fail and refuse to approve the Shareholders' Agreement as required by the Purchase Agreement and its Schedules.

79.    The Ocean Bay Entities and British Colonial did in fact breach the Purchase Agreement to be performed on Defendants' part. In particular, *inter alia,* Defendants Ocean Bay

Entities and British Colonial have breached the Agreement by refusing to finally approve the form of the Shareholders' Agreement which had been agreed upon by IGY and Defendants the Ocean Bay Entities and British Colonial prior to Adurion's involvement, which was required by the terms of the Purchase Agreement, and which was in substantially the same form as required under Schedule A to the Purchase Agreement. By so refusing, Defendants unilaterally prevented the transaction contemplated by the Purchase Agreement from Closing, because an approved Shareholders' Agreement was a prerequisite to the Bahamian Government entering into a Heads of Agreement approving the Project, which, in turn, was a prerequisite and critical requirement of closing.

80.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

### FOURTH CAUSE OF ACTION

### (Tortious Interference with Prospective Business Relations – Against Adurion)

81.    IGY and IGYL incorporate by reference, repeat and reallege each and every allegation in paragraphs 1-80 with the same force and effect as if set forth in their entirety in this paragraph.

82.    IGY and IGYL had a business relationship with Defendants the Ocean Bay Entities and British Colonial in that IGY and the Sellers had entered in to the Purchase Agreement including Schedule A thereto and the parties had also reached an agreement as to the form of a Shareholders' Agreement to be signed, governing the terms whereby after the closing IGY would be a Joint Venture to be entered into as contemplated in the Purchase Agreement. As set forth in the Purchase Agreement, the shareholders of IGY post-closing would be the Sellers

on the one hand, and IGY's parent company, IGYL, or a designated affiliate of IGYL on the other hand.

83.    But for the wrongful interference by Adurion, the negotiations and relations among Plaintiffs and the Ocean Bay Entities and British Colonial would have culminated in an approved Shareholders' Agreement, and accordingly would have culminated in a closing of the transaction contemplated by the Purchase Agreement.

84.    Adurion had actual knowledge of the business relations among Plaintiffs and the Ocean Bay Entities and British Colonial.

85.    Adurion acted in bad faith, either with the sole purpose to harm Plaintiffs or with wrongful, dishonest, unfair and improper means and intentionally, maliciously, and without justification interfered in the business relationship between Plaintiffs and the Ocean Bay Entities and British Colonial.  On information and belief, Adurion engaged in its wrongful conduct to prevent Sellers from approving the Shareholders' Agreement, for the sole purpose of harming Plaintiffs, and intentionally and with malice, in order to prevent Plaintiffs from reaping the fruits of IGY's labor over the course of more than a year, and to prevent Plaintiffs from participating in the Project.

86.    Adurion in fact caused injury to the business relations among Plaintiffs and the Ocean Bay Entities and British Colonial.

87.    As a direct result of the foregoing, IGY and IGYL have been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## FIFTH CAUSE OF ACTION

### (Fraud in the Inducement – Against All Defendants)

88.      IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-87 with the same force and effect as if set forth in their entirety in this paragraph.

89.      Pursuant to Section 10.07 of the Purchase Agreement, which required IGY's consent before the Sellers could assign the Purchase Agreement to another party, Sellers requested that IGY consent to the assignment of some portion of British Colonial's interest to Adurion.

90.      In order to induce IGY to give its consent to the assignment of some portion of the Sellers' interest in either the Purchase Agreement or the transaction contemplated thereby to Adurion, in early December 2006 Allen, as Agent of the Sellers, specifically told a representative of IGY that Adurion intended to proceed to closing the transaction which had been negotiated, that Adurion's involvement would not block the closing, and that Adurion intended to honor the Sellers' obligations under the Purchase Agreement, including approving the Shareholders' Agreement.   Allen specifically represented to IGY's representative that Adurion would stand by the transaction on the terms already agreed upon and would not try to renegotiate the deal, and reaffirmed that misrepresentation in numerous telephone calls and in person meetings in November and December 2006.

91.      This statement by Allen, on the Sellers' behalf, was false, and was known by him to be false at the time that he made it, because he and the sellers were aware on information and belief that Adurion did not intend to abide by the terms of the Purchase Agreement at the time the representations made, and in fact after IGY gave its consent to the assignment, Adurion immediately began to attempt to demand to renegotiate significant terms of the Agreement.

24

92.    IGY justifiably relied on Allen's misrepresentation and was deceived by it, believing it to be true.

93.    IGY was injured because, contrary to Allen's statement, Adurion never intended to allow the Ocean Bay Entities or British Colonial to perform under the terms of the Purchase Agreement.

94.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

### SIXTH CAUSE OF ACTION

### (Unfair Competition – Against All Defendants)

95.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-94 with the same force and effect as if set forth in their entirety in this paragraph.

96.    The Purchase Agreement constituted a valid and existing Agreement which required Defendants the Ocean Bay Entities and British Colonial to refrain from competition with IGY concerning the subject matter of the transaction and Project contemplated by the Purchase Agreement. In addition, Defendants the Ocean Bay Entities and British Colonial were in a confidential relation with IGY because they had substantially agreed to all of the terms of the Joint Venture among them both in Schedule A to the Purchase Agreement and also by approving the Shareholders' Agreement among the parties.

