UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

IGY OCEAN BAY PROPERTIES LIMITED and        :
ISLAND GLOBAL YACHTING LTD.                 :
                                            :
                          Plaintiffs        :
                                            :
              v.                            :   Civil Action No. 07-10520
                                            :
OCEAN BAY PROPERTIES I LIMITED,             :
OCEAN BAY PROPERTIES II LIMITED,            :
BRITISH COLONIAL DEVELOPMENT COMPANY        :
LIMITED, PRK HOLDINGS LTD., ADURION         :
CAPITAL LIMITED and GEORGE ALLEN,           :
                                            :
                          Defendants        :
-----------------------------------------------------------------------x

## DECLARATION OF JOHN T. MORIN

I, John T. Morin, pursuant to 28 U.S.C. §1746, declare under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1.      I am a member of the firm of Wormser, Kiely, Galef & Jacobs LLP, and serve as co-counsel, along with the firm of Weil, Gotshal & Manges LLP for defendants Ocean Bay Properties I Limited ("OBI"), Ocean Bay Properties II Limited ("OBII"), British Colonial Development Company Limited ("BCDC"), PRK Holdings Ltd. ("PRK"), Adurion Capital Limited ("Adurion") and George Allen ("Allen" and, collectively with OBI, OBII, BCDC, Adurion, and PRK, the "Defendants").

2.      I am familiar with the pleadings and the facts underlying this matter; and I make this Declaration to (i) provide an outline of the motions being made, and (ii) introduce the Declarations submitted on behalf of the Defendants and the documents relevant to the motions.

3.      Defendants PRK, Adurion and Allen hereby seek to dismiss, pursuant to Fed. R. Civ. P. 12(b)(2), the claims asserted against them by plaintiffs IGY Ocean Bay Properties Limited ("IGY") and Island Global Yachting Ltd. ("IGYL" and, collectively with IGY, the "Plaintiffs") on the grounds that PRK, Adurion and Allen are not subject to the personal jurisdiction of this Court.  In support of this motion, PRK, Adurion and Allen also submit the Declarations of Eugene Fraser, the President of Defendant PRK (Exhibit E hereto); Dr. Jürg Gassmann, the General Counsel to, and non-executive Director of, Defendant Adurion (Exhibit F hereto); and Defendant George Allen (Exhibit G hereto).

4.      In the alternative, PRK, Adurion and Allen also move to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), all causes of action asserted against them on the grounds that each cause of action fails to state a claim upon which relief may be granted.

5.      Defendants OBI, OBII and BCDC move to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) all causes of actions asserted against them on the grounds that each cause of action fails to state a claim upon which relief may be granted.

<u>BACKGROUND</u>

6.      Plaintiffs' complaint, a copy of which is annexed as Exhibit A ("Complaint"), was originally filed in the Supreme Court of the State of New York, New York County on or about October 9, 2007.  (See Dkt. Entry No. 1)  This matter was duly removed to this Court on November 21, 2007.  Following the filing and removal of this matter, Plaintiffs and Defendants entered into an agreement pursuant to which Defendants were authorized to respond to the Complaint by or before January 15, 2008.

7.  As alleged in the Complaint, this case arises out of, or is in some way related to, a Purchase Agreement, dated November 7, 2005 ("Purchase Agreement") allegedly between OBI, OBII, and BCDC as "Sellers" and IGY as "Purchaser".  A copy of the Purchase Agreement is annexed hereto as Exhibit B.

8.  In connection with the marina development which was the subject of the Purchase Agreement, Purchaser alleges that it received an "Approval in Principle" from the Bahamian Ministry of Financial Services and Investments, dated December 7, 2006, which granted preliminary approval for the development, subject to a list of conditions to be satisfied by Purchaser.  A copy of the Approval in Principle is attached hereto as Exhibit C.

9.  As further alleged in the Complaint, defendants OBI, OBII and BCDC allegedly terminated the Purchase Agreement by a notice to the IGY dated July 5, 2007 (a copy of which is annexed hereto as Exhibit D).

WHEREFORE, Declarant respectfully requests that the Court dismiss the Complaint in its entirety.

John T. Morin

Executed in New York, New York
on December 20 2007

3

# Exhibit A (Part 1)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IGY OCEAN BAY PROPERTIES
LIMITED and ISLAND GLOBAL
YACHTING LTD.

        Plaintiffs,

    v.

OCEAN BAY PROPERTIES I LIMITED,
OCEAN BAY PROPERTIES II LIMITED,
BRITISH COLONIAL DEVELOPMENT
COMPANY LIMITED, PRK HOLDINGS
LTD., ADURION CAPITAL LIMITED and
GEORGE ALLEN,

        Defendants.

Index No. _603307-07_

**SUMMONS**

    You are hereby summoned and required to serve upon Plaintiffs' attorneys an answer to the complaint, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

    The basis of the venue designated is Plaintiffs' residence.

Dated:   New York, New York
        October 5, 2007

               GREENBERG TRAURIG LLP

               By:
               Simon Miller
               Sophia Tsokos
               200 Park Avenue
               New York, New York 10166
               (212) 801-9200

               *Attorneys for Plaintiffs*

NEW YORK
COUNTY CLERK'S OFFICE

[OCT 0 9 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| IGY OCEAN BAY PROPERTIES LIMITED and ISLAND GLOBAL YACHTING LTD.<br><br>            Plaintiffs,<br><br>    v.<br><br>OCEAN BAY PROPERTIES I LIMITED, OCEAN BAY PROPERTIES II LIMITED, BRITISH COLONIAL DEVELOPMENT COMPANY LIMITED, PRK HOLDINGS LTD., ADURION CAPITAL LIMITED and GEORGE ALLEN,<br><br>          Defendants. | Index No. 603307/07<br><br>**COMPLAINT** |

     Plaintiffs IGY Ocean Bay Properties Limited ("IGY") and Island Global Yachting Ltd. ("IGYL"), as and for their complaint against Defendants Ocean Bay Properties I Limited, Ocean Bay Properties II Limited (the "Ocean Bay Entities"), British Colonial Development Company Limited ("British Colonial"), PRK Holdings, Ltd. ("PRK"), Adurion Capital Limited ("Adurion") and George Allen ("Allen") (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

    1.    This action arises from the breach by the Defendant Sellers[1] of a Purchase Agreement for the sale of a parcel of land in the Commonwealth of the Bahamas (the "Bahamas"), and also Defendants' tortious interference with Plaintiffs' existing and prospective contractual relationships, unfair competition, and the fraud in the inducement of Defendants Allen, the Ocean Bay Entities, British Colonial and PRK.

---

[1]    Any capitalized terms which are not defined in the Nature of the Action have the meanings ascribed to them in the Factual Background below.

2.    IGY (also referred to herein as "Purchaser") and Defendants the Ocean Bay Entities and British Colonial (together with PRK, collectively, the "Sellers" or the "Seller Defendants") entered into a Purchase Agreement for the purchase of waterfront property owned by the Sellers adjoining the British Colonial Hilton Hotel located in Nassau, Bahamas (the "Property"), to develop an offshore, mixed-use mega-yacht marina and resort development (the "Project"). Because the Sellers wanted to retain a portion of the equity interest in the Property, the Purchase Agreement provided that the purchase price would be comprised of $8 million in cash payable by IGY and a $10 million equity interest in IGY given to the Sellers at closing. Accordingly, in the Purchase Agreement, the parties agreed that after the closing IGY would be a Joint Venture entity that would own, develop and operate the Property, with the shareholders of IGY being the Sellers on the one hand, and on the other hand Island Global Yachting Facilities Ltd. ("IGY Facilities"), a wholly-owned subsidiary of IGY's parent company, IGYL, or a designated affiliate of IGY Facilities (the "Joint Venture"). In anticipation of the Joint Venture, the Purchase Agreement also contained a lengthy, detailed and comprehensive outline of the terms of a Shareholders' Agreement that would govern the relationship among the parties in IGY post-closing. The parties contemplated drafting a separate document constituting a form Shareholders' Agreement, to be executed at closing.[2] The Purchase Agreement required the parties to act in good faith with respect to the negotiation and approval of the Shareholders' Agreement.

3.    Specifically, Sellers had an obligation not to "unreasonably withhold, condition or delay [their] approval of" the Shareholders' Agreement. As a finalized Shareholders' Agreement was the *sine qua non* of the closing of the transaction. In order for IGY properly to obtain the

---

[2]    The parties refer to the "Operating Agreement" and its successor, the "Shareholders' Agreement" interchangeably; for clarity, the document will be referred to herein as the Shareholders' Agreement.

necessary approvals from the Government of the Commonwealth of the Bahamas (the "Bahamian Government") – through a document from the Bahamian Government called a "Heads of Agreement" – which would allow it to purchase the Property, lease the seabed, own, develop and operate the proposed Project, IGY had to provide the Bahamian Government with evidence that IGY would be the rightful owner of the Property.    Thus, the Bahamian Government would not grant IGY the Heads of Agreement giving it the right to purchase and develop the Property, or to use the adjacent seabed, without knowing that IGY was or would become the rightful owner of parcels that would comprise or facilitate access to the development Project. Without a Heads of Agreement, the contemplated transaction could not close, nor could the Project be undertaken.   IGY applied for an "Approval in Principle," the precursor to the Heads of Agreement in March 2006.

4.      According to the specific terms set forth in the Purchase Agreement, the parties drafted the required Shareholders' Agreement between September 2006 and December 2006. IGY gave a draft of the Shareholders' Agreement to the Sellers in September 2006.  Because the Shareholders' Agreement had already been substantially negotiated, the Sellers had few comments, which they delivered to IGY. By December 2006, every comment given by the Sellers was either incorporated into the draft Shareholders' Agreement or satisfactorily addressed by IGY, and the parties had agreed upon the form of the Shareholders' Agreement that could be submitted to the Bahamian Government in connection with obtaining the Heads of Agreement. After all of their comments were addressed, the Sellers neither indicated that they had any additional comments, nor did they respond that the Agreement was unacceptable in any way. On or about December 7, 2006, the Bahamian Government granted its Approval in Principle to the Project.

5.     Throughout the course of the transaction, IGY committed nearly $1 million conducting due diligence and other activities in connection with closing, incurring legal fees in connection with the negotiation of the agreements, engaging third parties to assist in the planning, design and permitting process, and engaging third party consultants in respect to discussions with the Bahamian Government, among other things.

6.     As the work progressed (with IGY bearing both the laboring oar and the expense), in approximately early December 2006, the Defendant Sellers and their agent, Allen, advised that a majority economic interest and a voting interest in British Colonial had been acquired in some manner by Adurion, and British Colonial requested IGY's consent, under the Purchase Agreement, to assign some of the Sellers' rights under the Purchase Agreement to Adurion.

7.     At this critical stage of the transaction, which was close to closing after over an entire year's worth of work by IGY, to induce IGY to agree to the assignment, the Sellers and their agent, Allen, specifically represented to IGY that Adurion would stand by the transaction as already agreed upon and would not block the closing or try to renegotiate the deal. IGY justifiably relied on the representations made by Sellers and Allen, which repeatedly reaffirmed that Adurion's participation in the upper tier entities associated with Sellers would not have any impact on the desire or determination of Sellers to close the transaction. Allen and the Sellers led IGY to believe that the transaction would proceed to closing and that Adurion would not fail to honor the agreements previously agreed upon by the Sellers.

8.     However, as soon as Adurion acquired its interest, it immediately began to attempt to renegotiate the terms that had been agreed pursuant to the Purchase Agreement, including the sale price, various obligations, and management rights.

4

9.      Most significantly, evidently believing that the Sellers should get a better deal than that already agreed to in writing, Adurion caused the Sellers to refuse to approve the form of Shareholders' Agreement which had already been substantially agreed upon by the Sellers prior to Adurion's involvement, which was prepared in conformance with the detailed terms in the Purchase Agreement, and which was the *sine qua non* of obtaining the Heads of Agreement and closing the transaction.    Instead, Adurion raised, and caused the Sellers to raise, additional objections and comments to the Shareholders' Agreement that were inconsistent with both the fundamental terms of the Joint Venture outlined in the Purchase Agreement, and were also in breach of the Seller's obligations, under the Purchase Agreement, to act in good faith with respect to the negotiation and approval of the Shareholders' Agreement.    Specifically, Sellers breached their obligation not to "unreasonably withhold, condition or delay [their] approval of" the Shareholders' Agreement.

10.      On information and belief, Adurion controlled the Sellers and prevented them from approving the agreed upon documents, and Defendants' actions unilaterally prevented the closing from taking place.

11.      After having caused, through their unilateral and wrongful actions and contractual breaches, the transaction not to proceed to closing, Defendants then sent a letter in July 2007 purporting to terminate the Purchase Agreement, claiming that IGY breached by not meeting the closing deadline.    Pursuant to the clear terms of the Purchase Agreement, such "termination" was invalid.

12.      And now, after purporting to terminate the Purchase Agreement with IGY and in violation of the confidentiality provisions of that Purchase Agreement, Defendants have, on information and belief, misappropriated the work product generated by IGY over the course of

more than a year in good faith, and in reliance on the signed Purchase Agreement, including the results of IGY's extensive negotiations with the Bahamian Government with whom it worked closely.   On information and belief, Defendants intend to use the work product in order to develop the Project with a different investor.

13.   Defendants' breaches of contract, tortious interference, fraud in the inducement and unfair competition have harmed Plaintiffs, who as a result lose the benefit of their bargain in this deal. In addition, Defendants' actions could cause irreparable harm to the fundamental business plan of IGYL and IGY which is to develop, own and operate luxury marina facilities, in this case on the island of Nassau and New Providence Island.   This is because any new development would require IGYL to engage in the same process to obtain a Heads of Agreement, and the same officials within Government who worked on this transaction closely with IGYL might consider that IGYL does not have the ability or intention to complete an alternative marina development due to the failure to complete this transaction.   Because the Property and Project are unique, and on information and belief is the sole site upon Nassau on which a Project of this type could be built, IGY is irreparably harmed.   Accordingly, IGY is entitled to specific performance as well as damages for Defendants' actions.

## PARTIES

14.   Plaintiff IGY Ocean Bay Properties Limited is a corporation organized under the laws of the Commonwealth of the Bahamas with its principal place of business at 717 Fifth Avenue, New York, New York.

15.   Plaintiff Island Global Yachting Ltd. is a corporation organized under the laws of the Cayman Islands with its principal place of business at 717 Fifth Avenue, New York, New York.

16.     On information and belief, Defendant Ocean Bay Properties I Limited is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

17.     On information and belief, Defendant Ocean Bay Properties II Limited is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

18.     On information and belief, Defendant British Colonial is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

19.     On information and belief, Defendant PRK is a corporation organized and existing under the laws of Canada.

20.     On information and belief, Defendant Adurion is a corporation organized and existing under the laws of the United Kingdom.

21.     On information and belief, Defendant Allen is an individual residing in Florida.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the causes of action herein.  The Purchase Agreement among the parties provides for exclusive jurisdiction and venue in State or federal court in New York county, and the parties consented to jurisdiction and venue in such court.

23.     Venue is proper pursuant to CPLR § 503 because Plaintiffs have their principal place of business in the County of New York.

24.     Personal jurisdiction over Defendants is proper because Defendants consented to jurisdiction in the Purchase Agreement, the causes of action alleged herein arise out of the transaction of business within the State of New York, tortious acts committed within the State, and tortious acts causing injury within the State, and because on information and belief, Defendants transact business in the State of New York.

7

## **FACTUAL BACKGROUND**

25.    IGY is an indirect, wholly-owned subsidiary of IGYL which, together with its affiliates, is a premier owner, developer and operator of luxury yacht marinas, yachting-oriented destinations and related facilities throughout the world.  IGYL and its affiliates currently own, operate and develop or seek to develop numerous marinas worldwide, primarily with the intention of offering high quality services to the yachting industry.   Since its inception, IGYL has exerted great effort to promulgate and protect its brand-name and reputation. Indeed, the Island Global Yachting name and services have become widely known and have acquired a worldwide reputation for excellence and significant goodwill.

26.    On or about November 7, 2005, IGY and Defendants, the Ocean Bay Entities and British Colonial, entered into a Purchase Agreement (the "Purchase Agreement"), providing for the purchase by IGY of the Ocean Bay Property consisting of approximately five acres of prime undeveloped waterfront property in downtown Nassau, The Bahamas.   On information and belief, the Property is owned by Defendants the Ocean Bay Entities which, in turn, are owned by British Colonial.

27.    The Property on which the marina and resort were to be developed is unique, and is on information and belief the only viable site for IGY for such a Project on the island of Nassau, the Bahamas.

28.    On this Property, and the adjoining seabed to be leased from the Bahamian Government, IGY planned to develop an offshore, mixed-use mega-yacht marina and resort development with up to 72 slips and an upland development comprising a condo-hotel with up to 200 units, 24 beachfront villas, office and related facilities, retail, residential and  an area for parking.

29.     Under the Purchase Agreement, the Sellers were to receive at closing $18 million made up of $8 million in cash payable by IGY and a $10 million equity interest in IGY. Accordingly, in the Purchase Agreement, the parties agreed that after the closing IGY would be a Joint Venture entity that would own, develop and operate the Property, and the shareholders would be the Sellers on the one hand, and IGY Facilities, a wholly owned subsidiary of IGY's parent company, IGYL, or a designated affiliate of IGY Facilities. The Purchase Agreement set forth the terms governing the parties' relationship in the Joint Venture at the time of closing, and provided that the Sellers and IGY Facilities or its designated affiliate would enter into an Amended and Restated Operating Agreement for IGY (the "Shareholders' Agreement") that would govern their relationship in IGY post-closing. Further, the Purchase Agreement provided that the parties would use their good faith efforts to do so within 90 days of the Purchase Agreement. At the time of the Purchase Agreement, the parties had already extensively negotiated the fundamental terms of the Shareholders' Agreement, and a detailed, comprehensive, nine page outline of its terms was attached as Schedule A to the Purchase Agreement.

30.     Entering into the Shareholders' Agreement was a *sine qua non* of the Project moving to closing. A fully agreed upon form of Shareholders' Agreement was required by the Bahamian Government before it would grant to IGY what is referred to as a "Heads of Agreement" – that is, the Bahamian Government required evidence that IGY would be the proper and rightful owner of the Property before it could grant the Heads of Agreement. The Heads of Agreement would be, in effect, a license agreement between IGY and the Bahamian Government, permitting the sale of the Property to IGY, approving the Project, and permitting IGY to use the seabed adjacent to the Property, which was clearly critical to the Project to

9

develop an offshore, mixed-use marina. Indeed, the Purchase Agreement provided if such Heads of Agreement could not be obtained, either party had the option to terminate the Purchase Agreement. Without the Heads of Agreement, the transaction could never close because the Heads of Agreement would also give the necessary approval by the Bahamian Government for the sale of the Property.

31.    The Purchase Agreement contained several sections requiring the Sellers to act in good faith – particularly in connection with the Shareholders' Agreement which was a prerequisite to obtaining the necessary Government approvals and Heads of Agreement. Pursuant to Section 5.05 entitled "Additional Covenants," the Sellers covenanted, in relevant part:

> Seller shall use its good faith, commercially reasonable and diligent efforts to assist Purchaser in (i) securing the Necessary Approvals, whether by amendment, extension and assignment of the Existing Heads of Agreement in the name of Purchaser or otherwise, and (ii) negotiating and finalizing the terms and provisions of the Amended and Restated Operating Agreement.

32.    Accordingly, the Sellers represented that they would cooperate with IGY in obtaining all necessary approvals from the Bahamian Government, specifically, on paragraph D of page 1 of the Purchase Agreement:

> Seller has indicated that it now has or can assist Purchaser in its efforts to obtain all of the permits, licenses and approvals that may be necessary for Purchaser to (i) obtain the right from the Government of the Commonwealth of the Bahamas, by easement, lease, irrevocable license or otherwise, to use, develop and occupy the Submerged Land, and (ii) develop a mixed-use Project on the Ocean I Property, the Ocean II Property and the Submerged Land, including, but not limited to, a mega-yacht marina and attendant facilities as well as other uses (such as retail, commercial, parking and/or residential properties) that Purchaser determines may be appropriate for the Ocean Bay Property, all as more specifically described on **Schedule "B"** attached hereto (the "Potential Development")

Such obligations would also include the Sellers' obligations to approve and execute necessary documents such as the Shareholders' Agreement, in connection with such approvals, and the Sellers represented they had authority to do so.

33.    Pursuant to Section 7.03 of the Purchase Agreement, entitled "Good Faith Efforts; Critical Path Schedule," the parties agreed to "use their respective good faith and commercially reasonable efforts to cause the critical path milestones in the transaction" to be satisfied.  More specifically, the parties agreed that:

> Seller and Purchaser covenant and agree that they shall use their respective commercially reasonable, diligent and good faith efforts to agree upon the form of Amended and Restated Operating Agreement within ninety (90) days of the date hereof and <u>neither shall unreasonably withhold, condition or delay its approval of the same;</u> *provided, however,* that the parties agree that, <u>without limitation,</u> it shall be reasonable for either party to disapprove a proffered form of Amended and Restated Operating Agreement on the basis that the same is inconsistent with the terms of **Schedule A** in a manner that is materially adverse to its interest.