97.    Further, Section 5.02 of the Purchase Agreement contained a confidentiality agreement, whereby the Sellers agreed to hold confidential (and to cause their agents to hold confidential) and not disclose "all information, whether written or oral, furnished to Seller about Purchaser, its Affiliates or their business and affairs, including, without limitation, the IGY Partnership Agreement and the IGY Unaudited Financials." The Purchase Agreement prohibited

Sellers from disclosing any type of "confidential information, including analyses, compilations, studies or other documents prepared," and further prohibited disclosure of the Purchase Agreement and transactions contemplated thereby.

98.     However, Defendants the Ocean Bay Entities and British Colonial have deliberately and willfully, by unfair and improper means, and in violation of their contractual and confidential obligations, misappropriated the labor and expenditures of IGY incurred throughout the course of the transaction, during which time IGY spent nearly $1 million drawing up plans required by the Bahamian Government, obtaining licenses and permits, conducting due diligence investigations, and engaging third parties to prepare reports, studies, analyses and design plans necessary for closing.  In addition during this entire time IGY was negotiating the Heads of Agreement with the Bahamian Government and obtained an Agreement in Principle for the benefit of IGY to construct a mixed-use mega-yacht marina and resort development.

99.     Defendants the Ocean Bay Entities and British Colonial are unfairly misappropriating IGY's commercial advantage earned through organization, skill, labor, and money, by taking all of that material to which they had access, including the fruitful results of the negotiations with the Bahamian Government, and after wrongfully purporting to breach the Purchase Agreement, using that material in connection with building the marina contemplated by the Project, but with a different partner.

100.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## SEVENTH CAUSE OF ACTION

**(Tortious Interference with Prospective Business Relations – against all Defendants)**

101.    IGY and IGYL incorporate by reference, repeat and reallege each and every allegation in paragraphs 1-100 with the same force and effect as if set forth in their entirety in this paragraph.

102.    IGY and IGYL had a business relationship with the Bahamian Government in that they had negotiated the terms of a Heads of Agreement over the course of close negotiations over the course of a year, and on December 7, 2006, the Ministry of Financial Services and Investments of the Bahamian Government issued to IGY the Approval in Principle to construct a mixed-use mega-yacht marina and resort development.

103.    But for the wrongful interference by Defendants, on information and belief the negotiations and relations among IGY, IGYL and the Bahamian Government would have culminated in a signed Heads of Agreement, and accordingly would have culminated in a closing of the transaction contemplated by the Purchase Agreement or, in the alternative, would have granted IGY and IGYL the license based on the negotiations already conducted to develop a marina on another site.

104.    Defendants had actual knowledge of the business relations between IGY and IGYL and the Bahamian Government.

105.    Defendants acted in bad faith, either with the sole purpose to harm IGY and IGYL or with wrongful, dishonest, unfair and improper means and intentionally, maliciously, and without justification interfered in the business relationship between the Bahamian Government. On information and belief, Defendants prevented the business relationship between IGY, IGYL and the Bahamian Government, for the sole purpose of harming IGY and IGYL, and

intentionally and with malice, in order to prevent IGY and IGYL from reaping the fruits of their labor over the course of more than one year, and to prevent them from participating in the Project or any other similar Project in the Bahamas.

106.    Defendants in fact caused injury to the business relations between IGY and IGYL and the Bahamian Government.

107.    As a direct result of the foregoing, IGY and IGYL have been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## PRAYER FOR RELIEF

WHEREFORE, for all of the foregoing reasons, Plaintiffs pray for judgment as follows:

(1)    On the first cause of action, granting IGY's damages on its cause of action for breach of contract in an amount yet to be determined but believed to be no less than $ 85,000,000;

(2)    On the second cause of action, granting IGY specific performance of the Purchase Agreement, requiring Defendants to agree to the Shareholders' Agreement and to close the transaction contemplated by the Purchase Agreement;

(3)    On the third cause of action, granting IGY damages on its cause of action for tortious interference with contract in an amount yet to be determined but believed to be no less than $ 85,000,000;

(4)    On the fourth cause of action, granting IGY and IGYL damages on their cause of action for tortious interference with prospective business relations in an amount yet to be determined but believed to be no less than $ 85,000,000;

(5)     On the fifth cause of action, granting IGY damages on its cause of action for fraud in the inducement in an amount yet to be determined but believed to be no less than $ 85,000,000.

(6)     On the sixth cause of action, granting IGY damages on its cause of action for unfair competition in an amount yet to be determined but believed to be no less than $ 85,000,000;

(7)     On the seventh cause of action, granting IGY and IGYL damages on their cause of action for tortious interference with prospective business relations in an amount yet to be determined but believed to be no less than $ 85,000,000;

(8)     Awarding Plaintiff the costs and disbursements of this action, including attorneys' fees; and

(9)     Granting Plaintiff such other and further relief as this Court may deem just, proper and equitable.

Dated: New York, New York
        October 5, 2007

GREENBERG TRAURIG, LLP

By:
        Simon Miller
        Sophia Tsokos
        200 Park Avenue
        New York, New York 10166
        (212) 801-9200

*Attorneys for Plaintiffs*

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IGY OCEAN BAY PROPERTIES LIMITED and
ISLAND GLOBAL YACHTING LTD.,

Plaintiffs,

v.

OCEAN BAY PROPERTIES I LIMITED, OCEAN BAY
PROPERTIES II LIMITED, BRITISH COLONIAL
DEVELOPMENT COMPANY LIMITED, PRK
HOLDINGS LTD., ADURION CAPITAL LIMITED and
GEORGE ALLEN,

Defendants.

SUMMONS AND COMPLAINT

Attorneys for Plaintiffs

Law Offices
Greenberg Traurig LLP

MetLife Building
200 Park Avenue
New York, NY 10166

212.801.9200
Fax 212.801.6400