(Emphasis added).

34.    Further, Section 5.02 of the Purchase Agreement contained a confidentiality agreement, whereby the Sellers agreed to hold confidential (and to cause their agents to hold confidential) and not disclose "all information, whether written or oral, furnished to Seller about Purchaser, its Affiliates or their business and affairs, including, without limitation, the IGY Partnership Agreement and the IGY Unaudited Financials." This definition prohibited Sellers from disclosing any type of "confidential information, including analyses, compilations, studies or other documents prepared," and further prohibited disclosure of the Purchase Agreement and transactions contemplated thereby.

11

35.    The Purchase Agreement specified an Outside Closing Date of September 30, 2006, subject to Purchaser's right to extend for two thirty-day periods.

36.    As required by the Purchase Agreement, promptly upon the signing of the Purchase Agreement in November 2005, on March 28, 2006 IGY filed a development proposal to apply for Approval in Principle from the Ministry of Financial Services and Investments of the Bahamian Government. IGY worked closely over the course of the next year with the Bahamian Government to obtain the approvals required for the Project, and also to reach a Heads of Agreement with the Government.

37.    Over the course of the next nine months, the parties obtained the certifications and necessary approvals needed to close the transaction. On or about December 7, 2006, IGY received approval of the Proposed Development by the National Economic Counsel of the Bahamian Government as well as an Approval in Principle from the Ministry of Financial Services and Investments of the Bahamian Government to construct a mixed-use mega-yacht marina and resort development (the "Approval in Principle"). IGY also received approval of the proposed sale transaction, which would result in a Heads of Agreement provided that a Shareholders' Agreement was entered into by the parties.

38.    In addition, during this time, on the basis of the detailed terms for the Shareholders' Agreement set forth in the Purchase Agreement, IGY gave a draft of the Shareholders' Agreement to the Sellers in September 2006. Because the Shareholders' Agreement had already been substantially negotiated, the Sellers had few comments to the Shareholders' Agreement which they delivered to IGY, and IGY incorporated or otherwise satisfactorily addressed all of the Sellers' comments. By early December 2006, the parties had agreed upon the form of the Shareholders' Agreement that could be submitted to the Bahamian

Government in connection with obtaining the Heads of Agreement -- after all of the Sellers' comments had been addressed, the Sellers did not indicate that they had any additional comments, nor did they indicate that the Shareholders' Agreement was unacceptable in any way. Moreover, Sellers had an obligation under the Purchase Agreement not to "unreasonably withhold, condition, or delay [their] approval" of the Shareholders' Agreement.

39.    The form of Shareholders' Agreement which was agreed upon was consistent with the requirements of the Purchase Agreement.

40.    IGY spent nearly $1 million throughout the course of the transaction, drawing up plans required by the Bahamian Government, obtaining licenses and permits, conducting due diligence investigations, legal fees and costs, and engaging third parties to prepare reports, studies, analyses and design plans necessary for closing and in an effort to lay the groundwork for Government approval.  IGY retained Bahamian local legal counsel and third party consultants to provide lobbying and advisory services, perform environmental investigations including a Phase 1 Site Assessment, complete residential market studies, perform a wind/wave engineering study, develop a parking study, perform a geotechnical investigation, provide conceptual design services relating to the marina, hotel, retail, office and parking, and provide several artistic renderings of the Project.  In addition, during the entire time IGY was negotiating the Heads of Agreement with the Bahamian Government.

41.    Pursuant to the Purchase Agreement, IGY expected that the Sellers would, at the closing, execute the Shareholders' Agreement that had been agreed to, which was a prerequisite to a Heads of Agreement.   Without a Heads of Agreement the entire Project would be terminated.

**Adurion's Involvement Beginning in December 2006**

42.    In approximately early December 2006, Defendant Sellers and their agent, Allen, advised IGY that a majority economic interest and voting interest in British Colonial had been acquired in some manner by Adurion.  Pursuant to Section 10.07 of the Purchase Agreement, which required IGY's consent before the Sellers could assign the Purchase Agreement to another party, British Colonial requested that IGY consent to the assignment of some portion of British Colonial's interest to Adurion.

43.    In connection with the request, Allen, on behalf of the Sellers specifically assured IGY that Adurion intended to cooperate in closing the transaction in accordance with the Purchase Agreement.  Allen, on behalf of the Sellers, specifically advised a representative of IGY and counsel for IGY that Adurion would not seek to alter the existing contractual arrangement between the parties or fail to honor the agreements previously agreed upon by the Sellers.

44.    In addition, the Sellers continued to represent that they would approve the Shareholders' Agreement which was a prerequisite to receiving the Heads of Agreement. Adurion also represented to IGY that it intended to proceed to closing of the transaction which was in place, and in respect to which IGY had been incurring extensive expense and effort over the course of more than a year to bring to closing.

45.    In fact, in order to induce IGY to give its consent to the assignment to Adurion, in early December 2006 the agent of the Sellers, Allen, specifically told a representative of IGY that Adurion intended to proceed to closing the transaction which had been negotiated, that Adurion's involvement would not block the closing, and that Adurion intended to honor the

Sellers' obligations under the Purchase Agreement, including approving the Shareholders' Agreement.

46.     Relying on these representations, IGY gave its consent to the assignment of a portion of the Purchase Agreement to Adurion. In addition, IGY requested an extension of the Outside Closing Date first to January 31, 2007, then to June 30, 2007, to allow the Bahamian Government sufficient time to issue the Heads of Agreement. Defendants agreed to the January 31, 2007 extension specifically, and did not refuse the June 30, 2007 extension.

47.     In contrast to the explicit representations of the Sellers and Allen to induce IGY to consent to the assignment to Adurion, almost immediately after the assignment Adurion began to demand to revisit the agreements among IGY, British Colonial and the Ocean Bay Entities, and the Shareholders' Agreements exchanged by the parties in order to renegotiate the terms of the deal, including the purchase price, that had been agreed upon.

48.     In particular, Adurion demanded the renegotiation of the Shareholders' Agreement which had already been agreed to by the parties prior to Adurion's involvement in early December 2006.

49.     On information and belief, all of a sudden Adurion refused to permit the Sellers to approve the Shareholders' Agreement, causing the Sellers to renege on the deal. Adurion raised, and caused the Sellers to raise, additional objections and comments to the Shareholders' Agreement that were inconsistent with both the fundamental terms of the Joint Venture outlined in the Purchase Agreement and Sellers' explicit obligations in the Purchase Agreement to act in good faith with respect to the negotiation and approval of the Shareholders' Agreement.

50.     Instead, Adurion demanded and caused the Sellers to demand that the boundaries of the Property that would be sold should be decreased so as not to include certain portions of the

**Exhibit A (Part 2)**

land, and demanded that the purchase price should be increased, that IGY take on additional obligations, that the Seller group be granted additional management rights over the development Project (even though Defendants do not have the expertise in marina development that IGY, whose entire business is devoted to it, does), as well as renegotiating the limits of the marina, site configuration and emergency access to the British Colonial hotel site, *inter alia*.

51.    Adurion's actions and the actions it caused all of the other Defendants to take, thereby prevented IGY from ever obtaining the necessary Heads of Agreement. Defendants thereby unilaterally prevented the closing. Defendants' actions undercut all of the agreements that had already been negotiated among the parties in this transaction that was approaching closing, and undercut all of the extensive work undertaken by IGY for more than one year.

52.    Adurion's failure and refusal to permit the Sellers to approve the agreed upon Shareholders' Agreement, pursuant to the Purchase Agreement, was done in bad faith, even though it knew that the approved Shareholders' Agreement was the *sine qua non* of the transaction proceeding to closing, because without it the Bahamian Government would not give its Heads of Agreement. Sellers' obstruction of the closing by failure to approve the Shareholders' Agreement was in breach of Sellers' obligations under the Purchase Agreement, including but not limited to Section 7.03 which prohibited them from "unreasonably withhold[ing], condition[ing], or delay[ing] . . . approval" of the Shareholders' Agreement.

53.    Thus, even though IGY had received the Approval in Principle on December 7, 2006, Adurion's refusal to permit execution of the Shareholders' Agreement – causing the Sellers to be in violation of the Purchase Agreement – was the reason that the transaction could not proceed to closing, because Defendants prevented a Heads of Agreement from ever being capable of being issued by the Bahamian Government.

16

54.    Defendants' unilateral wrongful actions and contractual breaches were the cause of the closing not having occurred by the Outside Closing Date as defined by the Purchase Agreement and as extended by agreement of the parties.

55.    Despite Defendants' own obstructive conduct which prevented a closing from occurring, on or about July 5, 2007, it was Defendants who sent a letter to IGY purporting to give notice that they were terminating the Purchase Agreement pursuant to Section 9.01(d) thereof for Purchaser's failure to effectuate a closing prior to the Outside Closing Date defined in the Agreement.    However, Section 9.01(d) prevents precisely this circumstance – it does not permit the party whose actions caused the inability to close – here, Sellers – to also terminate the Purchase Agreement for failure to close.

56.    On or about July 18, 2007, IGY sent demand letters to all Defendants demanding that they comply with their obligations under the Purchase Agreement according to its terms, including without limitation their obligations under Section 7.03 of the Purchase Agreement to approve the Shareholders' Agreement in the form that had already been negotiated, and to take all necessary steps to proceed to a prompt closing of the purchase within a commercially reasonable timeframe.

57.    Defendants responded by letter dated July 27, 2007 stating, *inter alia,* that they considered the Purchase Agreement terminated.

58.    On information and belief, after wrongfully purporting to terminate the Purchase Agreement, Defendants are using the work product developed by IGY over the course of more than a year, including designs, plans, financial projections and relationships, and are in particular using the approvals and licenses obtained from the Bahamian Government through IGY's sole efforts and labor, in order to build the planned marina without IGY.  Rather, on information and

17

belief, Defendants have partnered with another investor, and intend to move forward with the Project as planned without IGY.

59.    Accordingly, on information and belief, Adurion engaged in its wrongful conduct to prevent Sellers from approving the Shareholders' Agreement, and all Defendants prevented the business relationship between IGY and the Bahamian Government, for the sole purpose of harming IGY, and intentionally and with malice, in order to prevent IGY from reaping the fruits of its labor over the course of more than a year, to prevent it from participating in the Project and wrongfully to misappropriate its efforts, goodwill and Property, including misappropriation of IGY's work product over the course of more than one year, plans, specifications, and other materials. This all was in violation of the Purchase Agreement, and also in violation of the confidentiality agreement contained within the Purchase Agreement.

60.    Defendants' actions not only misappropriate the value of IGY's labor, but also minimizes IGY or IGYL's ability to develop a marina on a different parcel of land. As set forth above, the Bahamian Government was not initially inclined to approve one marina, let alone two. In any event, Nassau is a small island and the market and Nassau cannot support an infinite number of such Projects. In fact, the site of the Project was unique because, on information and belief, it was the sole viable site for the contemplated Project. And, Defendants' interference in IGY's established business relationship with the Bahamian Government has caused IGY harm on this basis as well.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Against the Ocean Bay Entities and British Colonial)

61.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-60 with the same force and effect as if set forth in their entirety in this paragraph.

62.    The Purchase Agreement is a valid and enforceable contract entered into by IGY and Defendants the Ocean Bay Entities and British Colonial.

63.    IGY has at all times duly performed all of its obligations pursuant to the Purchase Agreement.

64.    Despite demand being made by Plaintiffs, Defendants the Ocean Bay Entities and British Colonial have failed and refused and still fail and refuse, to perform the terms of the Purchase Agreement to be performed on Defendants' part. In particular, *inter alia*, Defendants have breached the Agreement by refusing to agree upon the final Shareholders' Agreement which was agreed upon by IGY and Sellers prior to Adurion's involvement in early December 2006, which was required by the terms of the Purchase Agreement, and which was in substantially the same form as required under Schedule A to the Purchase Agreement. By so refusing, Defendants Ocean Bay Entities and British Colonial unilaterally prevented the transaction contemplated by the Purchase Agreement from Closing, because an agreed-upon Shareholders' Agreement was a prerequisite to the Bahamian Government entering into a Heads of Agreement approving the Project, and the right to use the seabed and also approving the sale of the Property, which, in turn, was a prerequisite and critical requirement of closing.

65.    Defendants' breaches of the Purchase Agreement were material.

66.    By acting in bad faith and by failing and refusing to approve the Shareholders' Agreement, Defendants the Ocean Bay Entities and British Colonial also breached the implied covenant of good faith and fair dealing in the Purchase Agreement, and specifically breached their express obligations to act in good faith pursuant to Sections 5.05 and 7.03 of the Purchase Agreement.

67.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## SECOND CAUSE OF ACTION

**(Specific Performance – Against the Ocean Bay Entities and British Colonial)**

68.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-67 with the same force and effect as if set forth in their entirety in this paragraph.

69.    The Purchase Agreement is a valid and enforceable contract entered into by IGY and Defendants the Ocean Bay Entities and British Colonial.

70.    IGY has at all times duly performed all of its obligations pursuant to the Purchase Agreement and has at all times been willing and able to perform any remaining obligations, including proceeding to closing of the transaction contemplated by the Purchase Agreement.

71.    Despite demand being made by Plaintiffs, Defendants the Ocean Bay Entities and British Colonial failed and refused and still fail and refuse, to perform the terms of the Purchase Agreement to be performed on Defendants' part.   In particular, *inter alia,* Defendants have breached the Agreement by refusing to approve the Shareholders' Agreement which was agreed upon by IGY and Defendants, which was required by the terms of the Purchase Agreement, and which was in substantially the same form as required under Schedule A to the Purchase Agreement.  By so refusing, Defendants unilaterally prevented the transaction contemplated by the Purchase Agreement from Closing, because a finalized and approved Shareholders' Agreement was a prerequisite to the Bahamian Government entering into a Heads of Agreement approving the Project, which, in turn, was a prerequisite and critical requirement of closing.

72.    Defendants the Ocean Bay Entities and British Colonial have at all times been able and still are able to perform the terms of the Purchase Agreement to be performed on

20

Defendants' part. In particular, *inter alia*, Defendants the Ocean Bay Entities and British Colonial have been and are able to approve the Shareholders' Agreement which was agreed upon by IGY and Defendants and are able to convey the Property as contemplated by the Purchase Agreement.

73.    IGY has no adequate remedy at law, because the Property is unique.

74.    By reason of the foregoing, IGY is entitled to a Judgment ordering Defendants the Ocean Bay Entities and British Colonial to approve the Shareholders' Agreement and convey the Property pursuant to the terms of the Purchase Agreement.

## THIRD CAUSE OF ACTION

### (Tortious Interference with Contractual Relations – Against Adurion)

75.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-74 with the same force and effect as if set forth in their entirety in this paragraph.

76.    The Purchase Agreement is a valid and enforceable contract entered into by IGY and Defendants the Ocean Bay Entities and British Colonial.

77.    Adurion had actual knowledge of the Purchase Agreement among IGY and the Sellers and had specific knowledge of all of its terms.

78.    Adurion, acting in bad faith, either with the sole purpose to harm IGY or with wrongful, dishonest, unfair and improper means and intentionally, maliciously, and without justification caused the Ocean Bay Entities and British Colonial to breach the Purchase Agreement by, *inter alia*, causing them to fail and refuse to approve the Shareholders' Agreement as required by the Purchase Agreement and its Schedules.

79.    The Ocean Bay Entities and British Colonial did in fact breach the Purchase Agreement to be performed on Defendants' part. In particular, *inter alia*, Defendants Ocean Bay

Entities and British Colonial have breached the Agreement by refusing to finally approve the form of the Shareholders' Agreement which had been agreed upon by IGY and Defendants the Ocean Bay Entities and British Colonial prior to Adurion's involvement, which was required by the terms of the Purchase Agreement, and which was in substantially the same form as required under Schedule A to the Purchase Agreement. By so refusing, Defendants unilaterally prevented the transaction contemplated by the Purchase Agreement from Closing, because an approved Shareholders' Agreement was a prerequisite to the Bahamian Government entering into a Heads of Agreement approving the Project, which, in turn, was a prerequisite and critical requirement of closing.

80.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## FOURTH CAUSE OF ACTION

### (Tortious Interference with Prospective Business Relations – Against Adurion)

81.    IGY and IGYL incorporate by reference, repeat and reallege each and every allegation in paragraphs 1-80 with the same force and effect as if set forth in their entirety in this paragraph.

82.    IGY and IGYL had a business relationship with Defendants the Ocean Bay Entities and British Colonial in that IGY and the Sellers had entered in to the Purchase Agreement including Schedule A thereto and the parties had also reached an agreement as to the form of a Shareholders' Agreement to be signed, governing the terms whereby after the closing IGY would be a Joint Venture to be entered into as contemplated in the Purchase Agreement. As set forth in the Purchase Agreement, the shareholders of IGY post-closing would be  the Sellers

on the one hand, and IGY's parent company, IGYL, or a designated affiliate of IGYL on the other hand.

83.    But for the wrongful interference by Adurion, the negotiations and relations among Plaintiffs and the Ocean Bay Entities and British Colonial would have culminated in an approved Shareholders' Agreement, and accordingly would have culminated in a closing of the transaction contemplated by the Purchase Agreement.

84.    Adurion had actual knowledge of the business relations among Plaintiffs and the Ocean Bay Entities and British Colonial.

85.    Adurion acted in bad faith, either with the sole purpose to harm Plaintiffs or with wrongful, dishonest, unfair and improper means and intentionally, maliciously, and without justification interfered in the business relationship between Plaintiffs and the Ocean Bay Entities and British Colonial.  On information and belief, Adurion engaged in its wrongful conduct to prevent Sellers from approving the Shareholders' Agreement, for the sole purpose of harming Plaintiffs, and intentionally and with malice, in order to prevent Plaintiffs from reaping the fruits of IGY's labor over the course of more than a year, and to prevent Plaintiffs from participating in the Project.

86.    Adurion in fact caused injury to the business relations among Plaintiffs and the Ocean Bay Entities and British Colonial.

87.    As a direct result of the foregoing, IGY and IGYL have been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

23

## FIFTH CAUSE OF ACTION

### (Fraud in the Inducement – Against All Defendants)

88.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-87 with the same force and effect as if set forth in their entirety in this paragraph.

89.    Pursuant to Section 10.07 of the Purchase Agreement, which required IGY's consent before the Sellers could assign the Purchase Agreement to another party, Sellers requested that IGY consent to the assignment of some portion of British Colonial's interest to Adurion.

90.    In order to induce IGY to give its consent to the assignment of some portion of the Sellers' interest in either the Purchase Agreement or the transaction contemplated thereby to Adurion, in early December 2006 Allen, as Agent of the Sellers, specifically told a representative of IGY that Adurion intended to proceed to closing the transaction which had been negotiated, that Adurion's involvement would not block the closing, and that Adurion intended to honor the Sellers' obligations under the Purchase Agreement, including approving the Shareholders' Agreement.   Allen specifically represented to IGY's representative that Adurion would stand by the transaction on the terms already agreed upon and would not try to renegotiate the deal, and reaffirmed that misrepresentation in numerous telephone calls and in person meetings in November and December 2006.

91.    This statement by Allen, on the Sellers' behalf, was false, and was known by him to be false at the time that he made it, because he and the sellers were aware on information and belief that Adurion did not intend to abide by the terms of the Purchase Agreement at the time the representations made, and in fact after IGY gave its consent to the assignment, Adurion immediately began to attempt to demand to renegotiate significant terms of the Agreement.

24

92.    IGY justifiably relied on Allen's misrepresentation and was deceived by it, believing it to be true.

93.    IGY was injured because, contrary to Allen's statement, Adurion never intended to allow the Ocean Bay Entities or British Colonial to perform under the terms of the Purchase Agreement.

94.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## SIXTH CAUSE OF ACTION

### (Unfair Competition – Against All Defendants)

95.    IGY incorporates by reference, repeats and realleges each and every allegation in paragraphs 1-94 with the same force and effect as if set forth in their entirety in this paragraph.

96.    The Purchase Agreement constituted a valid and existing Agreement which required Defendants the Ocean Bay Entities and British Colonial to refrain from competition with IGY concerning the subject matter of the transaction and Project contemplated by the Purchase Agreement.  In addition, Defendants the Ocean Bay Entities and British Colonial were in a confidential relation with IGY because they had substantially agreed to all of the terms of the Joint Venture among them both in Schedule A to the Purchase Agreement and also by approving the Shareholders' Agreement among the parties.

97.    Further, Section 5.02 of the Purchase Agreement contained a confidentiality agreement, whereby the Sellers agreed to hold confidential (and to cause their agents to hold confidential) and not disclose "all information, whether written or oral, furnished to Seller about Purchaser, its Affiliates or their business and affairs, including, without limitation, the IGY Partnership Agreement and the IGY Unaudited Financials." The Purchase Agreement prohibited

Sellers from disclosing any type of "confidential information, including analyses, compilations, studies or other documents prepared," and further prohibited disclosure of the Purchase Agreement and transactions contemplated thereby.

98.    However, Defendants the Ocean Bay Entities and British Colonial have deliberately and willfully, by unfair and improper means, and in violation of their contractual and confidential obligations, misappropriated the labor and expenditures of IGY incurred throughout the course of the transaction, during which time IGY spent nearly $1 million drawing up plans required by the Bahamian Government, obtaining licenses and permits, conducting due diligence investigations, and engaging third parties to prepare reports, studies, analyses and design plans necessary for closing.  In addition during this entire time IGY was negotiating the Heads of Agreement with the Bahamian Government and obtained an Agreement in Principle for the benefit of IGY to construct a mixed-use mega-yacht marina and resort development.

99.    Defendants the Ocean Bay Entities and British Colonial are unfairly misappropriating IGY's commercial advantage earned through organization, skill, labor, and money, by taking all of that material to which they had access, including the fruitful results of the negotiations with the Bahamian Government, and after wrongfully purporting to breach the Purchase Agreement, using that material in connection with building the marina contemplated by the Project, but with a different partner.

100.    As a direct result of the foregoing, IGY has been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## SEVENTH CAUSE OF ACTION

**(Tortious Interference with Prospective Business Relations – against all Defendants)**

101.   IGY and IGYL incorporate by reference, repeat and reallege each and every allegation in paragraphs 1-100 with the same force and effect as if set forth in their entirety in this paragraph.

102.   IGY and IGYL had a business relationship with the Bahamian Government in that they had negotiated the terms of a Heads of Agreement over the course of close negotiations over the course of a year, and on December 7, 2006, the Ministry of Financial Services and Investments of the Bahamian Government issued to IGY the Approval in Principle to construct a mixed-use mega-yacht marina and resort development.

103.   But for the wrongful interference by Defendants, on information and belief the negotiations and relations among IGY, IGYL and the Bahamian Government would have culminated in a signed Heads of Agreement, and accordingly would have culminated in a closing of the transaction contemplated by the Purchase Agreement or, in the alternative, would have granted IGY and IGYL the license based on the negotiations already conducted to develop a marina on another site.

104.   Defendants had actual knowledge of the business relations between IGY and IGYL and the Bahamian Government.

105.   Defendants acted in bad faith, either with the sole purpose to harm IGY and IGYL or with wrongful, dishonest, unfair and improper means and intentionally, maliciously, and without justification interfered in the business relationship between the Bahamian Government. On information and belief, Defendants prevented the business relationship between IGY, IGYL and the Bahamian Government, for the sole purpose of harming IGY and IGYL, and

27

intentionally and with malice, in order to prevent IGY and IGYL from reaping the fruits of their labor over the course of more than one year, and to prevent them from participating in the Project or any other similar Project in the Bahamas.

106.    Defendants in fact caused injury to the business relations between IGY and IGYL and the Bahamian Government.

107.    As a direct result of the foregoing, IGY and IGYL have been damaged in amount yet to be determined but believed to be no less than $ 85,000,000.

## PRAYER FOR RELIEF

WHEREFORE, for all of the foregoing reasons, Plaintiffs pray for judgment as follows:

(1)    On the first cause of action, granting IGY's damages on its cause of action for breach of contract in an amount yet to be determined but believed to be no less than $ 85,000,000;

(2)    On the second cause of action, granting IGY specific performance of the Purchase Agreement, requiring Defendants to agree to the Shareholders' Agreement and to close the transaction contemplated by the Purchase Agreement;

(3)    On the third cause of action, granting IGY damages on its cause of action for tortious interference with contract in an amount yet to be determined but believed to be no less than $ 85,000,000;

(4)    On the fourth cause of action, granting IGY and IGYL damages on their cause of action for tortious interference with prospective business relations in an amount yet to be determined but believed to be no less than $ 85,000,000;

(5)    On the fifth cause of action, granting IGY damages on its cause of action for fraud in the inducement in an amount yet to be determined but believed to be no less than $ 85,000,000.

(6)    On the sixth cause of action, granting IGY damages on its cause of action for unfair competition in an amount yet to be determined but believed to be no less than $ 85,000,000;

(7)    On the seventh cause of action, granting IGY and IGYL damages on their cause of action for tortious interference with prospective business relations in an amount yet to be determined but believed to be no less than $ 85,000,000;

(8)    Awarding Plaintiff the costs and disbursements of this action, including attorneys' fees; and

(9)    Granting Plaintiff such other and further relief as this Court may deem just, proper and equitable.

Dated: New York, New York
      October 5, 2007

GREENBERG TRAURIG, LLP

By: _____
Simon Miller
Sophia Tsokos
200 Park Avenue
New York, New York 10166
(212) 801-9200

*Attorneys for Plaintiffs*

29

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IGY OCEAN BAY PROPERTIES LIMITED and
ISLAND GLOBAL YACHTING LTD.,

Plaintiffs,

v.

OCEAN BAY PROPERTIES I LIMITED, OCEAN BAY
PROPERTIES II LIMITED, BRITISH COLONIAL
DEVELOPMENT COMPANY LIMITED, PRK
HOLDINGS LTD., ADURION CAPITAL LIMITED and
GEORGE ALLEN,

Defendants.

SUMMONS AND COMPLAINT

Law Offices
Greenberg Traurig, LLP

Attorneys for Plaintiffs

Met Life Building
200 Park Avenue
New York, NY 10166

212.801.9200
Fax 212.801.6400
www.gtlaw.com

**Exhibit B (Part 1)**

## PURCHASE AGREEMENT

**Between**

**OCEAN BAY PROPERTIES I LIMITED, OCEAN BAY PROPERTIES II LIMITED, and BRITISH COLONIAL DEVELOPMENT COMPANY LIMITED,**

collectively, as Seller

**and**

**IGY OCEAN BAY PROPERTIES LIMITED,**

as Purchaser

**Dated as of November 7, 2005**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** .................................................................................................**2**
    SECTION 1.01.    Certain Defined Terms ....................................................2
    SECTION 1.02.    Interpretation and Rules of Construction.............................8

**ARTICLE II PURCHASE AND SALE**.............................................................................**8**
    SECTION 2.01.    Purchase and Sale of the Property ...................................8
    SECTION 2.02.    Consideration...................................................................9
    SECTION 2.03.    Closing Adjustments; Closing Costs. .............................10
    SECTION 2.04.    Closing............................................................................10
    SECTION 2.05.    Closing Deliveries by Seller ..........................................10
    SECTION 2.06.    Closing Deliveries by Purchaser....................................11
    SECTION 2.07.    Allocation of Consideration............................................12
    SECTION 2.08.    Title Abstract .................................................................12

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ..........................**13**
    SECTION 3.01.    Authority of Seller..........................................................13
    SECTION 3.02.    Organization, Authority and Qualification of Seller Entities...........13
    SECTION 3.03.    No Conflict .....................................................................13
    SECTION 3.04.    Governmental Consents and Third Party Approvals........................13
    SECTION 3.05.    Financial Information. .....................................................14
    SECTION 3.06.    Intentionally Omitted......................................................14
    SECTION 3.07.    Intentionally Omitted......................................................14
    SECTION 3.08.    Litigation .......................................................................14
    SECTION 3.09.    Compliance with Laws; Permits......................................14
    SECTION 3.10.    Intellectual Property. ......................................................14
    SECTION 3.11.    Taxes..............................................................................14
    SECTION 3.12.    Material Contracts. .........................................................15
    SECTION 3.13.    Tangible Personal Property .............................................15
    SECTION 3.14.    Full Disclosure...............................................................15
    SECTION 3.15.    Brokers...........................................................................15
    SECTION 3.16.    Title................................................................................15
    SECTION 3.17.    Solvency ........................................................................16

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................**16**
    SECTION 4.01.    Organization and Authority of Purchaser........................16
    SECTION 4.02.    No Conflict .....................................................................16
    SECTION 4.03.    Brokers...........................................................................16
    SECTION 4.04.    Due Diligence Expenses; Credited Deposit.....................17
    SECTION 4.05.    Financing .......................................................................17
    SECTION 4.06.    Seller Deliveries. ...........................................................17

**ARTICLE V ADDITIONAL AGREEMENTS**....................................................................**17**
    SECTION 5.01.    Conduct Related to Property Prior to the Closing .............17

i

SECTION 5.02.    Confidentiality and Public Announcements .......................................18
SECTION 5.03.    Tax Concessions. ............................................................................19
SECTION 5.04.    Further Action...................................................................................19
SECTION 5.05.    Additional Covenants ......................................................................19
SECTION 5.06.    Exclusivity........................................................................................19
SECTION 5.07.    Notice................................................................................................20
SECTION 5.08.    Third Party Consultants ..................................................................20
SECTION 5.09.    Title to Real Property ......................................................................20

ARTICLE VI TAX MATTERS ..................................................................................21
SECTION 6.01.    Conveyance Taxes............................................................................21

ARTICLE VII CONDITIONS TO CLOSING ...........................................................21
SECTION 7.01.    Conditions to Obligations of Purchaser...........................................21
SECTION 7.02.    Conditions to Obligations of Seller .................................................23
SECTION 7.03.    Good Faith Efforts; Critical Path Schedule .....................................24

ARTICLE VIII INDEMNIFICATION .........................................................................25
SECTION 8.01.    Survival of Representations and Warranties .....................................25
SECTION 8.02.    Indemnification by Indemnifying Parties..........................................25
SECTION 8.03.    Notice of Loss; Third Party Claims...................................................26
SECTION 8.04.    Tax Treatment..................................................................................27

ARTICLE IX TERMINATION.....................................................................................27
SECTION 9.01.    Basis of Termination. .......................................................................27
SECTION 9.02.    Effect of Termination .......................................................................28

ARTICLE X GENERAL PROVISIONS ......................................................................29
SECTION 10.01.   Expenses ...........................................................................................29
SECTION 10.02.   Notices..............................................................................................29
SECTION 10.03.   Escrow of Cash Deposit ...................................................................31
SECTION 10.04.   Intentionally Omitted........................................................................32
SECTION 10.05.   Severability.......................................................................................32
SECTION 10.06.   Entire Agreement..............................................................................32
SECTION 10.07.   Assignment .......................................................................................32
SECTION 10.08.   Amendment .......................................................................................33
SECTION 10.09.   Waiver ...............................................................................................33
SECTION 10.10.   No Third Party Beneficiaries.............................................................33
SECTION 10.11.   Currency ...........................................................................................33
SECTION 10.12.   Governing Law..................................................................................33
SECTION 10.13.   Waiver of Jury Trial .........................................................................34
SECTION 10.14.   Mutual Drafting ................................................................................34
SECTION 10.15.   Counterparts......................................................................................34
SECTION 10.16.   Joint and Several...............................................................................34

THIS PURCHASE AGREEMENT (this "Agreement"), is dated as of November 7, 2005, among OCEAN BAY PROPERTIES I LIMITED, a corporation incorporated under the laws of the Commonwealth of the Bahamas ("Ocean I"), OCEAN BAY PROPERTIES II LIMITED, a corporation incorporated under the laws of the Commonwealth of the Bahamas ("Ocean II"), and BRITISH COLONIAL DEVELOPMENT COMPANY LIMITED, a corporation incorporated under the laws of the Commonwealth of the Bahamas ("BCD") (Ocean I, Ocean II and to the extent provided in **Section 5.10** below, BCD, each, a "Seller Entity" and collectively, "Seller"), and IGY OCEAN BAY PROPERTIES LIMITED, a corporation incorporated under the laws of the Commonwealth of the Bahamas ("Purchaser").

## RECITATIONS:

A.      Ocean I is the fee owner of approximately 3.05 acres of land referred to in the Existing Heads of Agreement (as defined herein), as being bounded Northwardly by the Harbor of Nassau, Eastwardly by the British Colonial Hilton Hotel (the "BC Hotel"), Southwardly by the walk on the North side of Marlborough Street and by West Bay Street, and Westwardly by West Bay Street and by the Ocean II Property (the "Ocean I Property").

B.      Ocean II is the fee owner of approximately 2.01 acres of land referred to in the Existing Heads of Agreement as being bounded Northwardly by the Harbor of Nassau, Eastwardly by the Ocean I Property, Southwardly by West Bay Street and by Crown Land known as the Western Esplanade and Westwardly by the Crown Land and by Nassau Harbor (the "Ocean II Property" and collectively with the Ocean I Property, the "Ocean Bay Property").

C.      BCD is the fee owner of those certain parcels of land upon which the BC Hotel, the Center of Commerce and the Fort Nassau Buildings are situated (collectively, the "BC Hotel Property") and is willing to grant, in accordance with this Agreement, certain reciprocal use and access rights between the BC Hotel Property and the Ocean Bay Property to enable access to and from the portion of the Submerged Land (as defined herein) adjacent to the BC Hotel Property on which a portion of a marina may be developed as depicted on **Schedule "C"** attached hereto.

D.      Seller has indicated that it now has or can assist Purchaser in its efforts to obtain all of the permits, licenses and approvals that may be necessary for Purchaser to (i) obtain the right from the Government of the Commonwealth of the Bahamas, by easement, lease, irrevocable license or otherwise, to use, develop and occupy the Submerged Land, and (ii) develop a mixed-use project on the Ocean I Property, the Ocean II Property and the Submerged Land, including, but not limited to, a mega-yacht marina and attendant facilities as well as other uses (such as retail, commercial, parking and/or residential properties) that Purchaser determines may be appropriate for the Ocean Bay Property, all as more specifically described on **Schedule "B"** attached hereto (the "Potential Development").

E.      Seller desires to participate in the Potential Development of the Ocean Bay Property by obtaining an equity interest in Purchaser at the Closing.

F.      Purchaser and Seller desire to effect a transaction whereby Seller will sell, and Purchaser will purchase, the Ocean Bay Property in exchange for the Consideration (as defined herein) and otherwise upon the terms and subject to the conditions provided for below.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, Seller and Purchaser hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01.      <u>Certain Defined Terms</u>.  For purposes of this Agreement:

"<u>Acquisition Documents</u>" means this Agreement, the Deeds, the Amended and Restated Operating Agreement, the Bill of Sale, and any certificate, financial statement, report or other document delivered at Closing pursuant to this Agreement.

"<u>Action</u>" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person.

"<u>Amended and Restated Operating Agreement</u>" means the Amended and Restated Operating Agreement of Purchaser, mutually agreed to by Purchaser and Seller, admitting the Seller Member as a member of Purchaser with an initial percentage membership interest equal to the Seller Equity Interest and otherwise reflecting the terms and conditions set forth on **Schedule A** attached hereto.

"<u>Bill of Sale</u>" has the meaning set forth in **Section 2.05** hereof.

"<u>BC Hotel Parking Needs</u>" has the meaning set forth in **Section 7.01(l)** hereof.

"<u>BCD</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are required by Law to be closed in the City of New York.

"<u>Cash Deposit</u>" has the meaning set forth in **Section 2.02(a)**.

"<u>Cash Consideration</u>" has the meaning set forth in **Section 2.02(a)**.

"<u>Claims</u>" means any and all administrative, regulatory or judicial actions, suits, petitions, appeals, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations, proceedings, consent orders or consent agreements.

2

"Closing" means the closing described in **Section 2.04** hereof and other transactions contemplated pursuant to this Agreement and shall be deemed to occur on the Closing Date.

"Closing Date" means the date on which the Closing occurs. As more specifically discussed in **Section 7.03** hereof, Purchaser and Seller shall each use their respective good faith and commercially reasonable efforts to cause the Closing to occur by January 31, 2006.

"Consideration" has the meaning set forth in **Section 2.02** hereof.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer or gains and similar Taxes imposed by any Governmental Authority in connection with the conveyance and sale of the Property (or any portion thereof) to Purchaser.

"Credited Deposit" has the meaning set forth in **Section 2.02(b)**.

"Deed" means the general warranty deed[s] to be executed by Seller at the Closing, sufficient in form and substance to convey fee simple title in each parcel of Ocean Bay Property to Purchaser.

"Deposit" has the meaning set forth in **Section 2.02(b)**.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as **Exhibit 1.01(b)**, to be delivered by Seller to Purchaser pursuant to **Section 4.06** hereof.

"Encumbrances" means any security interest, pledge, hypothecation, mortgage, lien (including environmental and tax liens), violation, charge, lease, license, encumbrance, servient easement, adverse claim, reversion, reverter, preferential arrangement, restrictive covenant, condition or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

"Environment" means surface waters, groundwaters, soil, subsurface strata and ambient air.

"Environmental Laws" means all Laws, now or hereafter in effect and as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, health, safety, natural resources or Hazardous Materials.

3

"Environmental Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing and the like into or upon any land or water or air or otherwise entering into the Environment.

"Escrow Agent" shall mean Wormser, Kiely, Galef & Jacobs LLP.

"Existing Heads of Agreement" means that certain Heads of Agreement, dated as of March 10, 1998, by and among the Government of the Commonwealth of the Bahamas, Ocean I, Ocean II and BCD.

"FIB Permit" shall have the meaning set forth in **Section 7.01(d)** hereof.

"Financial Statements" shall have the meaning set forth in **Section 3.05(a)** hereof.

"Governmental Authority" means the Commonwealth of the Bahamas and any political subdivision thereof or agencies or instrumentalities of any thereof and the City of Nassau and any political subdivision thereof or agencies or instrumentalities of any thereof.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Materials" means (a) petroleum and petroleum products, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (b) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any applicable Environmental Law, and (c) any other chemical, material or substance which is regulated by any Environmental Law.

"IGY" shall mean Island Global Yachting L.P., a Cayman Islands exempted limited partnership, together with its Affiliates.

"IGY Contributions" means any and all out-of-pocket costs and expenses incurred by Purchaser, IGY and their Affiliates at or prior to Closing in connection with the acquisition of the Property, due diligence investigation of the Property and the preparation of the Preliminary Plans for the Potential Development, including, without limitation, Purchaser's share of the Conveyance Taxes (as set forth in **Section 2.03(b)**) and Other Closing Charges, travel expenses, environmental site assessment reports, property condition reports, marine and geophysical studies, engineering studies, market studies, feasibility reports and design and development plans, Purchaser's Share of Costs to remediate the Known Contamination and the fees and costs of legal counsel incurred in connection with the drafting and negotiation of this Agreement, the drafting and negotiation of the Acquisition Documents and the Closing, in all such cases supported by reasonably detailed invoices. Organizational costs of IGY and their Affiliates (excluding Purchaser) shall not be deemed to be IGY Contributions.

"IGY Partnership Agreement" has the meaning set forth in **Section 4.05**.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, (e) all other intellectual property or proprietary or industrial rights and moral rights and (f) registrations and applications for registration of the foregoing.

"LIBOR" shall mean the per annum London Interbank Offered Rate for U.S. dollar deposits having a one-month term (rounded upwards, if necessary, to the nearest one-sixteenth (1/16) of one (1%) percent) as reported in The Wall Street Journal (or if The Wall Street Journal shall cease to be publicly available or if the information contained in The Wall Street Journal, in the Purchaser's judgment, shall cease to accurately reflect such London Interbank Offered Rate, then LIBOR shall be as reported by any publicly available reputable source of similar market data selected by the Purchaser that, in the Purchaser's sole judgment, accurately reflects such London Interbank Offered Rate).

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law (including any Environmental Law), Action or Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking.

"Management Agreement" means that certain management agreement in effect as of the date hereof between BCD (or its designee) and its property manager which relates to the management of the parking lot located on the BC Hotel Property.

"Material Contracts" has the meaning set forth in **Section 3.12(a)** hereof.

"Necessary Approvals" has the meaning set forth in **Section 7.01** hereof.

"Ocean I" has the meaning set forth in the recitals to this Agreement.

"Ocean II" has the meaning set forth in the recitals to this Agreement.

"Ocean Bay Property" has the meaning set forth in the recitals to this Agreement.

"Other Closing Charges" has the meaning set forth in **Section 2.03(d)** hereof.

"Outside Closing Date" means September 30, 2006, TIME BEING OF THE ESSENCE; *provided, however,* that if the Necessary Approvals have not been obtained by the then scheduled Outside Closing Date, Purchaser shall have the right to extend the Outside Closing date two (2) times for up to thirty (30) days on each occasion by notice to Seller, with TIME BEING OF THE ESSENCE as to the Outside Closing Date as so extended.

"Owner's Title Policy" means an owner's policy of title insurance, together with endorsements and guarantees, if any, to be issued to Purchaser at Closing by the Title Company, pursuant to which the Title Company insures Purchaser's ownership interest in the Ocean Bay Property.

"Parking Lot Management Agreement" has the meaning set forth in **Section 7.01(i)** hereof.

"Parking Lot Plan" has the meaning set forth in **Section 7.01(l)** hereof.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust or unincorporated organization or other entity.

"Permitted Encumbrances" means any title matter of record which does not have a material adverse effect on (i) the use, operation and development of the Ocean Bay Property as presently conducted, (ii) access to the Ocean Bay Property or (iii) the Potential Development, subject to the provisions of Section 5.09.

"Potential Development" means has the meaning set forth in the recitals to this Agreement.

"Preliminary Plans" means those certain preliminary, conceptual plans for the development of the Ocean Bay Property prepared by Purchaser in consultation with the Seller and summarized on Schedule attached hereto.

"Property Taxes" means real and personal ad valorem property Taxes.

"Property" has the meaning set forth in **Section 2.01** hereof.

"Property Reports" has the meaning set forth in **Section 2.02(b)**.

"Purchaser Indemnified Party" has the meaning set forth in **Section 8.02** hereof.

"Remaining Purchase Price" has the meaning set forth in **Section 2.02** hereof.

"Remedial Action" means all action to (a) clean up, remove, treat or handle in any other way Hazardous Materials in the Environment; (b) prevent the Environmental Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or the Environment; or (c) perform remedial investigations, feasibility studies, corrective actions, closures and post-remedial or post-closure studies, investigations, operations, maintenance and monitoring.

"Requirements of Law" means (a) the organizational documents of an entity, and (b) any law, regulation, ordinance, code, decree, treaty, ruling or determination of an arbitrator, court or other Governmental Authority, in each case applicable to or binding upon such Person or to which such Person, any of its property or the conduct of its business is subject including, without limitation, laws, ordinances and regulations pertaining to the zoning, occupancy and subdivision of real property.

"Seller's Accountants" means the independent certified public accountants of Seller.

"Seller Contributions" means the sum of Seller's share of the Conveyance Taxes (as set forth in Section 2.03(b)), Other Closing Charges, sums paid to Aldevco Inc. not to exceed $5,000 per month for consulting in connection with the transactions contemplated by this Agreement commencing on the date hereof and ending on the Closing Date, the reasonable and actual out-of-pocket costs and expenses incurred by Seller to reimburse George Allen and/or Aldevco Inc. for travel and lodging to the extent related to the transactions contemplated by this Agreement, Seller's share of costs to remediate the Known Contamination, and the fees and costs of legal counsel incurred in connection with the drafting and negotiation of this Agreement and the Acquisition Documents and the Closing, in each case supported by reasonably detailed invoices.

"Seller Entity" has the meaning set forth in the Recitals to this Agreement.

"Seller Equity Interest" means an equity interest in Purchaser to be issued to Seller at the Closing equal to the percentage derived by dividing (i) the sum of the Remaining Purchase Price and Seller Contributions by (ii) the sum of the Consideration, the IGY Contributions and the Seller Contributions.

"Seller Indemnitor" means Ocean I and Ocean II pursuant to **Section 8.03**.

"Seller Member" has the meaning set forth in **Section 2.02** hereof.

"Submerged Land" means (i) the area of submerged land surrounding and immediately adjacent to the Ocean I Property, Ocean II Property and (ii) the area of submerged land surrounding and immediately adjacent to the north-western edge of the BC Hotel Property (i.e., west of the existing sea wall), as depicted on **Schedule C**.

"Tax" or "Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority, including taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs' duties, tariffs, and similar charges.

"Third Party Claim" has the meaning set forth in **Section 8.04(b)** hereof.

"Title Company" means any reputable title insurance company selected by Seller and reasonably satisfactory to Purchaser.

"Title Report" means that certain title report ordered by Seller from Title Company.

SECTION 1.02.    Interpretation and Rules of Construction.    In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or a Schedule or Exhibit to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor Laws;

(h)    references to a Person are also to its successors and permitted assigns; and

(i)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01.    Purchase and Sale of the Property. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Purchaser, and Purchaser shall purchase from Seller, all of the following assets, whether tangible or intangible, and properties, whether real, personal or mixed, all of which are directly or indirectly owned by Seller or to which Seller is directly or indirectly entitled as set forth below (collectively, the "Property"):

(a)    the Ocean Bay Property;

8

(b)    all furniture, fixtures, equipment, machinery and other tangible personal property used or held for use by Seller at the Ocean Bay Property set forth on **Section 3.13** of the Disclosure Schedule attached hereto;

(c)    all rights of Seller under all contracts, licenses, sublicenses, agreements, leases, commitments, and permits related to the Ocean Bay Property, including, without limitation, the Existing Heads of Agreement, and all Material Contracts;

(d)    any and all development rights associated with or appurtenant to the Ocean Bay Property; and

(e)    all municipal, state and federal permits, licenses, agreements, waivers and authorizations held by Seller in connection with, or required for, the Ocean Bay Property, to the extent transferable.

SECTION 2.02.        Consideration.

(a)    The consideration (the "Consideration") for the Property shall be Eighteen Million United States Dollars ($18,000,000.00), which will be paid as follows, subject to adjustments as provided for herein:

(i)    upon its execution and delivery of this Agreement, Purchaser shall deposit with Escrow Agent the sum of Two Hundred Thousand United States Dollars ($200,000.00) (together with the interest, if any, thereon, the "Cash Deposit");

(ii)    Seven Million Eight Hundred Thousand United States Dollars ($7,800,000.00), as adjusted pursuant to **Section 2.03(a)**, shall be paid in cash at Closing by wire transfer of immediately available funds to an account specified by Seller prior to Closing (together with the Cash Deposit, the "Cash Consideration"); and

(iii)    Ten Million United States Dollars ($10,000,000.00), (the "Remaining Purchase Price") shall be payable in the form of the issuance to Seller or its assignee (the "Seller Member") of an initial membership interest in Purchaser equal to the Seller Equity Interest.

(b)    In addition to the Cash Deposit, Seller acknowledges that Purchaser has, or reasonably anticipates that it will, expend in excess of $200,000.00 in the conduct of its due diligence investigations and in engaging third parties to prepare various reports, studies and analysis concerning the Property and its suitability for Purchaser's intended purposes (collectively, the "Property Reports") which amount Purchaser shall be deemed to have made as an additional deposit (the "Credited Deposit" and together with the Cash Deposit, the "Deposit"). If the transactions contemplated hereby close in accordance with the terms hereof, then the Cash Deposit shall be disbursed to Seller on the Closing Date as a credit against the Consideration. If Closing does not occur, the Cash Deposit shall be applied in accordance with the provisions of **Section 9.02**. Attached hereto as **Exhibit 2.02(b)** is an itemized list of amounts expended to date, amounts due but unpaid (based upon invoices received) and amounts expected to be incurred prior to the Closing Date with respect to Purchaser's (or its Affiliate's) due diligence investigation of the Property as of the date hereof.

SECTION 2.03.        Closing Adjustments; Closing Costs.

(a)      The Cash Consideration shall be adjusted to reflect an equitable allocation as between Purchaser and Seller of Property Taxes, payments under and permits and/or contracts being assigned to Purchaser at Closing, and such other items as are customarily allocated between purchasers and sellers of real property in the Bahamas.

(b)      Purchaser shall pay, as its share of Conveyance Taxes, an amount equal to the lesser of:  (x) $400,000.00; or (y) 50% of the actual aggregate Conveyance Taxes.

(c)      Seller shall pay any and all Conveyance Taxes in excess of Purchaser's share of Conveyance Taxes.

(d)      Seller and Purchaser shall each pay half of the total costs of (i) recording/registering the Deeds in connection with the purchase and sale of the Ocean Bay Property, (ii) notarial charges, (iii) other closing costs and expenses and (iv) title insurance premiums (collectively, "Other Closing Charges").

SECTION 2.04.        Closing.  Upon the terms and subject to the conditions of this Agreement, the sale and purchase of the Property contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166 on the third (3rd) Business Day following the satisfaction or waiver by Purchaser of the conditions precedent specified in **Section 7.01** or at or such other time or such other place mutually acceptable to the parties.

SECTION 2.05.        Closing Deliveries by Seller.   At Closing, Seller shall deliver or cause to be delivered to Purchaser:

(a)      the Deeds with all required documentary and Conveyance Tax stamps affixed;

(b)      a bill of sale (the "Bill of Sale") in form and substance sufficient to convey all tangible and intangible personal property included in the definition of Property to Purchaser free and clear of any and all Encumbrances;

(c)      an executed counterpart of the Amended and Restated Operating Agreement;

(d)      the Parking Lot Management Agreement duly executed by the manager thereunder;

(e)      affidavits of title and such other affidavits as may be required by the Title Company or Governmental Authority in connection with the conveyance of the Ocean Bay Property;

(f)      a payoff letter or other documentation confirming that Property has been released from the lien of any mortgage or other security instrument;

10

(g)     evidence reasonably satisfactory to Purchaser or Title Company that the Property is free and clear of Encumbrances other than Permitted Encumbrances;

(h)     a true and complete copy, certified by the Secretary or an Assistant Secretary of Seller, of the resolutions duly and validly adopted by the Board of Directors of Seller evidencing its authorization of the execution and delivery of this Agreement and the Acquisition Documents and the consummation of the transactions contemplated hereby and thereby;

(i)     a certificate of the Secretary or an Assistant Secretary of Seller certifying the names and signatures of the officers of Seller authorized to sign this Agreement and the other documents to be delivered hereunder and thereunder;

(j)     such other documents, instruments or certificates reasonably required by Purchaser to consummate the transactions contemplated herein;

(k)     a closing certificate certifying that all representations and warranties made by Seller herein are true and correct as of Closing;

(l)     items required to be supplied pursuant to **Article VII** hereof;

(m)     instruments, in recordable form, evidencing such cross easement and signage rights as between the Ocean Bay Property and the property(ies) owned by Seller and its Affiliates as Purchaser and Seller mutually determine are necessary or advisable for the development and operation of the Ocean Bay Property and/or the operation of the BC Hotel Property as further contemplated by the Amended and Restated Operating Agreement; and

(n)     vacant possession of the Ocean Bay Property other than as permitted pursuant to the Parking Lot Management Agreement.

SECTION 2.06.     Closing Deliveries by Purchaser.   At Closing, Purchaser shall deliver to Seller:

(a)     the cash portion of the Consideration, as adjusted pursuant to **Section 2.03**, by wire transfer in immediately available funds;

(b)     an executed counterpart of the Amended and Restated Operating Agreement;

(c)     executed counterparts of the Parking Lot Management Agreement and each Acquisition Document to which Purchaser is a party;

(d)     such affidavits as may be required by the Title Company or Governmental Authority in connection with the conveyance of the Ocean Bay Property;

(e)     a true and complete copy, certified by the Secretary or an Assistant Secretary of Purchaser, of the resolutions duly and validly adopted by the Board of Directors of Purchaser evidencing its authorization of the execution and delivery of this Agreement and each

11

Acquisition Document to which it is a party and the consummation of the transactions contemplated hereby and thereby;

(f)     a certificate of the Secretary or an Assistant Secretary of Purchaser certifying the names and signatures of the officers of Purchaser authorized to sign this Agreement and the Acquisitions Documents and the other documents to be delivered hereunder and thereunder;

(g)     evidence reasonably satisfactory to Seller of the issuance of the Seller Equity Interest;

(h)     a closing certificate certifying that all representations and warranties made by Seller herein are true and correct as of Closing;

(i)     items required to be supplied pursuant to **Article VII** hereof; and

(j)     instruments, in recordable form, evidencing such cross easement and signage rights as between the Ocean Bay Property and the property(ies) owned by Seller and its Affiliates as Purchaser and Seller mutually determine are necessary or advisable for the development and operation of the Ocean Bay Property and/or operation of the BC Hotel Property and as further contemplated by the Amended and Restated Operating Agreement.

SECTION 2.07.     Allocation of Consideration.  Seller and Purchaser agree to allocate the Consideration among the Property for all purposes in accordance with the allocation schedule to be agreed upon by each Seller Entity and Purchaser and to be set forth in a writing signed by them at least five (5) days before the Closing.  Unless otherwise required by applicable law, neither Seller nor Purchaser shall take, nor shall they permit any of their respective controlled Affiliates to take, any position for purposes of any Tax with respect to the allocation of the Consideration which is inconsistent with such allocation. Nothing in this **Section 2.07** shall affect any other term or condition of this Agreement or relieve Seller or Purchaser from any of its obligations hereunder, including, but not limited to, its obligations in respect of the Closing (it being understood that the agreement of Seller and Purchaser to an allocation schedule pursuant to this **Section 2.07** shall not be a condition precedent to the Closing).

SECTION 2.08.     Title Abstract.  By the earlier of (i) thirty (30) days from the date of this Agreement and (ii) a date required by any Requirements of Law, Seller shall produce or cause to be produced to Purchaser and its attorneys, a current epitome of title of all deeds and documents of title relating to the Ocean Bay Property together with all deeds and documents of title in Seller's possession and such other information as Purchaser or its attorneys shall reasonably require to deduce from a good root of title a good and marketable documentary title in fee simple, along with an Abstract of Title in respect of the Ocean Bay Property under the provisions of Sections 3 (5) and (9) of the Conveyancing and Law of Property Act of the Bahamas.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF SELLER

SECTION 3.01.    Authority of Seller.  Each Seller Entity has all legal power and capacity to execute and deliver this Agreement and each Acquisition Document to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by each Seller Entity and constitutes a legal, valid and binding obligation of each Seller Entity, enforceable against each Seller Entity in accordance with its terms.

SECTION 3.02.    Organization, Authority and Qualification of Seller Entities.  Each Seller Entity is an organization duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Each Seller Entity is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary or desirable.  True and correct copies of the charter documents of each Seller Entity have been or will be delivered by Seller to Purchaser.

SECTION 3.03.    No Conflict.  Neither: (x) the execution and delivery of this Agreement and each Acquisition Document to which it is a party by each Seller Entity, nor (y) the performance by each Seller Entity of its respective obligations hereunder and thereunder, does or will (a) violate, conflict with or result in the breach of the charter documents of any Seller Entity, (b) conflict with or violate any Law or Governmental Order applicable to the Property, Seller or any Seller Entity or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance on the Property pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Seller or any Seller Entity is a party or by which the Property is bound or affected.

SECTION 3.04.    Governmental Consents and Third Party Approvals. Except as disclosed on **Section 3.04** of the Disclosure Schedule, neither: (x) the execution and delivery of this Agreement and each Acquisition Document to which it is a party by each Seller Entity, nor (y) the performance by each Seller Entity of its respective obligations hereunder and thereunder, does or will require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority or other third party.  The foregoing representation and warranty does not cover consents, approvals, authorizations or orders of, actions by, filings with or notifications to any Governmental Authority or other party required to implement the Potential Development required by the Purchaser as set forth herein.

13

SECTION 3.05.    Financial Information.

(a)    True and complete copies of the audited balance sheets for both Ocean I and Ocean II for the fiscal years ending December 31, 2001, December 31, 2002 and December 31, 2003, and the related statements of income and cash flows of each such Seller Entity, in each case as opined on by Seller's Accountants (collectively, the "Financial Statements") are attached hereto as **Section 3.05** of the Disclosure Schedule.

(b)    The Financial Statements: (i) were prepared in accordance with the books of account and other financial records of the applicable Seller Entities (except as may be indicated in the notes thereto), (ii) present fairly in all material respects the financial condition and results of operations of the applicable Seller Entities as of the dates thereof or for the periods covered thereby and (iii) were prepared in accordance with International Financial Reporting Standards applied on a basis consistent with the past practices of the applicable Seller Entities.

SECTION 3.06.    Intentionally Omitted.

SECTION 3.07.    Intentionally Omitted.

SECTION 3.08.    Litigation.    Except as set forth in **Section 3.08** of the Disclosure Schedule, there is no Action by or against any Seller Entity, or by or against Seller and relating to any Seller Entity, or relating to the Property, pending, or to the knowledge of Seller, threatened before any Governmental Authority.  Except as set forth in **Section 3.08** of the Disclosure Schedule, the Property is not subject to any Governmental Order and, to the knowledge of Seller, there are no such Governmental Orders threatened to be imposed by any Governmental Authority.

SECTION 3.09.    Compliance with Laws; Permits.

(a)    Except as set forth in **Section 3.09(a)** of the Disclosure Schedule, each Seller Entity has materially complied with, and has conducted and continues to conduct its business materially in accordance with, all Laws and Governmental Orders applicable to each such Seller Entity and relating in any way to the Property and no Seller Entity is in material violation of any such Law or Governmental Order.

(b)    Except as set forth on **Section 3.09(b)** of the Disclosure Schedule, each Seller Entity has obtained, and is in material compliance with, all necessary or required permits, approvals, licenses and other authorizations of any Governmental Authority or as may be required by Law to own, lease, occupy and/or develop the Property, and each of such permits, approvals, licenses and other authorizations are renewable on an annual basis by paying the annual fee therefor and are listed in **Section 3.09(b)** of the Disclosure Schedule.

SECTION 3.10.    Intellectual Property.    Except as set forth in **Section 3.10** of the Disclosure Schedule, Seller does not own or have the right to use any Intellectual Property relating to the Property.

SECTION 3.11.    Taxes.    Except as set forth in **Section 3.11** of the Disclosure Schedule, (i) there are no Tax liens on any of the Property, and (ii) there are no Taxes

that will be or become liens on the Property or Purchaser after the Closing attributable to Property related activities of any Seller Entity prior to the Closing.

SECTION 3.12.    Material Contracts.

(a)    Section 3.12(a) of the Disclosure Schedule lists each contract and agreement, whether oral or in writing, relating to the Property (such contracts and agreements, together with the agreements listed in Section 3.12(a) of the Disclosure Schedule being "Material Contracts") copies of each of which have been furnished to Purchaser, including, without limitation:

(i)    all management contracts, service contracts and contracts with independent contractors or consultants (or similar arrangements) that are not cancelable without penalty or further payment and without more than thirty (30) days' notice excluding the Management Agreement;

(ii)    all contracts and agreements between or among a Seller Entity, on the one hand, and another Seller Entity, or any Affiliate of any Seller Entity, on the other hand; and

(iii)    all other contracts and agreements which are material to the Property.

(b)    Each Material Contract (i) is valid and binding on the applicable Seller Entity and, to the knowledge of Seller, the counterparties thereto, and is in full force and effect and (ii) upon consummation of the transactions contemplated by this Agreement, shall continue in full force and effect without penalty or other adverse consequence. No Seller Entity is, and, to the knowledge of Seller, the counterparties thereto are not, in material breach or violation of, or default under, any Material Contract. No Seller Entity has received any notice of termination, cancellation, breach or default under any Material Contract. Seller has made available to Purchaser true, accurate and complete copies of all Material Contracts.

SECTION 3.13.    Tangible Personal Property.  Section 3.13 of the Disclosure Schedule lists all tangible personal property used or otherwise owned or leased by a Seller Entity with respect to the Ocean Bay Property.

SECTION 3.14.    Full Disclosure.  No representation or warranty of Seller in this Agreement, nor any statement or certificate furnished or to be furnished to Purchaser pursuant to this Agreement, or in connection with the transactions contemplated by this Agreement, contains or will contain any untrue statement of a material fact.

SECTION 3.15.    Brokers.    Except as set forth in Section 3.15 of the Disclosure Schedule, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

SECTION 3.16.    Title.  The Ocean Bay Property (and each parcel or portion thereof) is free and clear of all mortgages, deeds of trust, other similar security instruments and voluntary liens other than those which will be released on or prior to the Closing Date.

15

SECTION 3.17.      Solvency.  Seller Indemnitor is solvent as of the date hereof and reasonably believes it has or at the time of any claim will have sufficient assets to fulfill its indemnity obligations pursuant to **Article VIII** hereof.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
## OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

SECTION 4.01.      Organization and Authority of Purchaser.  Purchaser is a company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement and each Acquisition Document to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not materially and adversely affect the ability of Purchaser to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and each Acquisition Document to which it is a party.  The execution and delivery by Purchaser of this Agreement and each Acquisition Document to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Purchaser.  This Agreement and each Acquisition Document to which it is a party has been duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by Seller) this Agreement and each Acquisition Document to which it is a party constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms.

SECTION 4.02.      No Conflict.  The execution, delivery and performance by Purchaser of this Agreement and each Acquisition Document to which it is a party do not and will not (a) violate, conflict with or result in the breach of any provision of the charter documents of Purchaser, (b) conflict with or violate any Law or Governmental Order applicable to Purchaser or its assets, properties or businesses or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Purchaser is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of Purchaser to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.

SECTION 4.03.      Brokers.  Except as set forth on **Section 4.03** of the Disclosure Schedule, no broker, finder or investment banker is entitled to any brokerage, finder's

or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.

SECTION 4.04.    Due Diligence Expenses; Credited Deposit.    Purchaser represents and warrants that Exhibit 2.02(b) sets forth a true and correct list of amounts expended to date, amounts due but unpaid (based on invoices received) and amounts reasonably expected to be incurred prior to the Closing Date with respect to Purchaser's (or its Affiliate's) due diligence investigation of the Properties.

SECTION 4.05.    Financing.    As of the date of this Agreement, IGY, the parent entity of Purchaser, has entered into subscription agreements with third party investors pursuant to which such investors have committed, subject to the terms and conditions contained therein and the Amended and Restated Agreement of Limited Partnership of IGY, dated as of April 14, 2005, as amended by the First Amendment, dated as of August 15, 2005 (the "IGY Partnership Agreement"), to provide to IGY up to $120,000,000 (of which $12 million has been called from investors as of the date hereof) for purposes of, among other things, financing of transactions of the type contemplated by this Agreement.    True and complete copies of the following have been provided to Seller: (i) the IGY Partnership Agreement; and (ii) an unaudited balance sheet of IGY as of September 30, 2005 and an unaudited income statement for the period of April 14, 2005 (inception) through September 30, 2005 (the "IGY Unaudited Financials").

SECTION 4.06.    Seller Deliveries.    Within twenty one (21) days from the date hereof, Seller shall deliver to Purchaser (i) the Management Agreement, (ii) the Disclosure Schedule contemplated by Exhibit 1.01(b) and (iii) the survey or other picture illustrating a portion of the Submerged Land in front of the BC Hotel that is being delivered to Purchaser and to be attached as Schedule C (collectively, the "Section 4.06 Deliveries").    This Agreement may be terminated by Purchaser if (x) it is not satisfied with the Section 4.06 Deliveries in it sole discretion or (y) Seller fails to deliver all or any part of the Section 4.06 Deliveries prior to expiration of the 21-day period.    Purchaser shall notify Seller of its election to terminate this Agreement as contemplated hereby within 21 days after the first to occur of: (x) its receipt of the Section 4.06 Deliveries, and (y) the expiration of the 21 day period provided to Seller for the delivery of the Section 4.06 Deliveries,  and in the event of such termination, the Cash Deposit shall be immediately returned to Purchaser, and Purchaser and Seller shall have no further rights, obligations or liabilities to each other hereunder.  If Purchaser fails to terminate this Agreement within the 21 day period provided for in the preceding sentence, it shall be deemed to have accepted and approved of the Section 4.06 Deliveries or waived Seller's obligation to provide the same.

## ARTICLE V
## ADDITIONAL AGREEMENTS

SECTION 5.01.    Conduct Related to Property Prior to the Closing.  Seller covenants and agrees that, between the date hereof and the time of the Closing, the Property shall be maintained and operated in the ordinary course and consistent with prior practice in good faith.  Without limiting the generality of the foregoing, Seller shall (i) maintain all permits, approvals, licenses and other authorizations required for the operation of the Property; (ii) comply in all material respects with all Requirements of Law applicable to the Property; (iii)

perform and comply in all material respects with all contracts and commitments related to the Property; (iv) take no action, or fail to take an action, that is detrimental to the use, occupancy, management or potential development of the Property; and (v) not engage in any practice, take any action, fail to take any action or enter into any transaction which could cause any representation or warranty of Seller to be untrue or result in a breach of any covenant made by Seller in this Agreement or in any Acquisition Document to which Seller is a party.

SECTION 5.02.    Confidentiality and Public Announcements.

(a)    Seller agrees to, and shall cause its agents, representatives and Affiliates, and the employees, members, officers, directors and shareholders of each, to treat and hold as confidential (and, except as provided herein, not disclose or provide access to any Person to) all information, whether written or oral, furnished to Seller about Purchaser, its Affiliates or their business and affairs, including, without limitation, the IGY Partnership Agreement and the IGY Unaudited Financials. Notwithstanding the foregoing, the restrictions set forth in this **Section 5.02(a)** shall not apply to information which is or becomes generally available to the public other than as a result of a disclosure (not otherwise permitted by this **Section 5.02**) by Seller or its employees, members, officers, directors, shareholders, agents, representatives or Affiliates. Immediately upon the termination of this Agreement, Seller shall promptly return to Purchaser or destroy (at Purchaser's request) any and all copies (in whatever form or medium) of all such confidential information, including analyses, compilations, studies or other documents prepared, in whole or in part, on the basis thereof, then in the possession of it or any of its agents, representatives or Affiliates or their employees, members, officers, directors or shareholders.

(b)    Except as otherwise permitted by this Agreement, each of Purchaser and Seller agrees not to disclose the existence of this Agreement or the transactions contemplated hereby, except for disclosures (i) that are mutually agreed to in writing by the parties, (ii) general disclosures relating to Purchaser's potential acquisition of the Property without reference to any specific terms or the Consideration or (iii) to representatives of the applicable Governmental Authorities that are necessary or appropriate to permit Purchaser to obtain the Necessary Approvals and to permit Seller and its agents to comply with its obligations set forth in **Section 5.05** of this Agreement to assist Purchaser in obtaining the Necessary Approvals.

(c)    Nothing in this **Section 5.02** shall be deemed to prohibit or restrict the right of Purchaser to issue a press release or other public announcement that generally refers to the existence of a binding agreement between the parties and the fact that the Purchaser would acquire the Property in partnership with the Seller, on the terms and subject to the conditions contained in this Agreement (without reference to any specific terms or conditions or the Consideration).

(d)    Seller shall not intentionally make, or cause to be made, or authorize its Affiliates, employees or agents to make, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of Purchaser, and Seller shall cooperate with Purchaser as to the timing and contents of any such press release, public announcement or communication.

(e)    Notwithstanding anything herein to the contrary, each party hereto (and its representatives, agents and employees) may consult any tax advisor regarding the tax treatment and tax structure of the transactions contemplated hereby and may disclose to any Person, without limitation of any kind, the tax treatment and tax structure of such transactions and all materials (including opinions and other tax analyses) that are provided relating to such treatment or structure, except where confidentiality is reasonably necessary to comply with securities laws (including, where applicable, confidentiality regarding the identity of an issuer of securities or its Affiliates, agents and advisors).

SECTION 5.03.    Tax Concessions.    As part of its efforts to secure the Necessary Approvals, Purchaser shall apply for and pursue the issuance and/or granting of such tax concessions and/or tax abatements as its consultants and advisors reasonably deem appropriate and/or advisable, including tax concessions similar to those provided for in the Existing Head of Agreement.

SECTION 5.04.    Further Action.    Each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and the Acquisition Documents to which it is a party and consummate and make effective the transactions contemplated hereby and thereby.

SECTION 5.05.    Additional Covenants.    Seller shall use its good faith, commercially reasonable and diligent efforts to assist Purchaser in (i) securing the Necessary Approvals, whether by amendment, extension and assignment of the Existing Heads of Agreement in the name of Purchaser or otherwise, and (ii) negotiating and finalizing the terms and provisions of the Amended and Restated Operating Agreement. Purchaser and Seller agree that Seller shall not be required to pay for any third party consultants, other than Aldevco Inc. and its routine administrative, overhead and travel expenses. Costs of engineers, attorneys, third party consultants (other than Aldevco Inc.) or expediters and other extraordinary expenses required by Purchaser to secure the Necessary Approvals contemplated by this **Section 5.05** shall be borne by the Purchaser.

SECTION 5.06.    Exclusivity.    Seller and its Affiliates agree not to initiate, solicit, negotiate, accept or respond to any offers made by third parties to acquire the Property (or any portion thereof) whether such transaction is structured as a merger or purchase of assets, properties, stock or other interests directly or indirectly held in the Property. Seller shall not be deemed to have breached this **Section 5.06** if an employee or agent of Seller or one of its Affiliates not directly involved in the transactions contemplated by this Agreement inadvertently breaches the prohibitions set forth in the previous sentence, provided that: (a) such breach does not result in a binding agreement, written or oral; (b) promptly upon Seller becoming aware of the inadvertent breach it shall: (i) terminate such discussions or negotiations, as applicable, and inform the relevant third party that the Property is not for sale; and (ii) inform Purchaser both of the existence of the breach and the remedial steps being taken to cure any resulting damage. Seller covenants and agrees that it shall use commercially reasonable efforts to inform its key Affiliates, employees, consultants and agents of the restrictions set forth in this **Section 5.06**.

The foregoing obligations shall terminate upon termination of this Agreement as set forth in **Article IX** or otherwise.

SECTION 5.07.    Notice.    To the extent that either party has any actual knowledge of its default, misrepresentation, incorrect warranty or breach of or failure to perform any covenant made in this Agreement, such party shall promptly notify the other party of same.

SECTION 5.08.    Third Party Consultants.    At Purchaser's request, Seller agrees to cause Aldevco Inc. (and George Allen) to provide material assistance to Purchaser in connection with its efforts to secure the Necessary Approvals (including, without limitation, assisting Purchaser in Purchaser's preparation and Purchaser's filing of applications for a Heads of Agreement).    Seller shall be responsible for all fees, compensation and other amounts due to Aldevco Inc. and, at the Closing, such amounts incurred between the date of execution of this Agreement and Closing (not to exceed $5,000 per month plus travel and lodging reimbursements related to the transaction contemplated hereby) shall be included in calculating Seller's Contributions.    Purchaser shall be responsible for amounts due to any other third party consultants that are engaged by Purchaser with respect to obtaining the Necessary Approvals.

SECTION 5.09.    Title to Real Property.    Following execution of this Agreement, Seller shall deliver to Purchaser within 30 days after the date hereof an owner's title insurance commitment (the "Title Report") for the Ocean Bay Property together with true copies of the recorded documents shown as exceptions therein.    Purchaser, in its sole discretion, may, within thirty (30) days after receipt by Purchaser of the Title Report (the "Inspection Period") object ("Purchaser's Objections") in writing, to any easements, liens, encumbrances or other exceptions or requirements in the Title Report other than Permitted Encumbrances.    If Purchaser fails to object within the Inspection Period, the condition of title to the Ocean Bay Property reflected on such Title Report shall be deemed approved by Purchaser.    If Purchaser's Objections are made, Seller shall use reasonable efforts (provided nothing herein contained shall require Seller to bring any action or proceeding in order to render title to be in accordance with this Agreement) to eliminate the matters covered by Purchaser's Objections within thirty (30) days, provided the cost thereof does not exceed $25,000 and the terms of the next sentence do not apply.    In the case of a mortgage, deed of trust or similar security instruments granted by Seller (regardless of the amount of such mortgage, deed of trust or similar security instrument), created by Seller, Seller shall be obligated to pay or deposit with the title insurance company, the necessary sum for the removal of such mortgage, deed of trust or similar security instruments granted by Seller and for the title insurance company to insure against the same.    If Seller shall notify Purchaser that Seller is unable with reasonable efforts to eliminate the matters covered by Purchaser's Obligations within thirty (30) days, or that the cost thereof exceeds $25,000, then Purchaser, in its sole discretion and by notice to Seller, may either (i) waive such Purchaser's Objections and accept such title as Seller shall be able to convey, without any reduction of the Purchase Price or any credit or allowance against the same or (ii) terminate this Agreement.    In the event Purchaser elects to terminate this Agreement pursuant to the foregoing, the Cash Deposit shall be immediately returned to the Purchaser and all parties shall be relieved and discharged of any further liability hereunder.    All matters affecting title to the Ocean Bay Property contained in the Title Report (including, but not limited to, Purchaser's Objections which have been cured or waived), shall, once the Title Report has been approved (or deemed approved) by Purchaser, be "Permitted Encumbrances."

**Exhibit B (Part 2)**

SECTION 5.10.    BCD as a Party to this Agreement. BCD shall be deemed a "Seller Entity" and included within the meaning of "Seller" only for purposes of the following provisions of this Agreement (including Schedule A attached hereto): (i) Sections 2.05 (h), (i) and (m); (ii) the representations and warranties in Sections 3.01, 3.02, 3.03, 3.04 and 3.14, provided that BCD shall be deemed to make such representations and warranties only with respect to itself and not the other Seller Entities; (iii) clause (iii) of Section 4.06; (iv) Sections 5.02, 5.04 and 5.07; (v) Sections 7.01(l) and (m) and 7.02(d) and (e); (vi) Section 7.03, but only insofar as it relates to the Parking Lot Plan and paragraphs 8 and 11 of Schedule A attached hereto; (vii) Article X; and (viii) items 8 and 11 of Schedule A.

## ARTICLE VI

## TAX MATTERS

SECTION 6.01.    Conveyance Taxes. Seller shall be liable for, and shall hold Purchaser and its Affiliates harmless against, and agrees to pay any and all Conveyance Taxes in excess of Purchaser's share as set forth in Section 2.03(b) that may be imposed upon, or payable or collectible or incurred in connection with this Agreement and the Acquisition Documents and the transactions contemplated hereby and thereby. Purchaser and Seller agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable Seller to comply with any filing requirements.

## ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.01.    Conditions to Obligations of Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver, at or prior to the Closing, of each of the following conditions:

(a)    Representations, Warranties and Covenants.    The representations and warranties of Seller contained in this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing with the same force and effect as if made as of the Closing and all covenants and agreements of Seller set forth herein shall be materially complied with as of the Closing;

(b)    No Proceeding or Litigation. No Action shall have been commenced or threatened by or before any Governmental Authority against any Seller Entity or Purchaser, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement and the Acquisition Documents which, in the reasonable, good faith determination of Purchaser, is likely to render it impossible or unlawful to consummate such transactions;

(c)    Operating Agreement.    Purchaser and the Seller Member shall have executed the Amended and Restated Operating Agreement in the form approved by each of Purchaser and Seller Member pursuant to Section 7.03 hereof.

(d)    Consents and Approvals.    Purchaser shall have received all permits, licenses and approvals necessary for the use, development, operation, leasing and/or ownership,

sale or other disposition of marina and upland real estate facilities on the Ocean Bay Property in accordance with the Potential Development, including, without limitation, (i) a Permit to be granted to Purchaser under the provisions of the International Persons Landholding Act, 1993 (the "Act") and approval by the National Economic Council ("NEC") of the Potential Development (the "FIB Permit"), (ii) either (A) an amendment and extension of the Existing Heads of Agreement or (B) the issuance of a new Heads of Agreement to Purchaser containing terms reasonably satisfactory to Purchaser, and (iii) evidence reasonably satisfactory to Purchaser of the full acceptance and approval of the Potential Development by the department of the Government of the Bahamas responsible for historic preservation (collectively, "Necessary Approvals");

(e)    Intentionally Omitted.

(f)    Title Insurance for Owned Ocean Bay Property.    Purchaser shall receive from the Title Company, an owner's policy of title insurance in the amount of $18,000,000, or irrevocable and unconditional binder to issue the same, as ordered by Seller, dated, or updated to, the date of the Closing, insuring, or committing to insure, at its ordinary premium rates, Purchaser's good, valid and marketable title in fee simple to each parcel of Ocean Bay Property free and clear of all Encumbrances (other than the Permitted Encumbrances) and same shall also provide insurance over the easement(s) subject to the Submerged Land.  At the Closing, Seller and Purchaser shall each pay to the Title Company fifty percent (50%) of the premium and other title fees which are payable to the Title Company in respect of such title insurance policy;

(g)    Support Agreement. Purchaser shall have entered into a support agreement with Aldevco and such other third parties identified by Aldevco that may be necessary or appropriate to assist Purchaser in obtaining the Necessary Approvals, in each case, on such terms as Purchaser may, in its reasonable discretion, believe are appropriate;

(h)    Intentionally omitted;

(i)    Intentionally omitted;

(j)    Parking Lot Management Agreement.    Purchaser and the third party manager currently managing the BC Hotel Property shall have agreed upon the form and terms of and entered into a parking lot management agreement ("Parking Lot Management Agreement");

(k)    Environmental Analysis.    Purchaser, or third party providers commissioned by it, shall have completed an environmental assessment report of the Ocean Bay Property to Purchaser's satisfaction, which report shall contain a thorough evaluation of the environmental condition of the Ocean Bay Property and confirms no remediation or clean-up is required based on standards typically applied in U.S. federal jurisdictions other than the previously disclosed existence of elevated lead and arsenic levels (the "Known Contamination") which, according to estimates from a third party consultant engaged by Purchaser, can be remediated for a total cost in the range of $250,000 to $1,000,000. Purchaser agrees to undertake reasonable efforts to determine the total cost of remediation within ninety (90) days from the date hereof and notify Seller of such cost. The cost of the environmental assessment report shall

be borne by Purchaser. The Amended and Restated Operating Agreement shall provide that the cost to remediate the Known Contamination shall be borne equally by Purchaser and Seller and such cost shall be added to their respective capital accounts. Purchaser will consult with Seller prior to engaging any environmental consultant to perform any environmental remediation.

(l)    Parking Lot Plan.    Purchaser and Seller shall have mutually agreed upon a plan (the "Parking Lot Plan") which shall have been memorialized in either the Amended and Restated Operating Agreement or in a separate instrument, which shall, among other things: (i) identify with reasonable specificity the parking needs of the BC Hotel Property, including, without limitation, the parking needs of the guests, visitors, tenants and employees of the BC Hotel, the Fort Nassau Building and the Center of Commerce, currently satisfied by the existing surface parking lot on the Property ("BC Hotel Parking Needs"); (ii) provide Seller with reasonably adequate assurances that the BC Hotel Parking Needs shall be satisfied after Closing and incorporated in Potential Development; (iii) address the respective rights and obligations of Purchaser and Seller concerning the cost to satisfy the BC Hotel Parking Needs.

(m)    Cross-Easements.    Seller and Purchaser shall have mutually agreed upon and entered into recordable cross-easements (the "Access Cross-Easements") to the other party with respect to access, ingress and egress to and from the BC Hotel Property and to and from the Ocean Bay Property to the extent determined prior to the Closing.

(n)    Impairment of the Property.    As of the Closing, the Property shall not have suffered a material diminution in value as result of any act of "force majeure" that is beyond Seller's or Purchaser's ability to control, such as an act of God, war, casualty or other catastrophe, excluding, however, any such act which results in an adverse economic impact on an international scale.

(o)    Intentionally omitted.

SECTION 7.02.    Conditions to Obligations of Seller.    The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver, at or prior to the Closing, of each of the following conditions:

(a)    Representations, Warranties and Covenants.    The representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing with the same force and effect as if made as of the Closing and all covenants and agreements of Purchaser set forth herein shall be materially complied with as of the Closing;

(b)    No Proceeding or Litigation.    No Action shall have been commenced or threatened by or before any Governmental Authority against any Seller Entity or Purchaser, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement and the Acquisition Documents which, in the reasonable, good faith determination of Purchaser, is likely to render it impossible or unlawful to consummate the transactions contemplated herein.

(c)    Operating Agreement.    Purchaser and the Seller Member shall have executed the Amended and Restated Operating Agreement.

(d)    Parking Lot Plan.    Purchaser and Seller shall have mutually agreed upon a Parking Lot Plan which shall have been memorialized in either the Amended and Restated Operating Agreement or in a separate instrument, which shall, among other things: (i) identify the Hotel Parking Needs; (ii) provide Seller with reasonably adequate assurances that the BC Hotel Parking Needs shall be satisfied after Closing and incorporated in any Potential Development of the Property; (iii) address the respective rights and obligations of Purchaser and Seller concerning the cost to satisfy the BC Hotel Parking Needs.

(e)    Cross-Easements.    Seller and Purchaser shall have mutually agreed upon and entered into the Access Cross-Easements, to the extent determined prior to the Closing.

(f)    Parking Lot Management Agreement.    Purchaser and the third party manager currently managing the BC Hotel shall have entered the Parking Lot Management Agreement.

SECTION 7.03.    Good Faith Efforts; Critical Path Schedule.    The parties shall use their respective good faith and commercially reasonable efforts to cause the satisfaction of the foregoing conditions precedent.    Without limiting the generality of the foregoing, Purchaser and Seller covenant and agree that they shall each use their respective good faith and commercially reasonable efforts to cause the critical path milestones in the transaction specified below to occur in accordance with the following schedule:

| No. | Critical Path / Milestone | Schedule |
|---|---|---|
| 1 | Seller and Purchaser agree upon the Amended and Restated Operating Agreement | 90 days after the date hereof |
| 2 | Seller and Purchaser agree upon a Parking Lot Plan; and the Parking Lot Management Agreement | 90 days after the date hereof |
| 3 | Purchaser submits an application for a new Heads of Agreement | 90 days after the date hereof |
| 4. | Satisfaction of all conditions precedent and occurrence of the Closing | January 31, 2006 (the "Initial Target Date") |
| 5. | If the Closing does not occur on the Initial Target Date, to cause the satisfaction of all conditions precedent and occurrence of the Closing. | April 30, 2006 |

It shall not be a default by either party hereunder if any, or all, of the foregoing critical path milestones are not satisfied by the applicable dates unless such failure was caused by such party's failure to use commercially reasonable efforts to satisfy the same; in which event, the same shall be deemed a material breach within the meaning and application of **Section 9.01**.

Seller and Purchaser covenant and agree that they shall use their respective commercially reasonable, diligent and good faith efforts to agree upon the form of Amended and Restated Operating Agreement within ninety (90) days of the date hereof and neither shall unreasonably withhold, condition or delay its approval of the same; *provided, however,* that the parties agree

that, without limitation, it shall be reasonable for either party to disapprove a proffered form of Amended and Restated Operating Agreement on the basis that the same is inconsistent with the terms of **Schedule A** in a manner that is materially adverse to its interest.

## ARTICLE VIII

## INDEMNIFICATION

SECTION 8.01.    <u>Survival of Representations and Warranties</u>.    The representations and warranties of Purchaser and Seller contained in this Agreement and all statements contained in the Acquisition Documents, shall survive for eighteen (18) months following the Closing; *provided, however,* that (i) the representations and warranties made pursuant to **Sections 3.01, 3.02, 4.01**, and **4.02** shall survive indefinitely, (ii) the representations and warranties dealing with Tax matters shall survive until 120 days after the expiration of the relevant statute of limitations for the Tax liabilities in question, (iii) the representations and warranties of Seller contained in **Section 3.16** shall not survive Closing, and (iv) insofar as any claim is made by Purchaser for the breach of any representation or warranty of Seller contained herein, which claim arises out of allegations of personal injury or property damage suffered by any third party on or prior to the Closing, or activities or omissions that occur, on or prior to the Closing, such representations and warranties shall, for purposes of such claim by Purchaser, survive until thirty (30) calendar days after the expiration of the applicable statute of limitations governing such claims. Neither the period of survival nor the liability of Seller or Purchaser with respect to the other's representations and warranties shall be reduced by any investigation made at any time by or on behalf of such party. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties by Purchaser to Seller or Seller to Purchaser, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved.

SECTION 8.02.    <u>Indemnification by Indemnifying Parties</u>.

(a)    Purchaser and its Affiliates, and their respective shareholders, partners, officers, directors, employees, agents, successors and assigns (each, a "<u>Purchaser Indemnified Party</u>") shall be jointly and severally indemnified and held harmless by Ocean I and Ocean II (collectively, the "<u>Seller Indemnitor</u>") for and against all losses, damages (including incidental and/or consequential damages), claims, Liabilities, costs and expenses (including settlement costs), interest, awards, judgments and penalties (including reasonable attorneys' and consultants' fees and expenses) actually suffered or incurred by them (hereinafter, a "<u>Loss</u>"):

(i)    arising out of, caused by or resulting from (A) the breach of any representation or warranty made by Seller or any Seller Entity contained in this Agreement or any Acquisition Document first discovered after Closing; or (B) the breach of or failure to perform any covenant or agreement by Seller or any Seller Entity contained in this Agreement or any Acquisition Document first discovered after Closing; or

(ii)    incurred by any Purchaser Indemnified Party as a result of any third party claim against any Purchaser Indemnified Party if, but only to the extent that, such claim and resultant Losses arise out of, are caused by or result from (A) the ownership, occupancy, lease,

use or operation of the Property as of or prior to the Closing (but solely to the extent of such ownership, occupancy, lease, use or operation as of or prior to the Closing and excluding Purchaser's share of the cost to remediate the Known Contamination as specified in Section 7.01(k)), or (B) any action or failure to act when action was required as of or prior to the Closing (but solely to the extent such action or failure to act occurred as of or prior to the Closing) by a Seller Entity, or any of their respective Affiliates, employees or other agents.

(b)     Seller, the Seller Member and its Affiliates, and their respective shareholders, partners, officers, directors, employees, agents, successors and assigns (each, a "Seller Indemnified Party") shall be indemnified and held harmless by Purchaser for and against any Loss actually suffered or incurred by them arising out of, caused by or resulting from the breach of any representation or warranty made by Purchaser contained in **Article IV** of this Agreement Document first discovered after the Closing occurs.

SECTION 8.03.     Notice of Loss; Third Party Claims.

(a)     A Purchaser Indemnified Party or Seller Indemnified Party (as applicable, the "Indemnified Party") shall give the Purchaser or Seller Indemnitor, as applicable (the "Indemnitor") notice of any matter which an Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement, promptly after but no later than within sixty (60) days of such determination, stating the amount of the Loss, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises.

(b)     If an Indemnified Party shall receive notice of any action, audit, demand or assessment (each, a "Third Party Claim") against it or which may give rise to a claim for Loss under this **Article VIII**, within thirty (30) days of the receipt of such notice, the Indemnified Party shall give the Indemnitor notice of such Third Party Claim; *provided, however*, that the failure to provide such notice shall not release the Indemnitor from any of its obligations under this **Article VIII** except to the extent that the Indemnitor is materially prejudiced by such failure and shall not relieve the Indemnitor from any other obligation or Liability that it may have to any Indemnified Party otherwise than under this **Article VIII**. If the Indemnitor acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Losses that may result from such Third Party Claim, then the Indemnitor shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within five (5) days of the receipt of such notice from the Indemnified Party; *provided, however*, that if there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the judgment of the Indemnified Party in its sole and absolute discretion for the same counsel to represent both the Indemnified Party and the Indemnitor, then the Indemnified Party shall be entitled to retain its own counsel in each jurisdiction for which the Indemnified Party determines counsel is required, at the expense of the Indemnitor. In the event that the Indemnitor exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnitor in such defense and make available to the Indemnitor, at the Indemnitor's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnitor. Similarly, in the event the Indemnified Party is, directly

or indirectly, conducting the defense against any such Third Party Claim, the Indemnitor shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnitor's expense, all such witnesses, records, materials and information in the Indemnitor's possession or under the Indemnitor's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by and Indemnitor without the prior written consent of the Indemnified Party.

(c)    The IGY Member or Seller Member, as applicable, shall be entitled to offset the amount of any claim it may have against an Indemnitor under this **Article VIII** against the amounts from time to time distributable to the other member affiliated with such Indemnitor under the Amended and Restated Operating Agreement (provided that the applicable Indemnitor has acknowledged in writing both its liability for and the amount of such claim or not disputed such liability, or a final, non-appealable judgment is issued establishing the Indemnitors' liability and the amount of such liability).

(d)    Any amount due to an Indemnified Party in respect to a Third Party Claim but which remains unpaid for a period of 30 days following the determination of the Indemnitor's liability pursuant to this Article VIII shall, together with any and all costs of collection (including legal fees and late fees), bear interest at the rate of LIBOR plus 10%, to be adjusted on a monthly basis, until paid in full by the Indemnitor.

(e)    This **Article VIII** shall survive the Closing and delivery of the Deed.

SECTION 8.04.    <u>Tax Treatment</u>.    Seller agrees that all payments made by Seller to or for the benefit of Purchaser under this **Article VIII**, under other indemnity provisions of this Agreement and for any misrepresentations or breaches of warranties or covenants shall be treated as adjustments to the Consideration for Tax purposes and that such treatment shall govern for purposes hereof except to the extent that the Laws of a particular jurisdiction provide otherwise, in which case such payments shall be made in an amount sufficient to indemnify Purchaser on an after-Tax basis.

## ARTICLE IX

## TERMINATION

SECTION 9.01.    <u>Basis of Termination.</u>    This Agreement may be terminated at any time prior to Closing:

(a)    by Purchaser, if Seller or any of its Affiliates breaches **Section 5.05** or **Section 5.06** of this Agreement, or in the event of any other breach of or failure to perform in any material respect any representation, warranty, covenant or agreement set forth in this Agreement on the part of Seller shall have occurred and: (i) such breach or failure to perform remains uncured for ten (10) days after notice by Purchaser to Seller; *provided, however*, that if Seller has commenced to cure such breach or failure to perform within such ten (10) day period and such breach or failure to perform cannot reasonably be cured within such ten (10) day period, such period shall be extended for such time as is reasonably necessary for Seller in the exercise of due

diligence to cure the same; and (ii) as a result of such breach or failure to perform, any of the conditions set forth in **Section 7.01** is incapable of being satisfied by the Outside Closing Date;

(b)    by Seller, if a breach of or failure to perform in any material respect any representation, warranty, covenant or agreement set forth in this Agreement on the part of Purchaser shall have occurred and: (i) such breach or failure to perform remains uncured for ten (10) days after notice by Seller to Purchaser; *provided, however,* that if Purchaser has commenced to cure such breach or failure within such ten (10) day period and such breach or failure to perform cannot reasonably be cured within such ten (10) day period, such period shall be extended for such time as is reasonably necessary for Purchaser in the exercise of due diligence to cure the same; and (ii) as a result of such breach or failure to perform, any of the conditions set forth in **Section 7.02** is incapable of being satisfied by the Outside Closing Date;

(c)    by either Purchaser or Seller in the event that any Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, including, without limitation, the purchase of the Property and all approvals necessary to effectuate the Potential Development and such order, decree, ruling or other action shall have become final and nonappealable; *provided, however,* that the right to terminate this Agreement under this **Section 9.01(c)** shall not be available to any party who shall have solely caused such Governmental Authority to issue an order, decree or ruling or take any other action that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement;

(d)    by either Seller or Purchaser if the Closing shall not have occurred on or prior to the Outside Closing Date (as it may be extended); *provided, however,* that the right to terminate this Agreement under this **Section 9.01(d)** shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date; or

(e)    by the mutual written consent of Seller and Purchaser.

Each of Purchaser and Seller expressly agrees that the schedule of critical path milestones set forth in **Section 7.03** is a primary inducement for the parties to enter into the transactions contemplated by this Agreement. Accordingly, each party acknowledges that the termination rights in **Section 9.01(a)** or **Section 9.01(b)**, as applicable, may be available if a party fails to use its commercially reasonable efforts in satisfaction of the critical path milestones set forth in **Section 7.03** (after the applicable notice and cure periods have been utilized as set forth in **Sections 9.01(a)** or **Section 9.01(b)**, as the case may be).

SECTION 9.02.    Effect of Termination

(a)    If this Agreement shall be terminated by Seller pursuant to **Section 9.01(b)**, provided that no default or breach by Seller exists or any act or omission shall have occurred that would result in a failure of a condition precedent to Purchaser's obligations, then ownership of the Cash Deposit, the documents of title and the Property Reports shall be immediately vested in Seller and the Cash Deposit shall be released and paid over to Seller and the Property Reports shall be delivered to Seller, as its sole and exclusive remedy, as liquidated

damages for Purchaser's breach of this Agreement. Because the actual damages suffered by Seller as a result of such breach by Purchaser would be impracticable or extremely difficult or impossible to determine, Purchaser agrees that the amount of the Cash Deposit and receipt of the Property Reports and the documents of title shall be the amount of damages to which Seller is entitled upon such breach and that the amount of such liquidated damages is reasonable. Upon such payment of the Cash Deposit and delivery of the Property Reports to Seller, this Agreement shall be deemed automatically terminated, and the parties shall have no further rights, obligations or liabilities hereunder or with respect to the subject matter hereof, except such rights and liabilities as are expressly stated to survive the termination hereof.

(b)    If this Agreement shall be terminated for any reason other than pursuant to **Section 9.01(b)**, then the Cash Deposit shall be returned to Purchaser, and Purchaser shall have no further rights, obligations or liabilities hereunder or with respect to the subject matter hereof, except such rights and liabilities as are expressly stated to survive the termination hereof.

(c)    If this Agreement shall be terminated by Purchaser pursuant to **Section 9.01(a)**, in addition to any other rights Purchaser may have at law or in equity (including the right to specifically enforce this Agreement), Purchaser shall be entitled to an amount equal to the reasonable and actual out of pocket costs and expenses incurred by Purchaser and/or IGY and their Affiliates in connection with the transactions contemplated by this Agreement, including all due diligence fees and expenses, legal fees and expenses, expenses associated with the efforts by Purchaser and/or its Affiliates to obtain the Necessary Approvals whether incurred before or after the execution of this Agreement.

## ARTICLE X

## GENERAL PROVISIONS

SECTION 10.01.    <u>Expenses</u>.    Except as otherwise specified in this Agreement, each of Purchaser and Seller shall bear its own costs and expenses, including, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Acquisition Documents and the transactions contemplated by this Agreement and the Acquisition Documents, whether or not the Closing shall have occurred.

SECTION 10.02.    <u>Notices</u>.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 10.02**):

(a)    if to Seller:

Ocean Bay Properties I Limited,
Ocean Bay Properties II Limited, or
British Colonial Development Company Limited

29

c/o Propco 100 Ltd.
83 Campbell Avenue East
P.O. Box 487
Campbellville, Ontario
L0P 1B0
Telecopy: (905) 854-4783
Telephone: (905) 854-4593
Attention: Mr. Eugene Fraser

with a copy to:

Aldevco Inc.
13621 Deering Bay
Coral Gables, FL 33158
Telecopy: (305) 971-9719
Telephone: (305) 969-1505
Attention: George Allen

with a copy to:

Stuart E. Berelson and Keith M. Pinter
Wormser, Kiely, Galef & Jacobs LLP
825 Third Avenue
New York, New York 10022

And to:

J. Robert Hall
Loopstra Nixon LLP
135 Queens Plate Drive, Suite 600
Toronto, Ontario
Canada M9W 6V7
Telecopy: (416) 746-8319
Telephone: (416) 748-4760

(b)    if to Purchaser:

c/o Island Capital Group LLC
717 Fifth Avenue, 18th Floor
New York, New York 10022
Telecopy: (212) 705-5001
Telephone: (212) 705-5000
Attention: Marc W. Levy

with a copy to:

Greenberg Traurig, LLP
200 Park Avenue

New York, NY 10166
Telecopy: (212) 801-6400
Telephone: (212) 801-9200
Attention: David Bolen, Esq.

SECTION 10.03.    Escrow of Cash Deposit.

(a)    The Escrow Agent agrees to hold the Cash Deposit pursuant to the provisions of this **Section 10.03**. The Cash Deposit shall be invested in a money-market or other interest bearing account with a bank selected by Escrow Agent. It is expressly acknowledged by Seller and Purchaser that (i) the Escrow Agent shall be permitted and obligated to deposit the funds with into an account with a bank, which is a federally insured institution, but each recognize and agree that the limits of such insurance may be less than the total funds on deposit and that the Escrow Agent shall not be required to spread the funds among different institutions in order to fall within the federal insurance coverage limitations and (ii) the Escrow Agent makes no representation as to the yield from the Cash Deposit and shall bear no liability for any failure to achieve the maximum possible yield from the Cash Deposit.

(b)    If for any reason the Closing does not occur and either party makes a written demand upon the Escrow Agent in accordance with the notice requirements set forth in **Section 10.02** of this Agreement for delivery of the Cash Deposit or any portion thereof, the Escrow Agent shall immediately give written notice to the other party of such demand. If the Escrow Agent does not receive a written objection from the other party to the proposed delivery of the Cash Deposit or any portion thereof within ten (10) days after the giving of such notice, (i) such other party shall be deemed to have consented to such delivery and (ii) the Escrow Agent is hereby authorized to make such delivery. If the Escrow Agent does receive such written objection within such ten (10) day period, or if for any other reason the Escrow Agent in good faith shall elect not to make delivery, the Escrow Agent shall continue to hold the Cash Deposit until the Escrow Agent (x) is otherwise directed by written instructions from Seller and Purchaser, or a final non-appealable judgment of a court of competent jurisdiction, or (y) deposits the Cash Deposit with a court of competent jurisdiction in the State of New York, County of New York pursuant to **Section 10.03(f)** hereof.

(c)    It is understood and agreed that the Escrow Agent's only duties and obligations hereunder are as expressly set forth in this **Section 10.03**. The Escrow Agent shall not be liable for any action taken or omitted hereunder or for any error in judgment or mistake in fact or law, except as a result of its own willful misconduct or gross negligence. The Escrow Agent shall be protected in acting upon any written or oral communication, notice, certificate, or instrument or documents believed by it to be genuine and to be properly given or executed without the necessity of verifying the truth or accuracy of the same or the authority of the person giving or executing the same.

(d)    If a dispute shall arise as to the disposition of the Cash Deposit or any portion thereof or if the Escrow Agent shall be uncertain as to its duties or rights hereunder, the Escrow Agent is authorized to (i) refrain from taking any action other than to keep safely the Cash Deposit, except to comply with the judgment of a final, non-appealable court of competent jurisdiction as to the disposition thereof, or (ii) deposit or turn over the Cash Deposit with or to

any court of competent jurisdiction in the State of New York, the County of New York and thereupon be relieved from all responsibilities with respect thereto.

(e)    Upon disposing of the Cash Deposit in accordance with the provisions of this Agreement, the Escrow Agent shall be relieved and discharged of all claims and liabilities relating to the Cash Deposit, and shall not be subject to any claims or surcharges made by or on behalf of either party hereto.

(f)    Seller and Purchaser jointly agree to indemnify and hold the Escrow Agent harmless from all liabilities, costs, expenses, damages, actions or other charges which may be imposed upon, or incurred by, the Escrow Agent in connection with the performance of its duties hereunder (including, but not limited to, the release of the Cash Deposit), except with respect to any liability, cost, expense, damage, action or other charge incurred as a result of the Escrow Agent's willful misconduct or gross negligence.

(g)    The Escrow Agent shall not be liable for any loss caused by the failure, suspension, bankruptcy or dissolution of the bank in which the Cash Deposit is deposited.

(h)    The fact that the Escrow Agent is acting as such under this Agreement shall not in any way prevent it from representing Purchaser or any other party with respect to any litigation arising out of this Agreement or representing Purchaser or any other party in any other capacity, including representing Purchaser in connection with the transactions contemplated by this Agreement.

SECTION 10.04.    Intentionally Omitted.

SECTION 10.05.    Severability.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 10.06.    Entire Agreement.    This Agreement and the Acquisition Documents constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between Seller and Purchaser with respect to the subject matter hereof and thereof including that certain letter of intent dated as of March 18, 2005.

SECTION 10.07.    Assignment.    Seller may, with the prior written consent of Purchaser, which consent shall not be unreasonably conditioned, withheld or delayed, assign this Agreement to a party that agrees to acquire the BC Hotel; *provided, however*, that such assignment by Seller shall not relieve Seller of its indemnification obligations set forth in **Article VIII**. Seller acknowledges and agrees that it shall be reasonable for Purchaser to withhold its consent to the assignment of this Agreement to a party that: (a) is a competitor of Purchaser or

any of its Affiliates, provided that for the purposes of this **Section 10.07**, competitor shall mean any Person that engages in or seeks to engage in the business of owning, leasing, operating and/or developing mega-yacht marina facilities in the Bahamas, Caribbean or elsewhere; or (b) would materially diminish the integrity or reputation of Purchaser, the Property or the Potential Development.

SECTION 10.08.    *Amendment*.    This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, Seller and Purchaser or (b) by a waiver in accordance with **Section 10.09**.

SECTION 10.09.    *Waiver*.    A party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 10.10.    *No Third Party Beneficiaries*.    This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied (other than the provisions of **Article VI and VIII** relating to indemnified parties), is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 10.11.    *Currency*.    Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 10.12.    *Governing Law*.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts and laws.  All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any New York federal court sitting in the Borough of Manhattan of the City of New York; *provided, however,* that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of the City of New York.  Consistent with the preceding sentence, the parties hereto hereby (a) submit to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of the City of New York for the purpose of any Action arising out of or relating to this Agreement brought by any party hereto and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the

transactions contemplated by this Agreement may not be enforced in or by any of the above-named courts.

SECTION 10.13.     Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 10.13.**

SECTION 10.14.     Mutual Drafting. This Agreement is the result of the joint efforts of each party and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there shall be no construction against any party based on any presumption of that party's involvement in the drafting thereof.

SECTION 10.15.     Counterparts.  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 10.16.     Joint and Several. The liability of Seller Entities hereunder shall be joint and several.

**[EXECUTION PAGE FOLLOWS]**

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLER:

OCEAN BAY PROPERTIES I LIMITED

By: _____
Name:  Eugene Fraser
Title:  Director

OCEAN BAY PROPERTIES II LIMITED

By: _____
Name:  Eugene Fraser
Title:  Director

BRITISH COLONIAL DEVELOPMENT COMPANY LIMITED

By: _____
Name:  Eugene Fraser
Title:  Director

ESCROW AGENT:

WORMSER, KIELY, GALEF & JACOBS LLP

By: _____
Name:  Keith M. Prior
Title:  Partner

**[EXECUTION PAGE CONTINUES]**

IN WITNESS WHEREOF the Purchaser has caused its Common Seal to be hereunto affixed the day and year first hereinbefore written.

_____

The Common Seal of **IGY OCEAN BAY PROPERTIES LIMITED** was affixed hereto by **ANDREW L. FARKAS,** President of the said Company and the said **ANDREW L. FARKAS** affixed his signature hereto in the presence of:

_____
Marc W. Levy
Secretary

# Exhibit B (Part 3)

## EXHIBIT 1.01(b)

## DISCLOSURE SCHEDULE

Section 3.04- Governmental Consents and Third Party Approvals

Section 3.05 - Financial Statements

Section 3.08 – Litigation

Section 3.09(a) – Compliance with Laws

Section 3.09(b) – Compliance with Permits

Section 3.10 – Intellectual Property

Section 3.11 – Taxes

Section 3.12 – Material Contracts

Section 3.13 – Tangible Personal Property

Section 3.15 – Brokers on behalf of Seller

Section 3.16- Title/Parking Obligations

Section 4.03 – Brokers on behalf of Purchaser

EXHIBIT 2.02(b)

## DUE DILIGENCE EXPENSES

|  | Expenditure To Date | Reasonably Expected to be Incurred | Total |
|---|---|---|---|
| **Consulting** | | | |
| Oceanus Resources | $ 23,718 | $ 1,282 | $ 25,000 |
| Architectural | 10,000 | 15,000 | 25,000 |
| Legal        (1) | 0 | 10,000 | 10,000 |
| **Physical Studies** | | | |
| Marine Sounding | 1,800 | 3,200 | 5,000 |
| Wind & Wave Impact Study | 0 | 20,000 | 20,000 |
| Phase I Environmental Report | 26,639 | 0 | 26,639 |
| Endangered Species Study | 0 | 7,000 | 7,000 |
| Survey (Land/Water)        (2) | 0 | 5,000 | 5,000 |
| Market Study (Condo/Office) | 0 | 10,000 | 10,000 |
| Geotech Study (Soils Report) | 14,000 | 0 | 14,000 |
| Second Environmental Investigation   (2) | | 40,000 | 40,000 |
| **Other** | | | |
| Travel | 0 | 12,000 | 12,000 |
| Contingency | 0 | 9,000 | 9,000 |
| **Total** | $    76,157 | $ 132,482 | $   208,639 |

(1)    Reflects legal advice specific to suitability of Property for Purchasers intended use. Does not include legal expenses related to preparation of Acquisition Documents.

(2)    Reflects 50% of reasonably expected expenditure, reflecting agreement with Seller to pay 50% of expenditures on these reports.

## SCHEDULE A

The Operating Agreement of IGY Ocean Bay Properties Limited (the "Company") shall be amended and restated (the "Amended and Restated Operating Agreement") to reflect the following provisions and such other provisions as are reasonable and customary under the circumstances.[*] In accordance with **Section 7.03** of this Agreement, Purchaser and Seller will endeavor in good faith to agree upon the terms and conditions of the Amended and Restated Operating Agreement within ninety (90) days of the date hereof.

1. <u>Admission of Seller; Capital Contributions.</u>

   - Seller, or a wholly owned Affiliate of Seller (the "Seller Member"), shall contribute the Ocean Bay Properties to the Company in exchange for the Cash Consideration and a membership interest in the Company with an initial percentage membership interest equal to the Seller Equity Interest.

   - Island Global Yachting Facilities Ltd. or its Affiliate (the "IGY Member") shall be the sole managing member of the Company at Closing.

   - The Seller Member shall have an initial capital account equal to $10 million <u>plus</u> the Seller Contributions and the IGY Member shall have an initial capital account equal to the sum of the Cash Consideration (as adjusted pursuant to Section 2.03(a)) <u>plus</u> the IGY Contributions.

2. <u>Additional Capital.</u>

   - The IGY Member will be responsible for satisfying any additional capital required by the Company following Closing, including any additional funds required in connection with a Potential Development (collectively, "Additional Capital"). The IGY Member shall have the right and authority to determine both: (a) the amount of Additional Capital that, from time to time, is required by the Company; and (b) whether and to what extent such Additional Capital will be obtained by: (i) the Company's incurring of secured or unsecured debt (which shall be deemed to include preferred equity investments), and in such instance, the identity of the lender and terms of such loan; (ii) the IGY Member, or another Affiliate of IGY, making a capital contribution to the Company; or (iii) capital contributions from one or more third party investors in exchange for a membership interest in the Company. Any Additional Capital contributed by the IGY Member, its Affiliate or any third party shall be in exchange for equity interests in the Company on terms at least as favorable to the Company as interests were issued in respect to the Seller Contributions and the IGY Contributions (and Additional Capital shall dilute existing interests on a pari passu basis). The IGY Member shall not finance the Potential Development in such a

---

[*] The terms of this <u>Schedule A</u> are not intended to be all-inclusive and, to the extent terms are included in this schedule the Parties recognize such terms are merely an outline and the exact language and the final terms of the Amended Operating Agreement shall be set forth therein.

manner that the ratio of all outstanding debt to equity of the Company (inclusive of previously invested and/or deemed invested capital) exceeds 80/20 without the consent of the Seller Member, which consent will not be unreasonably conditioned, withheld or delayed.

- In the event that the Additional Capital is provided by way of a capital contribution, whether from a third party investor, the IGY Member or another Affiliate of IGY (collectively, "New Equity") the respective percentage interest of all members of the Company, including the Seller Member, shall be subject to dilution.

- The Seller Member shall have a right of first refusal to provide up to 25% of the Additional Capital invested by way of New Equity; *provided, however,* that the Seller Member shall not be obligated to provide any Additional Capital.

3. Management.

- The Company shall be solely managed by the IGY Member. Subject to the rights of the Advisory Board described below, the IGY Member will have the sole discretion and authority to make all decisions with respect to the operation and the business of the Company, including, without limitation, the right to make all decisions with respect to any contemplated development of the Ocean Bay Properties (a "Potential Development"), borrow money and admit new members to the Company.

- Without limiting the generality of the foregoing, the IGY Member, in its capacity as sole managing member of the Company, shall have the right to cause the Company to enter into the agreements with IGY Service Providers contemplated by paragraph 6 below and to cause the Company to enter into agreements with Aldevco Inc. and such other third party consultants as the IGY Member may deem advisable with respect to zoning, entitlements, political and regulatory issues, and such other matters and things relative to any Potential Development or otherwise associated with the operation of the business of the Company.

- In the event the IGY Member receives a bona fide third party offer to purchase 75% or more of the membership interest held by the IGY Member, the IGY Member will have the right to cause the Seller Member to sell a similar portion of the membership interest held by the Seller Member, provided that, the Seller Member will be entitled to receive the same relative consideration (based upon relative percentage membership interests) as will be received by the IGY Member pursuant to such third party offer.

- The Seller Member may not, directly or indirectly, assign or pledge its interests in the Company without the consent of the IGY Member, which consent shall not be unreasonably withheld, conditioned or delayed; *provided, however,* that the Seller Member may assign or pledge its interests in the Company to an Affiliate of the Seller Member without the consent of the IGY Member, except if such Affiliate would be deemed a competitor under the meaning of the next sentence. Seller acknowledges and agrees that it shall be reasonable for Purchaser to withhold its

consent to an assignment or pledge of its interests in the Company to a party that: (a) is a competitor of Purchaser or any of its Affiliates, provided that for the purposes of this subparagraph, competitor shall mean any Person that engages in or seeks to engage in the business of owning, leasing, operating and/or developing mega-yacht marina facilities in the Bahamas, Caribbean or elsewhere; or (b) would diminish the integrity or reputation of Purchaser, the Property or the Potential Development.

• The IGY Member shall have a right of first offer with respect to the sale by the Seller Member of its interest in the Company, in accordance with the terms and conditions to be mutually agreed upon and memorialized in the Amended and Restated Operating Agreement.

4. Advisory Board.

• The Company shall establish an advisory board (the "Advisory Board") to offer non-binding advice and propose strategic direction with respect to Company's business and any Potential Development. For so long as the Seller Member holds an ownership interest in the Company, it shall be entitled to appoint a number of representatives to the Advisory Board such that its representation on the board will be proportional to its ownership interest in the Company, and at a minimum the Seller Member will have the right to appoint one member to such board for so long as the Seller Member is a member of the Company. The rights of the Seller Member concerning the Advisory Board is personal to the initially named Seller Member and will no longer be in effect if the interest of the Seller Member is assigned to a third party either directly or indirectly.

• For so long as the Seller Member has an ownership interest in the Company and Seller (or any Affiliate of Seller) holds at least a 10% direct, or indirect, ownership interest in the BC Hotel, the IGY Member will consult with the Advisory Board prior to taking any action that it reasonably anticipates will materially affect the reputation, profitability, structural integrity and/or the operation of the BC Hotel.

• In connection with the Seller Member's services as a member of the Advisory Board, Seller Member shall have the right, up to twice a year, to meet with senior executive(s) of the Company to discuss the progress of the Potential Development or any other matters relating to the Company; provided, however, that (i) the Seller Member provides the IGY Member with at least thirty (30) days prior written notice and (ii) the IGY Member shall not be expected to incur any travel costs for such meeting. Such meeting may be conducted telephonically or in person at the option of the Seller Member.

5. Distributions of Net Cash Flow.

• From time to time as determined by the IGY Member in its sole discretion, the Company shall make distributions of its "net cash flow" to the members as follows:

(i)    first, to the members *pro rata* in accordance with their percentage interests in the Company until all capital invested by them has been returned;

(ii)    thereafter, to the members *pro rata* in accordance with their percentage interests in the Company.

- "Net cash flow" shall be defined as the sum of all funds received by the Company from any source (excluding capital contributions by the members) less all cash expenditures by the Company (including but not limited to operating expenses, taxes, debt service, IGY Fees and other fees owed to third party service providers and costs incurred upon the sale of any assets of the Company) and reserves or escrows as required by any lender to the Company or as the IGY Member, as the sole managing member, may reasonably deem necessary for the Company's requirements.

- In lieu of cash, the Seller Member may, at its option, elect to receive up to 50% of the amount of distributions under clause (ii) above in the form of units of limited partnership interests in Island Global Yachting L.P. ("IGY") based on a valuation to be determined by IGY in its sole discretion contemporaneously with each such distribution.

- The IGY Member will endeavor to make distributions, as necessary, for the members of the Company to fulfill their respective tax obligations resulting from the undistributed profits of the Company.

6. IGY Services and Fees.

- The Company may engage IGY, or an Affiliate of IGY (each, an "IGY Service Provider"), to provide the services indicated below and the Company shall be obligated to pay each such IGY Service Provider the fee or other compensation described below (collectively, the "IGY Fees") in exchange for any services provided:

Development. In exchange for serving as the exclusive development manager for any and all development activities pursued by the Company, an IGY Service Provider shall be entitled to a fee equal to 5% of all hard and soft costs of such development (excluding the cost of acquiring the Ocean Bay Properties and financing costs); *provided, however,* that in connection with the development of the residential phase, the IGY Service Provider shall be entitled to a fee no greater than the then market-rate fee then being paid for development managers in similar contexts between arms-length parties. The development management fee shall not be due or payable if a third party development manager and not IGY or an IGY Service Provider acts as the development manager; *provided, however,* that a general contractor and other similar service professionals will not be deemed

to affect the IGY Service Provider's rate as the development manager for these purposes.

Marina Management. In exchange for serving as the marina manager for the marina facility constructed pursuant to the Potential Development, an IGY Service Provider shall be entitled to an annual fee equal to 4% of gross revenues realized by the marina.

Property Management. In exchange for serving as the property manager for any portion of the upland properties ultimately developed by the Company (excluding certain properties to be managed by third parties, as identified in the Operating Agreement), an IGY Service Provider shall be entitled to a fee equal to a percentage of gross revenues prevalent for providers of similar services to similar properties in the market at the time, except that such fee shall not be based on any percentage of sales of residential units developed on the properties.

Debt Placement Fee. In exchange for securing financing from any third party lender, an IGY Service Provider shall be entitled to a debt placement fee equal to 1% of the maximum principal amount of such financing, provided that such debt placement fee shall not be paid to an IGY Service Provider if such financing is actually obtained by the Company through the efforts of a third party broker retained by the Company.

- If the Company does not have sufficient cash available to pay the IGY Fees on a current basis, then such fees shall be deferred, without interest, until they can be paid in full.

- To the extent deferred, the IGY Fees shall not be treated as a capital contribution by the IGY Member and neither the IGY Member nor any of its Affiliates shall be permitted to contribute additional capital to the Company solely for purposes of paying such fees.

7. Retail Rights. The Seller Member will grant, or cause its Affiliates to grant, to the Company a right of first refusal with respect to the sale or lease of retail space subsequently developed by the Seller Member or its Affiliates at or near the BC Hotel, all as more specifically set forth in the Amended and Restated Operating Agreement to be agreed upon by Purchaser and Seller.

8. Cross Easements; Signage Rights The Seller Member and the IGY Member shall each cooperate, and cause their respective Affiliates to cooperate, in determining what cross easement and signage rights as between the Ocean Bay Property and any property owned by the Seller Member and its Affiliates are necessary or advisable for the development and operation of the Ocean Bay Property and/or the operation of the BC Hotel Property, and the Seller Member and the IGY Member shall, or shall cause their respective Affiliates, to enter

into appropriate agreements to memorialize such rights, all as more specifically set forth in the Amended and Restated Operating Agreement to be agreed upon by Purchaser and Seller.

9. <u>Intentionally Omitted.</u>

10. <u>Development Plan Objections.</u> In the event the Seller Member disagrees with any specific major direction (whether or not such direction has been implemented) by the IGY Member with respect to the scope, design, phasing, timing and/or the ratio of third party debt to New Equity obtained to fund the Additional Capital needs of the Company, in each such instance, in furtherance of the Potential Development (a "<u>Development Plan Objection</u>") the Seller Member shall have the following rights:

- *Mandatory Special Meeting.* The Seller Member shall have the right, by formal written notice expressly and specifically invoking its right to call a Mandatory Special Meeting to the IGY Member identifying in reasonable detail the nature and basis of its Development Plan Objections, to call up to three (3) special meetings (each, a "<u>Mandatory Special Meeting</u>") of the members of the Company, such meetings to be held, if at all, within 30 days after: (a) the 2nd anniversary of the Closing; (b) the 3rd anniversary of the Closing; and (c) the 5th anniversary of the Closing, respectively. At such Mandatory Special Meetings, the IGY Member and the Seller Member shall in good faith discuss the Development Plan Objection(s) raised by the Seller Member and attempt to find a mutually satisfactory resolution to the same; *provided, however,* the foregoing shall not be deemed to limit the authority of the IGY Member as the managing member. If the Seller Member fails to make a Development Plan Objection on either the 2nd or 3rd anniversary of the Closing it shall be deemed to have waived its right to call any subsequent Mandatory Special Meetings along with the associated Put Rights.

- <u>*Put / Call Rights.*</u>

  (a) With respect to a Mandatory Special Meeting held within thirty (30) days after the 2nd anniversary of the Closing, in the event that the parties are unable to reach a mutually satisfactory resolution to Seller's Development Plan Objection(s), the Seller Member shall have the right (a "<u>Put Right</u>"), exercisable within thirty (30) days after such Mandatory Special Meeting, to require the IGY Member to purchase 25% of the Seller Member's membership interest in the Company for a price equal to 25% of the Seller Member's capital account balance at such time. If the Seller Member fails to exercise its Put Right, the IGY Member shall have the right (the "<u>Call Right</u>"), exercisable within ten (10) days after the lapse or waiver of the Seller Member's Put Right, to acquire 25% of the Seller Member's membership interest in the Company for a price equal to 25% of the Seller Member's capital account balance at such time.

  (b) With respect to a Mandatory Special Meeting held within thirty (30) days after the 3rd anniversary of the Closing, in the event that the parties are unable to reach a mutually satisfactory resolution to Seller's Development Plan Objection(s), the Seller Member shall have a second Put Right, exercisable within thirty (30) days after such second Mandatory Special Meeting, to require the IGY Member to purchase 50% of the

Seller Member's remaining membership interest in the Company for a price equal to 50% of the Seller Member's capital account balance at such time. If the Seller Member fails to exercise this Put Right, the IGY Member shall have a second Call Right, exercisable within ten (10) days after the lapse or waiver of the Seller Member's second Put Right, to acquire 50% of the Seller Member's remaining membership interest in the Company for a price equal to 50% of the Seller Member's capital account balance at such time.

(c)  With respect to a Mandatory Special Meeting held within thirty (30) days after the 5th anniversary of the Closing, in the event that the parties are unable to reach a mutually satisfactory resolution to the Development Plan Objection(s), the Seller Member shall have a third Put Right exercisable within thirty (30) days after such third Mandatory Special Meeting, to require the IGY Member to purchase the balance of the Seller Member's membership interest in the Company for a price equal to 100% of the Seller Member's capital account balance at such time. If the Seller Member fails to exercise its Put Right, the IGY Member shall have a third Call Right, exercisable within thirty (30) days after the lapse or waiver of the Seller Member's third Put Right, to acquire the balance of the Seller Member's remaining membership interest in the Company for a price equal to 100% of the Seller Member's capital account balance at such time.

(d)  Notwithstanding anything contained in clauses (b) and (c) above, neither the Seller Member nor the IGY Member will be entitled to exercised its Put Right or Call Right, as applicable, on any subsequent occasion unless each such party exercises its rights when they first become available on the first anniversary and, then again, on the second anniversary of the Closing.

(e)  The IGY Member and the Seller Member will pledge their respective membership interests in the Company as security for their respective obligations set forth in this **paragraph 10**.

11.    Parking Plan. IGY Member and the Seller Member shall have mutually agreed upon a Parking Lot Plan which shall be memorialized in either the Amended and Restated Operating Agreement or in a separate instrument, which shall, among other things: (i) identify the BC Hotel Parking Needs; (ii) provide Seller with reasonably adequate assurances that the BC Hotel Parking Needs shall be satisfied after Closing and incorporated in the Potential Development; (iii) address the respective rights and obligations of Purchaser and Seller concerning the cost to satisfy the BC Hotel Parking Needs.

12.    Environmental Issues. The cost to remediate the Known Contamination shall be borne equally by the IGY Member and the Seller Member and such cost shall be added to their respective capital accounts.

13.    Seller's Ability to Cure Certain Defaults.  In connection with the construction of the Potential Development, the IGY Member shall agree to cause the Company to satisfy any outstanding liens that may be placed on the Property within ninety (90) days (or such other period of time that may be common in Nassau, Bahamas). If at any time there exists any lien on the Property that remains unsatisfied, or uncured beyond the applicable time period described

above and the IGY Member is not taking appropriate steps to protect the Company's interest in connection with such uncured liens, the Seller Member shall have the right, but not the obligation, to satisfy such liens within ten (10) days following notification to the IGY Member and the IGY Member's failure to respond to such notice or provide a reasonable explanation for permitting such liens to remain uncured. —Any amounts funded by the Seller Member for this purpose shall be deemed a loan to Purchaser, which shall include interest at the rate of six percent (6%) per annum, and shall be payable out of funds available for distribution to the members of the Company prior to any distributions being made to the IGY Member.

14.    Abandonment.    Following commencement of construction of any phase of the Potential Development, if it becomes apparent that the IGY Member has materially abandoned any phase of construction without cause (e.g., excluding force majeure events, default by third party contractors, political instability or other events or economic conditions that may then exist on the Island of the Bahamas) and for such a period of time that such abandonment creates a meaningful and appreciable risk that: (i) the Company will default under any financing encumbering the Property beyond notice and grace periods; (ii) results in the extended suspension of the Company's right to obtain additional construction draws under such financing; and/or (iii) the Property will lose and/or forfeit vested development rights, then the Seller Member may offer to provide such financing, either itself or from a third party, as may be reasonably required to complete construction of such phase (the "Seller Emergency Funding"); provided, however, that such Seller Emergency Funding is commensurate with rates and terms (taking into account all of such terms) then reasonably available for similar construction projects in a similarly situated marketplace and such financing is not recourse to the IGY Member.  If the Seller Member notifies the IGY Member of its offer to provide Seller Emergency Funding, then the IGY Member shall as soon as reasonably practicable (but not more than ten (10) Business Days), respond with one of the following options:

(i)    The IGY Member may reject the Seller Emergency Funding; or

(ii)    The IGY Member may accept the Seller Emergency Funding, in which case any amounts funded by the Seller Member shall be treated as Additional Capital to the Company and the respective percentage interests of the Seller Member and the IGY Member shall be adjusted accordingly.

Notwithstanding the foregoing, if either (x) or (y) below occurs as a result of the IGY Member's abandonment of construction as contemplated by this paragraph 14, then the Seller Member shall become the manager of the Company and the IGY Member shall become the passive member in the Company (i.e., the parties will switch places):

(x)    the IGY Member rejects the Seller Emergency Funding under clause (i), and it fails to procure financing reasonably required to complete construction of such abandoned construction phase and cause the Company to materially proceed to continue construction of such phase within a period not to exceed thirty (30) days; or

(y)    solely in connection with the Additional Capital contributed by the Seller Member pursuant to the Seller Emergency Funding, the IGY Member's equity membership interest in the Company falls below 10%.

15.    <u>Financial Reports, Books and Records</u>.

- IGY Member shall provide the Seller Member with periodic financial and status reports with respect to the Company and the Potential Development.

- Seller Member shall have reasonable access to the records, books papers which reflect the Company's financial condition.

16.    <u>Dispute Resolution</u>.    The Amended and Restated Operating Agreement shall contain mutually satisfactory provisions for resolution of disputes thereunder among the Seller Member, the IGY Member and the Company.

## SCHEDULE B

## PLANS AND SPECIFICATIONS

The Plans and Specifications for the Potential Development shall include a marina and mixed use development project that will include, at a minimum:

1. A mega-yacht marina with up to 50 slips, including land-fill necessary or desirable to construct such marina, a marina office and facilities for fueling yachts (including in-slip fueling); and

2. An upland portion consisting of a small boat marina with up to 40 slips, including fuel distribution facilities; up to 20,000 square feet of marina retail space; up to 25,000 square feet of general retail space; up to 35,000 square feet of office space; a parking garage with up to 375 parking spaces; 140 to 180 residential units consisting of condominium, timeshare or condo-hotel uses (in any combination of the foregoing); swimming pools; tennis courts; a security office; landscaping; and interior roadways, including entrance locations from Bay Street.

In addition, the timing of the mega-yacht marina and upland components of the Potential Development may be phased within reasonable time frames.

The description of Potential Development in this Schedule B shall automatically be deemed updated, supplemented and modified to incorporate the description of the proposed development contained in Purchaser's application for the Head of Agreement and other Necessary Approvals.

It is mutually agreed by the parties that the overall proposed development contained in Purchaser's application for the Heads of Agreement and other Necessary Approvals shall be substantially consistent with the general uses of the Property contemplated by items (1) and (2) above, except (i) as required by the applicable Governmental Authority, or (ii) for deviations in the number of slips, amount of square footage or non-material uses (such as a swimming pool) contemplated herein, it being understood that the Purchaser requires additional time to finalize the development plans for submission to the applicable Governmental Authority.

Exhibit C

DEC-11-2006 11:41  FROM:DAVIS & CO 1 242 326-7360            TO:19543026001            P:2/4



## THE MINISTRY OF FINANCIAL SERVICES AND INVESTMENTS

P. O. Box N-7770
Nassau, N.P.
The Bahamas

Telephone: (242) 327-5970-4

Facsimile: (242) 327-5907

7 December, 2006

Mr. Philip McKenzie
Davis & Co.
P.O. Box N-7940
Nassau, The Bahamas

Dear Mr. McKenzie:

Re:   Island Global Yachting Ltd. Proposal for Development of Marina, Condo
      Hotel, and Other Facilities in the Area of the British Colonial Hotel.

I am directed to advise that the National Economic Council considered and
approved in principle the above-captioned proposal.  The Council took the
following decisions:

1)   Approved the application for Investment Board Permits on behalf of
     IGY Ocean Bay Properties Limited for the purchase of approximately
     5.06 acres of vacant land adjacent to the British Colonial Hotel on its
     western side from its current owner and 3.6 acres of land to be
     reclaimed in the adjoining seabed to the north of the project site, and
     request for a long-term renewable lease by the Government for the 3.6
     acres of reclaimed land on terms to be determined by the Minister
     responsible for public lands and surveys.

2)   Approved the proposed investment by Island Global Yachting Ltd. in
     the development of a 72-slip marina with 6,292 linear feet of dockage,
     32 slips for mega yachts and 40 slips for boats up to 50 feet in length;
     16,500 sq. ft. of retail shopping space; 9,600 sq. ft. of prime office
     space on the top floor of a seven-level parking garage; a five- star, full-
     service  200-unit  condominium-hotel  and  24  beach-front
     condominium-hotel villas to include spa, gym and tennis facilities; the
     addition of 220 linear feet of public beach frontage including
     improvements to the existing public beach in the form of landscaping,
     toilets, showers and picnic facilities; and two first-class waterfront
     restaurants etc.

3)    The above approval in principle has been granted subject to:

(a) The submission and approval by the Ministry of Energy & Environment of an Environmental Impact Assessment and relevant coastal studies;

(b) Consultation with, and obtaining the required approvals and permits of the relevant Government agencies and Departments of the project components, and including but not limited to the Office of The Prime Minister, the Department of Physical Planning, the Town Planning Committee, the Ministry of Works and Utilities, the Ministry of Energy and the Environment, BEST Commission, the Ministry of Transport and Aviation, Water and Sewerage Corporation and the Port Department;

(c) Priority being given to consultation with, and obtaining the early approval by the Ministry of Energy and the Environment on environment and coastal erosion issues and by the Water and Sewerage Corporation with respect to the proposed sewerage collection and treatment facilities for the condominium-hotel marina, ancillary facilities and the entire project;

(d) Concessions under the Hotels Encouragement Act extending only to the components which qualify for same;

(e) Negotiation of a Heads of Agreement for early consideration by the NEC, taking into account the Council's concerns relative to the need for sufficient access for turning and maneuvering cruise ships within the turning basin, the proximity to the beach at Long Wharf, contingencies for oil spills and hurricanes, proper flushing to be achieved for the proposed marina design, reclaimed area of seabed and the impact it will have on currents, sediment flow and water quality, the impact the marina construction will have on Nassau Harbour and coastal areas, sewage pump-out facilities and treatment for the marina, and public beach access;

(f) The developer undertaking very early in the first phase of the project the upgrading, complete with appropriate public facilities and lush landscaping of the entire Western Esplanade beach including beach widening and re-nourishment and an additional 220 linear feet of new first class beach to be created at the adjoining project site;

(g) The establishment by the developer of a Foundation to be funded for the ongoing improvement and upkeep of public beaches;

(h) The re-nourishment by the developer of the Saunders public beach;

(i) Significant assistance by the developer in an amount and manner to be mutually agreed between the developer and the Government for the extension of the cruise ship turning basin in Nassau Harbour;

(j) Securing and funding by the developer of a marine consultant to be used by the Ministry of Transport and Aviation to advise the Ministry on various aspects of the project as they relate to that Ministry;

(k) The developer ensuring that the western finger of the marina closest to the shoreline is used for berthing only on the northern side and that the landscaping and configuration of that finger provides from the shoreline a pleasant and landscaped appearance.

4) The Investments Board will issue the permit on behalf of Island Global Yachting Ltd. subject to evidence of payment of real property tax and the requisite fee pursuant to the International Persons Landholding Act, 1993.

The Ministry of Financial Services and Investments looks forward to commencing discussions with respect to a draft Heads of Agreement at the earliest opportunity.

Yours sincerely,

Sheila Carey
Permanent Secretary

cc:   Permanent Secretary, Office of the Prime Minister
      Permanent Secretary, Ministry of Works
      Permanent Secretary, Ministry of Transport and Aviation
      Permanent Secretary, Ministry of Energy and the Environment
      Director of Legal Affairs
      Dr. Baltron Bethel,

Exhibit D

**Ocean Bay Properties I Limited**
**Ocean Bay Properties II Limited**
**British Colonial Development Company Limited**
The British Colonial Centre of Commerce
**One Bay Street**
**Nassau, Bahamas**

July 5, 2007

**VIA COURIER**

IGY Ocean Bay Properties Limited
c/o Island Capital Group LLC
717 Fifth Avenue, 10th Floor
New York, New York 10022
Attn: Marc W. Levy

Gentlemen:

This letter will serve as notice to you that the undersigned are terminating, with immediate effect, the Purchase Agreement, dated as of November 7, 2005 between Ocean Bay Properties I Limited, Ocean Bay Properties II Limited and British Colonial Development Company Limited as Seller and IGY Ocean Bay Properties Limited, as Purchaser (the "Agreement").

Seller is terminating the Agreement pursuant to Section 9.01(d) thereof, for Purchaser's failure to effectuate a Closing, prior to the Outside Closing Date, as defined in the Agreement.



IGY Ocean Bay Properties Limited
c/o Island Capital Group LLC
July 5, 2007
Page 2


    Upon the exchange of mutual releases between Seller and Purchaser,
Seller will return to the Purchaser the deposit under the Agreement.

       Very truly yours,

       Ocean Bay Properties I Limited
       Ocean Bay Properties II Limited and
       British Colonial Development Co. Limited

       By: _____
       Jürg Gassmann
       Director and Secretary, Ocean Bay Properties I Ltd.
       Director and Secretary, Ocean Bay Properties II Ltd.
       British Colonial Development Co. Ltd.


cc:  David Bolen, Esq.

IGY Ocean Bay Properties Limited
c/o Island Capital Group LLC
July 5, 2007
Page 3


Greenberg Traurig LLP
200 Park Avenue
New York, New York  10166
Attn:  David Bolen, Esq.



Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

IGY OCEAN BAY PROPERTIES LIMITED
and ISLAND GLOBAL YACHTING LTD.          :

         Plaintiffs,                    :

        -against-                     :          Civil Action No. 07-10520

OCEAN BAY PROPERTIES I LIMITED,          :
OCEAN BY PROPERTIES II LIMITED,
BRITISH COLONIAL DEVELOPMENT             :
COMPANY LIMITED, PRK HOLDINGS            :
LTD., ADURION CAPITAL LIMITED            :
and GEORGE ALLEN,
                         :

        Defendants.
_____X

### DECLARATION OF EUGENE FRASER REGARDING DEFENDANT PRK HOLDINGS LTD.'S MOTION TO DISMISS THE COMPLAINT

Eugene Fraser, pursuant to 28 U.S.C. § 1746, declares under the penalties of perjury under the laws of the United States of America, that the following is true and correct:

1.     I was President of PRK Holdings Ltd., a named Defendant in this action ("PRK"), in 2006 and 2007.

2.     I have personal knowledge of the facts contained in this Declaration, and I submit this Declaration in support of PRK's motion to dismiss the Complaint as to the claims asserted against it, specifically the Fifth, Sixth and Seventh Causes of Action.

3.     PRK is a limited liability company organized under the laws of the Commonwealth of the Bahamas, with its principal place of business in Nassau Bahamas, and its registered office at The Centre of Commerce, 1 Bay Street, Suite 400, Nassau, Bahamas.

4.     Therefore, Paragraph 19 of the Complaint is incorrect as it alleges that PRK is a corporation organized under the laws of Canada.

5.      When the Purchase Agreement was signed on or about November 7, 2005, PRK was the 100% shareholder of each of Ocean Bay Properties I Limited, Ocean Bay Properties II Limited, and British Colonial Development Company Limited, but it was not a party to the Purchase Agreement described in the Complaint.

6.      As of December 22, 2006, PRK no longer owned any shares or had any other interest in any of the entities associated with the transaction at issue or parties to the Purchase Agreement.

7.      PRK was never intended to be a party to the Shareholder's Agreement referenced in the Complaint.

8.      PRK does not do or transact any business in the State of New York; in fact, any business that it has ever conducted was centered in Nassau, Bahamas.

8.      PRK is not, and never has been, incorporated in the New York State, nor has it ever been authorized to do business in New York State.

9.      PRK does not maintain, nor has it ever maintained, any offices in New York State, nor does it maintain a mailing address in New York State.

10.     PRK does not have, nor has it ever had, any employees, personnel, agents or representatives located in New York State.

11.     PRK does not have, nor has it ever had, a telephone or facsimile line or phone number in New York State.

12.     PRK has never pursued and is not currently pursuing any contracts or business in New York State.

13.     PRK does not transact any business within New York State, nor does it contract outside New York State to supply goods within New York State.

14.     PRK does not own, lease or rent any real property in New York State.

15.    PRK does not have any bank accounts or other assets located in New York State.

16.    PRK does not have, nor has it ever had, any officer, director, employee or agent assigned to duty in New York State.

17.    PRK does not derive any revenue from goods used or consumed or services rendered in New York State.

18.    PRK does not incur or pay any taxes in New York State.

19.    The allegations in the Complaint against PRK do not refer to any business conducted or transacted in New York State.

Wherefor, the Declarant respectfully requests that all claims alleged in the Complaint against PRK be dismissed.


_____
Eugene Fraser

Executed on the 21ˢᵗ of December 2007
in *Guelph, ON* , Canada

Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

IGY OCEAN BAY PROPERTIES LIMITED and         :
ISLAND GLOBAL YACHTING LTD.                  :

                  Plaintiffs      : Civil Action No. 07-10520 (VM)
                                  :

      -against-                              :
                                  :

OCEAN BAY PROPERTIES I LIMITED,              :
OCEAN BAY PROPERTIES II LIMITED,             :
BRITISH COLONIAL DEVELOPMENT COMPANY         :
LIMITED, PRK HOLDINGS LTD., ADURION          :
CAPITAL LIMITED and GEORGE ALLEN,            :
                                  :

                 Defendants      :
------------------------------------------------------------------------x

## DECLARATION OF JÜRG GASSMANN IN SUPPORT OF ADURION CAPITAL LIMITED'S MOTION TO DISMISS

I, Jürg Gassmann, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury under the laws of the United States of America, that the following is true and correct:

1.     I am the General Counsel to, and a non-executive director of, Adurion Capital Limited ("Adurion"), one of the named defendants in the above-captioned action.

2.     I have personal knowledge of the facts contained in this Declaration and submit this Declaration in support of Adurion's motion to dismiss the Complaint in the above captioned action for lack of personal jurisdiction.

3.     Adurion is a limited liability company organized and existing under the laws of England and Wales, and its only place of business is 17-18 Old Bond Street, London W1S 4PT, England.

4.     Adurion is a mid-market investment boutique active in the London market.

5.     Adurion is not, and never has been, incorporated in the New York State.



6.     Adurion is not, and has never been, authorized to do business in New York State.

7.     Adurion does not maintain, nor has it ever maintained, any offices in New York State.

8.     Adurion does not maintain a mailing address in New York State.

9.     Adurion does not have, nor has it ever had, any employees, personnel, agents or representatives located in New York State.

10.     Adurion does not have, nor has it ever had, a telephone or facsimile number in New York State.

11.     Adurion has never pursued, and is not currently pursuing, any contracts or business in New York State.

12.     Adurion does not transact any business within New York State, nor does it contract outside New York State to supply goods within New York State.

13.     Adurion does not own, lease or rent any real property in New York State.

14.     Adurion does not have any bank accounts or other assets located in New York State.

15.     Adurion does not have, nor has it ever had, any officer, director, employee or agent assigned to duty in New York State.

16.     Adurion does not derive substantial revenue from goods used or consumed or services rendered, in New York State.

17.     Adurion does not incur or pay any taxes in New York State.

18.     Adurion has never been a party to the Purchase Agreement, dated as of November 7, 2005, between Defendants Ocean Bay Properties I Limited, Ocean Bay Properties II Limited, and British Colonial Development Company, on the one hand as "Seller", and Plaintiff IGY



Ocean Bay Properties Limited ("IGY") on the other as "Purchaser", which is described in the Complaint.

19.    Adurion was not to be a party to the prospective Shareholder's Agreement with IGY, which is also described in the Complaint.

20.    The allegations in the Complaint against Adurion do not relate to any business transacted in New York State; rather they deal exclusively with a project in Nassau in the Commonwealth of the Bahamas.

Wherefore, the Declarant respectfully requests that the Court dismiss all claims in the Complaint asserted against Adurion.

_____
Jürg Gassmann

Executed in _Grand Bend_, KS
on December 21, 2007

Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

IGY OCEAN BAY PROPERTIES LIMITED and :
ISLAND GLOBAL YACHTING LTD. :
                                  :

                         Plaintiffs      : Civil Action No. 07-10520(VM)
                                    :

        -against-                        :
                                    :

OCEAN BAY PROPERTIES I LIMITED, :
OCEAN BAY PROPERTIES II LIMITED, :
BRITISH COLONIAL DEVELOPMENT COMPANY :
LIMITED, PRK HOLDINGS LTD., ADURION :
CAPITAL LIMITED and GEORGE ALLEN, :
                                    :

                       Defendants    :

---------------------------------------------------------------------------x

### DECLARATION OF GEORGE ALLEN IN SUPPORT
### OF DEFENDANTS' MOTION TO DISMISS

     I, George Allen, pursuant to 28 U.S.C. § 1746, declare under the penalties of perjury under the laws of the United States of America, that the following is true and correct:

     1.     I am a named defendant in the above-captioned action.  I am submitting this Declaration in support of my motion to dismiss the complaint in the above captioned action for lack of personal jurisdiction.  I have personal knowledge of the matters described herein and would be competent and willing to testify to those matters if called upon to do so.

     2.     I am a resident of the State of Florida.  I currently reside at 141 Passage Island, Vero Beach, Florida, 32963, and I have resided in Florida for twenty-nine (29) years.

     3.     I do not own, lease, or possess any real property in New York State.

     4.     I do not regularly travel to New York State.

     5.     I do not own any interest in any companies or businesses located in New York State.

6.     I do not maintain an office in New York State.

7.     I do not have a mailing address in New York State.

8.     I do not have a telephone or facsimile number in New York State.

9.     I do not derive any substantial revenue from any goods used or consumed or services rendered in New York State.

10.     I do not have any employees, agents, personnel or representatives located in New York State.

11.     I am not a party to any contracts with any companies or businesses in New York State, nor am I a party to any contract, the subject matter of which concerns any property or business in New York State.

12.     I am currently not pursuing any contracts or business that are to be performed, or concern any goods or services, in New York State, nor was I during the relevant time period.

13.     I am not a party to the Purchase Agreement, dated as of November 7, 2005, between Defendants Ocean Bay Properties I Limited ("OBI"), Ocean Bay Properties II Limited ("OBII"), and British Colonial Development Company ("BCDC"), on the one hand as "Seller", and Plaintiff IGY Ocean Bay Properties Limited ("IGY") on the other as "Purchaser", that is described in the Complaint.

14.     I was not to be a party to the prospective Shareholder's Agreement with Plaintiff IGY Ocean Properties Limited, also described in the Complaint.

15.     Neither I nor any company or business in which I have any interest transacts any business within New York State, nor have we contracted outside New York State to supply goods within New York State.

16.     I do not have any bank accounts or other assets located in New York State.

17.     I do not incur or pay any taxes in New York State.

2

18.     Prior to the execution of the Purchase Agreement which occurred on or about November 7, 2005, I had a few meetings in New York State with Marc Levy, IGY's Senior Managing Director at IGY's New York office regarding the Purchase Agreement in late 2004 and 2005. I traveled from Florida for those meetings.

19.     Also prior to the execution of the Purchase Agreement, I had a few meetings in the New York offices of the attorneys for the parties to the Purchase Agreement.

20.     None of the allegations specifically asserted against me in the Complaint relate to my conduct in New York State.

21.     I have corresponded or spoken with Andrew Farkas (the principal of IGY) and Marc Levy by email and occasionally by phone (including by cell phone) while I was either in Florida or the Bahamas. At different points while corresponding with them, Messrs. Farkas and Levy were in various locations worldwide, including St. Thomas and Dubai, and New York. I have also met with Andrew Farkas and Marc Levy as well as other IGY personnel in Florida and the Bahamas.

Wherefore, the Declarant respectfully requests that all claims alleged in the Complaint against him be dismissed.


George Allen

Executed in Vero Beach, Florida  on December 20th, 2007

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
IGY OCEAN BAY PROPERTIES LIMITED and        :
ISLAND GLOBAL YACHTING LTD.                 :
                                            :
                          Plaintiffs        :
                                            :
            -against-                       :
                                            :  07-CV-10520 (VM)
OCEAN BAY PROPERTIES I LIMITED,             :
OCEAN BAY PROPERTIES II LIMITED,            :
BRITISH COLONIAL DEVELOPMENT COMPANY        :
LIMITED, PRK HOLDINGS LTD., ADURION         :
CAPITAL LIMITED and GEORGE ALLEN,           :
                                            :
                          Defendants
-----------------------------------------------------------------------x

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Morin

Declaration, along with the exhibits referenced therein, in support of (i) PRK Holdings

Ltd., Adurion Capital Limited, and George Allen's Motion to Dismiss pursuant to Fed. R.

Civ. P. 12(b)(2); (ii) PRK Holdings Ltd., Adurion Capital Limited, and George Allen's

Motion to Dismiss, filed in the alternative, pursuant to Fed. R. Civ. P. 12(b)(6); and (iii)

British Colonial Development Company, Ocean Bay Properties I Limited, and Ocean Bay

Properties II Limited's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) have been

hand-delivered and furnished by electronic mail on December 24, 2007 to:

>       Simon Miller
>       Greenberg Traurig, LLP
>       200 Park Avenue
>       New York, New York 10166

counsel for Plaintiffs.

Dated: New York, New York
       December 24, 2007

Ryan P. Poscablo
WEIL GOTSHAL & MANGES
767 Fifth Avenue
New York, New York 10053
212-310-8000